**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY WOLF, VALERIE DELLORTO, MELISSA ARREDONDO, JENNIFER BELLUCCI on her own behalf and as parent and next friend to A.J.B., A.E.B, and A.O.B, minors, ROBIN BETZ, NATHAN CLYMER, on his own behalf and as parent and next friend of P.C., a minor, SHAY JARM, AMY KING, and HEATHER LISSER, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| Plaintiffs, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| ACCREDO HEALTH GROUP, INC., EXPRESS SCRIPTS, INC., EVERNORTH HEALTH, INC., and THE CIGNA GROUP, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

NOW COME Plaintiffs, Valerie Dellorto, Kimberly Wolf, Heather Renee Lisser, Shay Jarm, Melissa Arredondo, Jennifer Bellucci as parent and next friend of A.J.B., A.E.B., and A.O.B., Robin Betz, Nathan Clymer as parent and next friend of P.C., and Amy King, individually and on behalf of all others similarly situated, by their attorneys LOEVY & LOEVY, and for their complaint against Defendants Express Scripts, Inc., Accredo Health Group, Inc., Evernorth Health, Inc., and The Cigna Group allege as follows:

### INTRODUCTION

1.      Federal antitrust law forbids companies from rigging markets, even when they hide the scheme behind complex contracts. Defendants did that here in the delivery of specialty

1

prescription drugs. Using their market power over PBM services, Defendants, the Cigna Group and its affiliates Evernorth and Express Scripts, tied those services to their affiliated specialty pharmacy, Defendant Accredo, and used exclusivity to shut out competing pharmacies. That creates a choke point over medicines millions of people rely on—especially patients with chronic, complex, and rare conditions, including those covered by employer plans and public programs like TRICARE. The result is higher costs, no meaningful choice, and medication delays and denials that predictably worsen serious disease and can place patients' lives at risk.

2.     The real-world impacts of Defendants' monopolistic takeover of the healthcare system are readily apparent wherever one looks. Victims abound.

3.     For example, in December of 2024, without any warning Defendant Accredo ceased delivering Plaintiff Melissa Arredondo's ulcerative colitis and hidradenitis suppurativa medication. The resulting eight-month delay led to uncontrolled disease progression that required Melissa to make multiple visits to the emergency room and undergo surgery to remove a large, rapidly growing mass.

4.     Since 2023, Plaintiff Nathan Clymer and his son P.C. have faced frequent delays in the delivery of medications for P.C.'s Kabuki syndrome and systemic juvenile idiopathic arthritis that put P.C. at risk of life-threatening macrophage activation syndrome.

5.     On multiple occasions, and most recently in February 2025, Accredo's failure to deliver medication to organ transplant recipient and Plaintiff Heather Lisser have forced her to go to the hospital to obtain an emergency dose of the drug that keeps her body from rejecting— with potentially disastrous consequences—her transplanted organ.

6.     Plaintiffs, on behalf of themselves and several Classes of similarly situated citizens, bring this complaint to redress injuries caused by Defendants' negligence and

exclusionary and anticompetitive conduct that has enabled Defendants to acquire, maintain, and exercise monopoly power in the relevant market. Defendants' conduct has resulted in supracompetitive prices, reduced competition, and impaired access to medically necessary care, harming patients and other market participants. Plaintiffs seek compensatory damages and targeted injunctive relief to halt the challenged practices and prevent their recurrence.

## BACKGROUND

7.      Plaintiffs in this case all suffer from chronic health conditions—including painful inflammatory diseases, genetic disorders, and organ transplants. To manage symptoms, they rely on life-saving and life-sustaining medications. Indeed, modern medicine has made it possible for Plaintiffs to lead largely symptom-free lives. But if Plaintiffs do not receive their prescribed drugs on time and on the schedule, as ordered by their medical providers, they face serious adverse health consequences—including severe pain, anaphylactic shock, rejection of transplanted organs, uncontrolled disease progression, and drug resistance brought on by inconsistent access to medications.

8.      Plaintiffs rely on their pharmacy—Defendant Accredo Health Group, Inc. ("Accredo")—to obtain their prescription drugs on-time and on-schedule.

9.      Accredo is a specialty pharmacy. It dispenses so-called "specialty drugs"—a category of particularly expensive drugs that includes the medications Plaintiffs depend on. Accredo operates via home delivery and has no brick-and-mortar locations.

10.     Treating "complex and chronic health conditions," including the serious illnesses that Plaintiffs suffer, is Accredo's stated purpose as a specialty pharmacy. And in its patient-facing materials, Accredo repeatedly emphasizes that it understands the vital importance of the

medications it dispenses to the health of its patients. It promises to provide expert care and deliver these prescription drugs to patients safely and precisely.

11.     Accredo fails to live up to these promises in ways that are shocking both for their systemic callousness and for the danger they create to Plaintiffs and those similarly situated.

12.     Patients who are required to use Accredo to fill covered prescriptions routinely encounter significant administrative barriers to obtaining medications, including routine refills. Patients often must make repeated calls, endure lengthy hold times, and are transferred between representatives without resolution. They are frequently given inconsistent or inaccurate information regarding refill status, prior-authorization requirements, or shipment dates, forcing them to restart the process and resulting in delays and interruptions in therapy. These obstacles are systemic and recur across patients.

13.     Defendants designed and maintain these processes to increase friction and attrition, reducing the number and quantity of prescriptions ultimately dispensed through Accredo. In so doing, Defendants create "savings" that they pass back upstream to attract and retain the PBM business of health insurance plan clients—thereby manufacturing the appearance of efficiency by outsourcing the cost onto patients.

14.     Meanwhile, the roadblocks and delays—of days, weeks, and often months—in the delivery of prescription medications harm patients and leave them in a constant state of stress and anxiety, worrying whether their next dose of medication will arrive on time or at all.

15.     In a free market, such egregious mistreatment of customers would be untenable because open competition would quickly put the offender out of business. Accredo would be forced to either reform itself or close its doors. But Defendants deprive Plaintiffs and other similarly situated patients of the power to take their business elsewhere.

16.     Plaintiffs all have insurance plans that contract with Accredo's corporate affiliate, Defendant Express Scripts, Inc. ("Express Scripts"), and corporate parent Defendant Evernorth Health, Inc. ("Evernorth"). Express Scripts, Evernorth, and Accredo are all part of one vertically and horizontally integrated health care mega-conglomerate: Defendant the Cigna Group ("Cigna").

17.     Express Scripts is a pharmacy benefit manager ("PBM"). In the legal construct Defendants are using, the PBM manages pharmacy benefits on behalf of the health insurer. It is set up as a titular middleman which moves the money and provides the connective tissue between the health insurers, pharmacies, and the drug manufacturers who sell the drugs into the system.

18.     Express Scripts is often identified as the largest PBM in the United States. It administers pharmacy benefits on behalf of tens of millions of Americans, including Plaintiffs.

19.     In addition to serving private insurer clients, Express Scripts is also the PBM used by TRICARE, the government healthcare program for current and retired members of the United States Armed Forces and their families.

20.     Among other functions, Express Scripts, working closely with its corporate parent Evernorth, categorizes medications as specialty drugs and creates and maintains networks of pharmacies at which patients may use their pharmacy benefits.

21.     Patients have no say as to which PBM their health insurance plan uses, which drugs that PBM defines as specialty, or which pharmacies that PBM chooses to dispense specialty drugs. Moreover, even when patients are given a choice of health plans (an increasingly rare occurrence) they are not given insight into what PBM or specialty pharmacies any given insurance plan will lock them into. Furthermore, because switching PBMs requires switching

health insurance (which can be costly and, as a practical matter, requires changing jobs for most working-age Americans who receive their health insurance as a benefit through their employment), patients are locked-in to the PBM and its policies.

22.     Knowing they have a captive customer base of patients who both badly need medicine and must use whatever options Express Scripts and Evernorth make available in order to apply pharmacy benefits, Express Scripts and Evernorth use their authority to define some of the most profitable dispensing opportunities as "specialty" drugs, explicitly exclude Accredo's rivals from dispensing specialty drugs to their captive patients, and ultimately capture the market for their corporate affiliate: Accredo. Cigna coordinates and facilitates this enterprise and reaps the profits.

23.     Freed from the need to compete with other pharmacies on cost or quality, Accredo and the other Defendants then inflate prices and degrade the quality of specialty pharmacy services in order to extract monopoly rents from this captive customer base.

24.     Simply put Defendants get rich profiting from the inconvenience, indignity, and poor health outcomes they force Plaintiffs and other similarly situated patients to suffer.

25.     Under these circumstances, Accredo's failure to provide pharmacy services consistent with industry standards and the applicable standard of care constitutes negligence and breaches its contractual and other obligations to patients. The resulting strain on public health infrastructure constitutes a public nuisance. And the anticompetitive conduct by Defendants that insulates Accredo from competition and locks patients into its abusive practices violates federal antitrust law and state consumer-protection statutes.

26.     Plaintiffs bring this action on behalf of themselves and three proposed Classes— the Private Insurance Statutory Claims Class, the TRICARE Class, and the Accredo Common

Law Claims Class—to obtain monetary relief for the harms they have suffered and injunctive relief to reform Defendants' practices so that this system no longer jeopardizes the health and well-being of themselves and their families.

**PARTIES**

## I.    Plaintiffs

27.    Plaintiff Kimberly Wolf is a resident of and domiciled in Aurora, Illinois. Kimberly suffers from ankylosing spondylitis, an inflammatory condition affecting the spine, and chronic urticaria, leading to hives across her body. Though these conditions can be mitigated by the Humira, Xolair, and Cimzia prescriptions she fills through Accredo, Kimberly continues to struggle to receive her medications on time and has experienced severe delays because of Accredo, including a two-month period in which she suffered from burning sensations, gastrointestinal issues, and extreme back pain without a dose of Humira. Despite repeatedly requesting otherwise, Kimberly has been told by her health insurer that she has no choice but to use Accredo for specialty pharmacy services.

28.    Plaintiff Valerie Dellorto is a resident of and domiciled in Berwyn, Illinois, and receives insurance coverage through her employer. Valerie suffers from severe asthma and psoriatic arthritis, a chronic autoimmune disease that causes painful swelling and stiffness in her joints. Her symptoms can be almost entirely mitigated with proper medication, but Valerie experienced persistent struggles with Accredo to receive her medications in a timely manner, including a four-month period during which Accredo refused to fill two separate prescriptions written by her rheumatologist. Despite seeking help from her insurer, Valerie was told that she had no choice but to use Accredo to fill her specialty medications.

29.    Plaintiff Melissa Arredondo is a resident of and domiciled in Hanford, California. Express Scripts requires Melissa to use Accredo to fill prescriptions for specialty medicines to

treat ulcerative colitis and hidradenitis suppurativa. Both of these conditions are chronic and painful inflammatory conditions, but they can be well-controlled with medication. Melissa has experienced persistent obstructions in obtaining her medications from Accredo, which has caused her to seek emergency room treatment for her conditions on multiple occasions. During one such delay, Melissa needed to get surgery because her uncontrolled hidradenitis suppurativa symptoms had caused a large and extremely painful lump to form in her armpit that required removal.

30.     Plaintiff Jennifer Bellucci sues as parent and next friend of her children, A.J.B., A.E.B., and A.O.B. All are residents of and domiciled in Schertz, Texas. Jennifer's husband is a veteran, and the family is insured through TRICARE, which uses Express Scripts as its PBM. As a result, Jennifer must use Accredo to fill her children's prescriptions for specialty drugs to treat their pediatric arthritis. Accredo has caused A.J.B., A.E.B., and A.O.B. persistent and confusing delays in the prescription filling and delivery of their drugs. On one recent occasion, Jennifer had to drive seven hours to and from Texas Children's Hospital in Houston to obtain a bridge prescription so that A.J.B. would not miss a dose while Accredo obstructed and delayed.

31.     Plaintiff Robin Betz is a resident of and domiciled in Redwood City, California, and had pharmacy benefits managed by Express Scripts until July 2025 at her former employer. Express Scripts required Robin to use Accredo to fill her prescription for Xolair. Xolair is a specialty drug that Robin takes to treat chronic idiopathic urticaria, a skin condition that causes painful hives but which can be well-controlled with medication. Robin had persistent difficulty getting her prescription refilled and missed many doses as a result, forcing her to endure painful full body rashes that are otherwise controlled by her medication.

32.     Plaintiff Nathaniel Clymer sues as parent and next of friend of his son, P.C. Both are residents of and domiciled in Mechanicsburg, Pennsylvania. Express Scripts requires that P.C. obtain specialty medications to treat health complications associated with Kabuki syndrome, a genetic disorder, and systemic juvenile idiopathic arthritis, a chronic inflammatory disease, from Accredo. P.C. has had persistent difficulty getting his prescription for Ilaris refilled and is frequently a week late taking a dose, contributing to chronic inflammation.

33.     Plaintiff Shay Jarm is a resident of and domiciled in Cedarburg, Wisconsin, and is insured through Common Ground Healthcare Cooperative. Shay suffers from psoriatic arthritis and has no choice but to fill her prescriptions through Accredo. On multiple occasions, Shay has been subject to extensive delays in medication shipment, including a two-month period during 2025 where she was unable to receive her prescription for Cosentyx. Shay has also had billing issues with Accredo, has been forced to deal with worsening symptoms and suspected resistance to her medication, and experiences ongoing anxiety about missing doses.

34.     Plaintiff Amy King is a resident of and domiciled in Arlington, Virginia. She is in a military family and is insured through TRICARE, which uses Express Scripts as its PBM. Express Scripts requires Amy to use Accredo to fill her prescription for Entyvio, a specialty medication she takes to treat ulcerative colitis. Amy has had persistent difficulties refilling her medication through Accredo, which forces her to spend hours on the phone navigating its refusals each time she is due for a refill, hoping she will give up. Amy persists because delayed dosses can cause her to develop antibodies that make this vital medication less effective for her condition. She is constantly distressed by Accredo's campaign delaying medications.

35.     Plaintiff Heather Lisser is a resident of and domiciled in Monroe, Wisconsin. Express Scripts requires her to use Accredo to fill a prescription for anti-rejection medicine that

she needs after receiving an organ transplant. Failure to take this medicine as prescribed can result in her immune system attacking the transplanted organ, with potentially fatal consequences. Heather has experienced persistent difficulties with and delays by Accredo when she has needed to obtain authorization for refills of her medication. On one occasion in or around January 2025, she ran out of pills as a result of these delay tactics and was forced to source an emergency bridge refill on her own and drive an hour to a UW Health Pharmacy Services facility to acquire it.

## II.     Defendants

36.     Defendant The Cigna Group ("Cigna") is a Delaware corporation with its principal place of business in Bloomfield, Connecticut. Cigna operates an integrated health-services enterprise, as Cigna describes it, insuring health risks while providing medical benefits with pharmacy "solutions" and downstream dispensing capabilities, all under common ownership and strategic direction.

37.     Cigna publicly describes its two enterprise "growth platforms": (i) Defendant Evernorth Health, Inc., d/b/a Evernorth Health Services ("Evernorth") and (ii) Cigna Healthcare. Cigna further states that these two platforms "work together" to create "cross-enterprise leverage," enabling the enterprise to move from "solution creation" to market quickly across Cigna's combined medical and pharmacy relationships.

38.     Under Cigna's structure, Evernorth includes the PBM and specialty pharmacy businesses at issue here, as well as a mail-order retail pharmacy business and the provision of other services related to pharmacy benefit management. These specifically include Defendants Express Scripts, Inc. d/b/a Express Scripts Pharmacy Benefit Services ("Express Scripts") and Accredo Health Group, Inc. d/b/a Accredo Specialty Pharmacy and Accredo by Evernorth

("Accredo"), which Cigna cohesively markets under the Evernorth brand as part of the Evernorth platform with Evernorth imagery and trade markings.

39.   Evernorth explicitly purports to offer "coordinated health solutions and capabilities" among these businesses and operating segments.

40.   Express Scripts is a Delaware corporation with its principal place of business in St. Louis, Missouri. It operates as Evernorth's PBM. As the PBM, Express Scripts is the "gatekeeper" for prescription medication access: it administers pharmacy benefits, adjudicates claims, designs and administers formularies, sets network participation rules, and enforces utilization controls that determine whether and how patients can obtain prescribed medications.

41.   Accredo is a Delaware corporation with its principal place of business in Memphis, Tennessee. It operates as a specialty pharmacy that dispenses high-cost specialty medications for complex and chronic conditions. Cigna itself describes its specialty pharmacy operations as "anchored by Accredo," meaning, Accredo is the downstream dispensing channel through which specialty drug demand is fulfilled when the PBM's rules require or compel that outcome.

42.   Evernorth—and by extension, Express Scripts and Accredo—is not a peripheral affiliate of Cigna. It is the core engine of Cigna's business and earnings. In Cigna's own segment reporting, Evernorth accounts for a massive portion of consolidated revenue and segment income, making Evernorth's performance financially vital to Cigna and its shareholders. For example, Cigna's 2024 Annual Report and Form 10-K shows that Evernorth was responsible for nearly 82% of total revenues that year.

43.   Evernorth's centrality to Cigna's business and the importance of Express Scripts and Accredo are reflected in Cigna's corporate governance. The portfolio of Cigna's President

and Chief Operating Officer, Brian Evanko, directly includes responsibility for Evernorth's operations. Evernorth's leadership team, meanwhile, includes Adam Kautzner, Pharm.D., President of Express Scripts and Evernorth Care Management, as well as Matt Perlberg, President of Pharmacy & Care Delivery for Evernorth (which includes Accredo). Evanko, Kautzner, and Perlberg are all members of Cigna's Enterprise Leadership Team, and Cigna's website identifies all three as members of its leadership.

44.     In short, Defendants share senior leadership who collaborate at multiple levels of Cigna's corporate structure and, as officers of Cigna, are responsible for integrating the activities of Accredo, Express Scripts, and Evernorth into a coherent business strategy directed from the highest levels of Cigna's executive leadership for the benefit of Cigna and its shareholders.

45.     This ownership and operational alignment creates a conflict of interest: the same corporate family that decides what prescriptions are covered, under what conditions, and through which channel, also owns the dispensing channel that profits when prescriptions are routed to its affiliated pharmacy.

## JURISDICTION AND VENUE

46.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Plaintiffs' claims arise under federal law and 15 U.S.C. § 15 because Plaintiffs allege injury by reason of conduct forbidden by federal antitrust laws.

47.     This Court independently has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because, given the number of patients served by Accredo, the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendants. The proposed class has more than 100 members. 28 U.S.C. § 1332(d)(5)(B).

48.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal claims.

49.     This Court has personal jurisdiction over Defendants because they regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and/or services provided to persons in this District.

50.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District and some of the events giving rise to the claims occurred in this District.

51.     Venue is further proper in this District pursuant to 15 U.S.C. § 22 because this case is a proceeding against a corporation pursuant to the antitrust laws of the United States, and Defendants transact business in this District.

## FACTS

### I.     Accredo Systemically Fails Patients

#### A.     Accredo publicly commits to providing reliable and supportive specialty pharmacy services to patients with chronic and/or severe medical conditions

52.     As a specialty pharmacy, Accredo provides pharmacy services to patients, including by filling and refilling prescriptions for specialty drugs, providing patients with instructions about how to handle and take their medications, coordinating with the PBMs managing patients' pharmacy benefits to verify coverage and facilitate payment, and communicating with patients' medical providers when necessary. It operates on a mail-order basis only and has no brick-and-mortar locations. It usually ships drugs directly to patients, but in some circumstances it may ship drugs to patients' medical providers if those medications must be administered in a clinical environment.

13

53.     Accredo only fills so-called "specialty" medications.

54.     There is no standard definition of "specialty medications," and no governmental or private entity sets industry-wide standards for determining whether to classify a medication as specialty. Accredo's parent company, The Cigna Group, defined the term in its 2024 annual report to shareholders as "high-cost medications for the treatment of complex and rare diseases."

55.     Accredo holds itself out as serving people with "complex and chronic health conditions," including cancer, rheumatoid arthritis, hepatitis C, HIV, bleeding disorders, and multiple sclerosis.

56.     As Accredo knows, patients with these and other chronic and/or severe health conditions require timely doses of their specialty medications to prevent life-threatening complications, disease progression, the development of drug resistance, and the resurgence of painful symptoms.

57.     Accredo presents itself to patients and the broader public as a valued and important part of the care team for vulnerable patients facing such chronic and/or severe health conditions.

58.     For example, Accredo's patient-facing materials represent that it understands the challenges faced by patients with complex and chronic conditions and commits to providing expert care to each patient.

59.     Accredo further represents that it is easy for patients to manage their prescriptions with Accredo and promises to "help [patients] manage your health condition so you can focus on living your life."

60.     On the home page of Accredo's website[1], visitors are greeted by a video with narration promising that "[Accredo ensures] your medication is delivered safely, precisely as it should be," that "we're here 24/7… [to] make your treatment as manageable as possible," and that "[Accredo has] a whole team dedicated to supporting you every step of the way."

61.     In the "Frequently Asked Questions" section of the website[2], Accredo touts that "we are dedicated to providing personalized care and support to each and every one of our patients," "[o]ur team of pharmacists and nurses are specialty-trained in a variety of conditions, ensuring that you receive the highest level of care possible," and that "[y]our health and well-being are our top priorities, and we are here to help every step of the way."

62.     In the Accredo website's "About" page[3], customers find statements that promise "[c]omplete coordination of care" and "[s]afe, prompt delivery of medications."

63.     Furthermore, in the "Patient Bill of Rights" section of Accredo's patient handbook, Accredo promises that:

As an Accredo patient, you have the right to:

1.      Be treated with dignity, courtesy and respect. . . .

6.      Receive information in a way you can understand to help you make informed decisions about your care.

7.      Be involved in decisions regarding your care.

8.      Be informed of the nature, purpose, frequency and outcomes, including potential unexpected outcomes of service. . . .

10.     Expect timely delivery of service. . . .

12.     Expect us to coordinate care with your prescriber and other providers. . . .

---

[1] https://www.accredo.com/
[2] https://www.accredo.com/frequently-asked-questions
[3] https://www.accredo.com/about

18. Be free from mental, physical, sexual and verbal abuse, neglect or exploitation.

64. Even setting aside such public-facing statements, Accredo employs a staff of licensed pharmacists. On information and belief, at least one Accredo executive with responsibility for overseeing this team of pharmacists is also a licensed pharmacist.

65. As trained pharmacists, such professionals are aware of the drugs Accredo dispenses, the chronic and/or severe conditions those drugs are approved to treat, and the medical consequences and complications that can occur when patients do not take timely doses of their specialty medications.

66. In summary, Accredo justifies its existence with a pledge to serve people who are seriously ill with chronic and/or severe conditions. Accredo knows that such patients will likely suffer adverse health effects if their specialty medications are not timely dispensed and delivered, and that such consequences can be severe.

**B.     Systemic failures of Accredo's business operations force patients to endure long delays in obtaining their medications**

67. Because Accredo deals in expensive specialty drugs that treat chronic and severe conditions, Accredo must address the same set of common issues—regardless of the particular medication patients take—to fill or refill a prescription. These include issues related to insurance coverage and authorization, prescriber communications, and billing.

68. Accredo knows that it lacks the systems, staff capacity, and training necessary to expeditiously resolve these issues which are completely foreseeable and are likely to and frequently do arise when providing specialty pharmacy services to patients, including Plaintiffs and other Class Members.

i.   *Accredo fails to provide patients with important information, adequately maintain patient accounts, document issues or steps taken to resolve those issues, or train its patient-facing staff*

69.    Although Accredo knows these issues can prevent prescription refills or delay medication delivery of medication, it does not timely call or otherwise notify patients when such issues arise which prevent it from filling a prescription. If the patient does not proactively call to monitor their refills, they only discover the problem when their medication is not delivered. Accredo thereby delays the resolution and dispensing, avoiding or delaying costs the plans are contracted to bear.

70.    When patients do call, they typically must navigate and endure an opaque and senseless labyrinth of dead ends, inaccurate information, and miscommunication that leaves them in constant apprehension as to when—and even if—the medication they need to manage painful symptoms will ever arrive.

71.    Accredo intentionally puts the onus on patients to navigate its broken process even though it also fails to maintain or provide adequate information for patients to resolve issues.

72.    Accredo provides patients with only minimal written information, such as receipts accompanying delivered medications and a bare-bones online portal.

73.    These sources of written information fail to provide patients with even basic information about their accounts, such as account or incident tracking numbers, that could assist in the resolution of issues.

74.    Similarly, the online portal provides information of only limited usefulness. The portal purports to provide a prescription tracker for "live updates," but this tracker only supplies information at a high level of generality. For example, the prescription tracker might inform a patient that their medication is at the "pharmacy review" stage. But the prescription tracker

17

provides no information regarding issues that may prevent Accredo from filling a prescription, no way to resolve the issue online, no way to use the web portal to ask for more information, and no account or incident tracking numbers that could assist in the resolution of issues.

75.     Accredo requires patients to resolve any prescription issues over the phone.

76.     Although Accredo's website lists multiple phone numbers that ostensibly serve different customer service purposes, all of these numbers feed into the same customer support system staffed by the same group of poorly trained customer service representatives.

77.     As a result, when a patient calls Accredo, for whatever reason, they are put into a standard, general queue, regardless of the reason for their call or the number they dialed. After a usually lengthy hold period and automated questionnaire, the calls are directed to a customer service representative, known as a "Patient Care Advocate."

78.     Patient Care Advocates are not pharmacists or pharmacy technicians.

79.     Patient Care Advocates answer phone calls and are supposed to facilitate communication between patients and pharmacists, schedule medication delivery, and resolve problems impeding delivery of the medication.

80.     Because Accredo does not provide patients with detailed account information or incident tracking numbers, patients must rely on Accredo to accurately maintain internal records that are readily accessible to Patient Care Advocates when patients call. Accredo fails to do so.

81.     At the most basic level of account creation, Accredo often creates multiple internal accounts linked to the same patient, without the patient's knowledge or direction. This causes confusion and delay when a Patient Care Advocate cannot find which account a particular prescription is linked to.

82.     This failure of basic bookkeeping is all the more inexplicable considering the volume of demographic information in Accredo's possession, provided by both the patient, the prescriber, and the patient's insurance plan.

83.     Even when Accredo accurately locates the correct account for a patient, on information and belief, that account contains only limited information. It is usually linked to a patient's phone number and lists the patient's prescription and any outstanding balance owed by the patient.

84.     Patient Care Advocates do not reasonably document questions asked, concerns raised, or information given or provided in their phone conversations with patients.

85.     On information and belief, Accredo's policies and the enforcement of those policies incentivize Patient Care Advocates to take as many calls as possible as quickly as possible and/or penalize Patient Care Advocates who take too long between calls. The cumulative result of these policies is that Patient Care Advocates have no time to meaningfully document their calls.

86.     As a result, internal patient accounts accessible only by Accredo staff do not include notes or other information documenting previous communications the patient has had with Accredo. The Patient Care Advocate handling a call can neither see what the patient previously told Accredo over the phone nor what information was given to the patient on that previous occasion. Nor does the system create an internal incident tracking number that allows patient interactions and issues to be linked and marked as resolved.

87.     Worse, on information and belief, the Patient Care Advocates do not have adequate training to understand the complex and myriad reasons that prescriptions are held up and are not trained or empowered to fix the many problems created by Accredo's unnecessarily

complicated system of approvals and checks that must be satisfied before a prescription is shipped.

88.     Consequently, patients frequently speak with one Accredo Patient Care Advocate, who directs them to take a specified action. After taking that action, the patient calls back, only to be connected with a different Patient Care Advocate who is not only completely unaware of the previous interaction, but who then directs the patient to do something completely different to resolve the same problem.

89.     As part of this process, Accredo Patient Care Advocates sometimes tell patients that only an Accredo backend team has the power to solve a problem, only to then inform the patient that there is no way for them to contact the backend team to solve the problem.

90.     Accredo Patient Care Advocates often tell patients that Accredo will resolve an issue and then call them back.

91.     Because Accredo does not provide patients with incident numbers, patients have no practical way to follow-up on an issue and are left waiting and wondering whether Accredo will call them back as promised.

92.     Accredo frequently does not call back, forcing patients to start the process anew.

93.     Furthermore, patient accounts lack basic but important information about the medications patients take, and Accredo Patient Care Advocates lack the basic knowledge, familiarity, and proficiency necessary to have conversations with patients.

94.     Because Patient Care Advocates are responsible for communicating patient needs with the backend teams that often have the power to resolve issues—but that patients cannot communicate with—it is vital that the Patient Care Advocates are familiar with patients' medications and conditions.

95.     Accredo does not provide sufficient training to Patient Care Advocates to instill such familiarity.

96.     For example, many drugs, including Humira and other adalimumab products, must be kept refrigerated. Patient accounts do not provide this information and Patient Care Advocates do not know it, with the sadly predictable consequence that Patient Care Advocates often schedule such drugs for standard delivery to save costs without regard to refrigeration requirements. This results in the medication overheating, which renders it ineffective.

97.     Moreover, Accredo's systems only allow Patient Care Advocates to deal with a single problem at a time. A patient may be told that their medication cannot be filled because they owe an outstanding balance. The patient may correct that payment issue, call back (and go through the same tedious process of sitting on hold and answering questions), only to be told that there is an entirely separate problem related to their insurance.

98.     Accredo could explain all such issues to the patient at once, so that everything can be expeditiously corrected, but it does not—instead forcing the patient to go through serial rounds of calls, corrective actions, and the discovery of additional problems. This process can be so time-consuming that prior authorizations expire before Accredo finally gets around to filling the medication, requiring the patient to make even more calls to renew the authorization.

99.     For patients, like Plaintiffs and other Class Members, for whom delivery of medication is time sensitive, the cumulative effect of these broken systems is delay in the delivery of their medications ranging from days to months.

> ii.     *Accredo fails to address common and foreseeable issues that delay dispensing*

100.    Beyond these account maintenance problems, Accredo is guilty of similar systemic failures in resolving the substance of common problems that patients experience—

including billing issues, prior authorization and insurance approvals, and problems with processing prescriptions written by patients' medical providers.

101.    Most billing issues involve problems or miscommunications with copay assistance programs in which patients participate to help make their medications affordable.

102.    Accredo never provides patients with itemized bills or invoices, but instead only provides information about the overall balance it claims patients owe.

103.    Because Accredo does not invoice patients, patients generally have no notice when something happens to cause them to have an outstanding balance. And because they are unaware, patients are likewise unable to promptly pay the remaining balance or work with their insurers or copay assistance programs to correct an inaccuracy before it results in a delay of their medication.

104.    Instead, patients learn of the problem for the first time when they try to refill their prescriptions, only to discover that Accredo has placed a hold on their account because of the billing issue.

105.    Accredo will not fill medications if there is any outstanding billing issue, even if the patient was not at fault, even if the patient had no previous notice that the problem existed, and even if the failure to fill the medication will result in a life-threatening medical condition.

106.    Issues related to insurance coverage or approval often require patients to call either Express Scripts or their insurer to resolve. Often, however, patients successfully fix the problem with Express Scripts or their insurer only to have Accredo nevertheless insist to them that the problem still exists, leading to multiple rounds of calls as both sides insist that the problem either has or has not been resolved. In the meantime, Accredo avoids filling the patient's medication and the accompanying expenses.

107. Problems processing the prescription often require communication between Accredo and the patient's medical provider.

108. When such prescription processing issues arise, Accredo routinely blames the patient's medical provider or otherwise represents to patients that their doctor—not Accredo—is the cause of the delay.

109. Usually, however, the fault lies directly with Accredo. For example, Accredo's system often mishandles prescriptions that are written to include both the brand name and the name of the generic or biosimilar version of that product (e.g. Humira and adalimumab).

110. Other times, medical providers must spend hours on the phone speaking with Accredo's poorly trained Patient Care Advocates trying unsuccessfully to resolve an issue—even as Accredo tells patients that their medications cannot be released for delivery until their doctor helps them resolve the issue. The providers are understandably reluctant and aggrieved, further complicating and delaying patients process to obtain the promised medications from Accredo.

111. Accredo does not even have a dedicated number medical professionals can use to resolve such issues. Instead, doctors trying to call Accredo to solve a problem for one of their patients must use the same general customer service line and wait in the same interminable queue as everyone else.

112. In sum, Accredo's systems avoid and delay obtaining, processing, or acting upon vital information, whether to or from patients or third parties.

113. The result is predictable. Patients wait while Accredo reaps the benefits.

      ***iii.***     ***Accredo routinely gives inaccurate or false information to patients and fails to follow-through on its promises***

114. All these problems are made worse by Accredo's common practice of giving patients incorrect information.

23

115.     On information and belief, part of the script Accredo gives to its Patient Care Advocates requires them to promise customers that Accredo will handle the problem.

116.     Accredo often does not handle the problem, and patients only get their medication delivered, if at all, after making repeated phone calls and spending hours on the phone.

117.     Similarly, when problems arise with a prescription that requires communication with a patient's medical provider, Accredo always tells patients that it will contact their doctor.

118.     Accredo often does not follow-up with the patient's doctor. To ensure the problem gets resolved, patients must separately call their medical providers and make sure that the provider is aware of the problem and repeatedly urge them to call Accredo themselves—a big ask for busy medical providers otherwise involved with patients.

119.     Accredo sometimes insists that a drug clearly covered by their insurance is not covered or not even available at Accredo, despite having previously dispensed them that drug.

120.     Accredo often tells patients that medications will be delivered by a certain date, but then does not complete the delivery at all or until much later.

121.     Such carelessness and callousness leaves patients unable to look out for their own interests. Not only are patients fooled into believing that Accredo has taken action to solve a problem when it has not, but patients often must then begin a whole new, laborious cycle of calls with Accredo to ensure that the issue actually gets resolved.

### iv.     *Accredo ignores the needs of patients who urgently require their medication*

122.     Compounding all of these problems, Accredo has no system to expedite the delivery of medications to patients in urgent need.

123.     If there is a hold on the account for any reason, Accredo's Patient Care Advocates tell patients that the computer system is locked and that they have no power to unlock it or release the medications for delivery—regardless of the patient's need for that drug. These

interactions are shielded from those with the supposed authority to make the needed decisions as Patient Care Advocates have no line of communication to the authorities.

124.    A person at risk of missing a dose or who actually has missed a dose is instead patched through to a pharmacy advice line, where they speak with a different Accredo rep. These pharmacy advice representatives also have no power to unlock or release the medications for delivery and can do little more than advise the patient on the importance of not missing a dose.

125.    Accredo does not even give pharmacy advice representatives authority to schedule medication for shipment.

126.    Instead, patients connected with the pharmacy advice line who urgently need their medications are told to contact the drug manufacturer, ask their doctor for samples, or go to the emergency room to receive their medication. In other words, Accredo offloads the duties and expenses that it is contracted to bear onto third parties, again resulting in ill-gotten profits to Defendants.

127.    Moreover, if a drug manufacturer offers a patient a replacement dose of medication that otherwise would not be covered by insurance, Accredo will not allow the manufacturer to send the replacement dose to any pharmacy other than Accredo, even if doing so would allow the patient to avoid shipping delays and more quickly resume their treatment.

128.    Finally, even once all of these issues are resolved, it still will take Accredo's backend and pharmacy teams days to process the medication—not including the time it takes to actually ship the drug to the patient.

129.    Once a patient has verified all of the necessary authorizations and scheduled a prescription for delivery, Accredo sends the prescription to the pharmacy team for review.

130.    If a pharmacist identifies an issue with a prescription during review (such as incorrect dosing or instructions), the order will be canceled or put on hold, and the patient will be sent back to step one of this process.

*       *       *

131.    All of the above points to a systemic rot within Accredo. These are not isolated problems, but are broadly experienced by Accredo patients.

132.    Accredo:

- Lacks adequate systems to organize patient account information and record communications and interactions patients have with Accredo;

- Lacks adequate systems to identify issues and problems experienced by patients, track progress toward resolutions, and mark them as closed/resolved when appropriate;

- Lacks adequate systems to train Patient Care Advocates or communicate important information about the handling of medications to the Patient Care Advocates scheduling it for delivery (for example, if it must be kept refrigerated);

- Lacks adequate systems to timely inform patients of problems with their account or prescriptions that require attention;

- Lacks adequate systems to effectively communicate with third parties— including insurers, copay assistance programs, and medical providers—to resolve problems preventing the dispensing of medications to patients;

- Lacks adequate systems to ensure that patients are provided accurate information;

- Lacks adequate systems to allow patients in urgent need of their medication to obtain that medication.

133. Other specialty pharmacies are not plagued by these problems.

134. Accredo is an outlier in its consistent deviation from industry standard practices.

135. In light of all these systemic issues, if Plaintiffs and similarly situated patients had the ability to use a different specialty pharmacy, they would. There are other specialty pharmacies actually capable of meeting these patients' needs.

**C.      Accredo's incompetence frequently causes the delayed delivery of life-saving or life-sustaining medications, which has serious consequences for patients**

136. Accredo patients—who suffer from severe and chronic illnesses—often miss doses of their medications because of the unnecessary delays caused by Accredo's inadequate systems and training explained above.

137. When patients miss doses, they may experience life-threatening complications, disease progression, the development of drug resistance, and the resurgence of painful symptoms.

138. Many patients are forced to seek emergency medical treatment to provide a bridge between doses, while others must endure debilitating symptoms.

139. Because patients have an urgent medical need to avoid these consequences, many of them plan to spend hours on the phone with Accredo every time that their medication is up for refill or reauthorization.

140. Especially for patients with chronic conditions that continually take prescription drugs over an extended period, dealing with Accredo to obtain their medication becomes akin to working a part-time job in terms of the demands on their time and attention.

27

141.    But patients generally feel that they have no choice. Only through extreme vigilance can Accredo patients do their best to get their prescriptions on time without missed doses or delays—and even then, Accredo's incompetence means that a missed dose is always a risk even for the most vigilant patients.

142.    As a result, even when Accredo delivers medications on time, the constant wrangling, uncertainty, and long hours on the phone cause patients to live in fear (and experience related emotional distress) that Accredo's senseless delays will cause them to imminently experience serious, painful, and preventable health problems.

143.    It does not have to be this way. Other pharmacies are willing and able to dispense specialty drugs and offer better-quality service—if only Express Scripts would let them compete.

## II. Cigna, Evernorth, and Express Scripts Insulate Accredo from Competition and Extract Monopoly Rents from Millions of Americans with Serious or Chronic Medical Conditions

### A.    Cigna Uses its PBM business as a self-dealing middleman

144.    Express Scripts, a direct subsidiary of Evernorth alongside Accredo and part of the Cigna Group, is among the three largest PBMs (alongside CVS Health Corp.'s CVS Caremark and UnitedHealth Group Inc.'s Optum Rx) who collectively manage approximately 79% of prescription drug claims in the United States, for roughly 270 million people.

145.    The putative purpose of these PBMs is to create economies of scale for the benefit of PBM clients—including health plans, insurers, and employers. In theory, PBMs aggregate many individual health plans into powerful blocs that have the muscle to negotiate discounts from manufacturers, control costs in distribution channels, and find efficiencies and so-called "optimization levers" that reduce drug utilization and limit health plan spending on high-cost therapies.

146.    PBMs wield this power by acting as the middleman in complex pharmaceutical supply chains connecting manufacturers, pharmacies, health insurers, and patients. Through a tangled and largely opaque web of contractual interrelationships, corporate affiliations, and horizontal and vertical integrations, the big three PBMs provide services including: claims administration and benefit management; coordinating pricing with manufacturers and negotiating rebates; orchestrating the flow of funds through the supply chain; and—crucially for purposes of this Complaint—controlling whether, how, where and when patients access the medicines they are prescribed through the creation of formularies, specialty drug lists, and pharmacy networks.

147.    Formularies are lists of covered drugs. They are usually organized into pricing tiers determined by PBM-led negotiations on behalf of insurers with drug manufacturers. If a drug is not included on a formulary at all or is on an exclusion list, then patients cannot use their pharmacy benefits to pay for that drug.

148.    For example, a formulary might be structured as follows:

| Tier | Type of Drug |
|---|---|
| Tier One (cheapest) | Generic drugs |
| Tier Two | Preferred brand-name drugs |
| Tier Three | Non-preferred brand-name drugs |
| Tier Four (most expensive) | Specialty drugs (including branded and generic specialty drugs) |

149.    Specialty drug lists define the drugs that get considered "specialty." The specialty drug list generally occupies its own tier on a formulary, and that specialty tier is typically the highest-priced tier on the formulary.

150.    As explained above, there is no standard definition of "specialty medications," and no governmental or private entity sets industry-wide standards for determining whether to classify a medication as "specialty." Although specialty drugs are generally high-cost medicines

used to treat chronic or severe conditions (such as rheumatoid arthritis, multiple sclerosis, or cancer), ultimately a drug is a specialty drug if a PBM says it is.

151. Specialty drugs account for approximately 40–50% of overall pharmacy dispensing revenue while making up only about 2% of total prescription volume. As some of the most expensive medications available for sale to the public, they are a key source of pharmaceutical revenue (and profit margin).

152. A pharmacy network is a list of pharmacies approved by a patient's insurance at which the patient can use their pharmacy benefits to purchase prescription medication. A patient who purchases a medication from an "in-network" pharmacy can use their insurance benefits to assist with the purchase, while insurance covers significantly less of the cost or pays nothing at all if the patient tries to use an "out-of-network" pharmacy.

153. PBMs further define specialty pharmacy networks consisting of pharmacies where insurance benefits can be used to obtain specialty medications.

154. The role played by PBMs in defining specialty drug lists and pharmacy networks is what creates the difference between specialty and non-specialty pharmacies. PBMs define both whether a drug is specialty and whether a pharmacy is an in-network specialty pharmacy. Thus, the terms "specialty medication" and "specialty pharmacy" reflect categories created by PBM-led corporate line-drawing.

155. Most pharmacies have the technical expertise and capacity to distribute most specialty drugs.

156. The many middleman functions performed by PBMs mean that they can tap multiple income streams at different levels in the supply chain. These include administrative and data fees, formulary pay-to-play (manufacturers paying PBMs, often in the form of higher

rebates and fees, for more favorable formulary access), rebate capture (guaranteeing a minimum rebate to clients and keeping the spread on higher actual rebates), and markup pricing (charging a plan sponsor more than the PBM actually reimburses the dispensing pharmacy), among other manufacturer- and pharmacy-related revenue streams.

157.    These income streams can further be magnified, supplemented, and diversified by adopting a vertical integration strategy that brings together multiple levels of the supply chain—including PBM services and retail and specialty pharmacies—under one corporate umbrella.

158.    This vertical integration strategy, which the three largest PBMs have all adopted, provides an engine for revenue generation in at least five ways.

159.    First, the PBM and its corporate affiliates benefit directly from the sale of pharmacy products to patients. As a result, the PBM essentially gets to double-dip, earning revenue from the sale itself and by providing the PBM services that create the infrastructure by which insurance plans reimburse pharmacies for dispensing prescription medications.

160.    Second, and relatedly, as providers of both PBM services and pharmacy services, the PBM is able to use its leverage with its clients (including health plans, insurers, and employers) as provider of PBM services (which include creating and managing formularies, specialty drug lists, and pharmacy networks) to both drive people insured by those clients to downstream affiliated businesses (including retail and specialty pharmacies) and exclude competitors of those downstream affiliates.

161.    For example, the combined ability to define drugs as "specialty" coupled with the ability to define what "specialty" pharmacies may dispense those specialty drugs creates a strong economic incentive for PBMs to expand or deploy specialty designations in ways that maximize

routing of high-revenue prescriptions into affiliated specialty pharmacies, while limiting the ability of non-affiliated pharmacies to dispense such drugs.

162. Third, vertical integration allows revenue and profits to be strategically shifted between the upstream PBM and downstream pharmacies and other affiliated businesses— meaning that, within a single corporate family, the enterprise can benefit financially even where one component's margin decreases, so long as another component's margin increases.

163. Fourth, vertical integration allows the largest PBMs to market themselves to clients as offering a comprehensive suite of products and services that can drive efficiencies through cost controls and expanded opportunities for optimization and reductions to drug utilization. These bundled offerings can make it harder for plan sponsors to unbundle services, compare alternatives on an apples-to-apples basis, or switch vendors without interruption.

164. Fifth, the size and complexity of vertically-integrated PBMs creates huge informational asymmetries between the PBM and its corporate affiliates on the one hand and clients on the other. Clients are forced to trust the accuracy of the PBM's representations with limited ability to conduct audits or other independent verification.

165. This leaves the PBM free to press its structural advantages across the supply chain to create the false appearance of efficiency to attract clients without actually creating meaningful cost-savings or better outcomes for clients or insureds.

166. Cigna epitomizes this vertical integration strategy. It combines a health insurance company (Cigna Healthcare) and a drug private labeler that sells pharmaceuticals manufactured by third parties under its own label (Quallent Pharmaceuticals), with a massive vertically-integrated PBM business operating under the Evernorth banner.

167. Furthermore, the centrality of vertical integration to Cigna's business is reflected in its governance structure. Key executives of Evernorth (including the corporate leaders of Express Scripts and Accredo) are core members of Cigna's leadership team, allowing seamless integration and coordination of business strategy, planning, and initiatives across the combined enterprise.

168. Evernorth operates Cigna's PBM (Express Scripts), specialty pharmacy (Accredo), and retail mail-order pharmacy businesses (Express Scripts Pharmacy), as well as other related businesses providing healthcare and pharmacy services.

169. Express Scripts is often measured to be the largest PBM, and it alone manages between a quarter and a third of all prescription drug claims in the United States, translating to coverage for tens of millions of Americans.

170. Cigna and Evernorth leverage the enormous market penetration of Express Scripts to drive profits across the vertically integrated conglomerate in all the ways described by the preceding paragraphs: direct sale of pharmacy products, exclusionary self-dealing, strategic synergies in revenue flows, and exploiting informational asymmetries.

**B. Express Scripts and Evernorth enter into contracts that require patients to exclusively use Accredo for their specialty pharmacy needs**

171. Express Scripts, with the involvement, direction, and assistance of its corporate parent Evernorth, contracts with plan sponsors and insurers, as well as smaller PBMs, to provide PBM services for commercial health insurance plans.

172. A "commercial health insurance plan" refers to private health insurance, as opposed to government-provided insurance (e.g., Medicare or Medicaid). In broad terms, a plan sponsor (for example, a private employer or union) contracts with an insurance carrier or other health benefit provider to provide health insurance coverage to beneficiaries. In addition to

traditional insurance, other kinds of health benefit providers include health maintenance organizations, preferred provider organizations, as well as others. For simplicity, this complaint refers to all such health benefit providers as "insurers." Plan sponsors will sometimes include pharmacy benefits in their contracts with insurers (who have an existing contractual relationship with a PBM), and other times may contract for pharmacy benefits directly with a PBM. A person's "health insurance plan" refers to the bundle of covered healthcare services and pharmacy benefits resulting from this contract between the sponsor, insurer, and (if applicable) any third-party PBM to which that person is entitled to access as a beneficiary.

173. When contracting with smaller PBMs, the smaller PBM will typically continue to provide claims administration services for its clients while Express Scripts and Evernorth take on responsibility for other PBM services, such as negotiating rebates, managing formularies, and/or maintaining pharmacy networks.

174. For example, Prime Therapeutics, the sixth largest PBM in the country, has contracted with Express Scripts and Evernorth. Prime Therapeutics primarily serves Blue Cross Blue Shield insurance plans.

175. On information and belief, these contracts last multiple years, consistent with industry practice.

176. Express Scripts and Evernorth similarly contract with TRICARE, the government health insurance program for more than nine million current and retired members of the United States Armed Forces and their families, to provide PBM services for TRICARE health plans.

177. Express Scripts and TRICARE renewed their contract in 2021, extending the Express Scripts-TRICARE relationship through at least 2029.

178.     As part of the PBM services Express Scripts and Evernorth provide their clients, they build and maintain formularies that define which medications are considered "specialty" drugs that must be obtained from a specialty pharmacy.

179.     As part of the PBM services Express Scripts and Evernorth provide their clients, they create and maintain pharmacy networks, including specialty pharmacy networks that define the pharmacies at which patients may use their insurance benefits to obtain specialty drugs.

180.     On information and belief, in creating and maintaining specialty pharmacy networks for commercial clients, Express Scripts and Evernorth do not use competitive bidding or other systems that would require pharmacies wishing to dispense specialty drugs to insureds to compete on price or quality.

181.     Instead, the vast majority of Express Scripts and Evernorth's contracts with their commercial clients require those clients to use Accredo as their designated and exclusive in-network specialty pharmacy. As a result, most patients covered by Express Scripts and Evernorth must exclusively use Accredo for their specialty pharmacy needs.

182.     Even in the rare circumstances when contractual arrangements offer patients the option of using other in-network specialty pharmacy options besides Accredo, these contracts still coerce patients to accept Accredo.

183.     For example, on information and belief, Defendants use their control over reimbursement infrastructure to prevent patients from obtaining 90-day prescriptions at pharmacies that compete with Accredo and requiring patients to pay higher out-of-pocket expenses if they use alternatives to Accredo.

184.     As a result of these exclusivity agreements and schemes, Express Scripts, Evernorth, and Accredo capture approximately 70% or more of the dispensing revenue from the sale of specialty drugs to patients insured by commercial plans that use Express Scripts.

185.     Express Scripts purports to give insureds on TRICARE plans the option of using Accredo, independent pharmacies, or pharmacies on military bases for their specialty pharmacy needs.

186.     In practice, however, Express Scripts provides only the illusion of choice. Express Scripts maintains an extensive list of maintenance drugs used to treat chronic conditions, and insureds are required to fill specialty drugs on the list either through home delivery via Accredo or at a military pharmacy. But military pharmacies often do not stock such specialty drugs and are only located on military bases, leaving Accredo as the only option reasonably available to patients who do not live on or in the immediate vicinity of a military base.

187.     The maintenance drugs on this list—which, by definition, are taken on an ongoing and continuing basis—include many of the most valuable drugs currently available to the public (including, for example, Humira and other adalimumab products). On information and belief, such drugs account for a majority of specialty drug dispensing revenues.

188.     Even for TRICARE patients filling specialty drugs that do not appear on the list of maintenance drugs, Express Scripts goes out of its way to coerce patients to select Accredo rather than independent pharmacies. For example, the scheme is set up such that patients are limited to obtaining a 30-day supply of medication if they choose to use an independent pharmacy but are promised a 90-day supply through Accredo, and patients are generally required to pay a higher out-of-pocket cost to obtain the same drug from an independent pharmacy instead of Accredo.

### C. Patients have no reasonably feasible way to opt out and use a different specialty pharmacy

189.     Patients have no input into whether their insurer or plan sponsor contracts with Express Scripts or Accredo, and they have no power to require additional in-network specialty pharmacy options or that a prescribed medication not be designated as a specialty drug.

190.     The specialty drugs Accredo dispenses are generally both too expensive for patients to purchase out of pocket and too vital for the patients' health to forgo.

191.     That leaves switching insurance providers as the only avenue for patients to gain access to a different specialty pharmacy. Put differently, the system is set up such that specialty pharmacies cannot compete with each other than by inducing the customer to upend much or all of their other healthcare services by switching insurance providers.

192.     Changing insurance plans, however, is impracticable if not functionally impossible due to the high associated costs (such as changing employment and potential disruptions to established relationships with medical providers) and enrollment periods that typically only open for a few weeks once per year.

193.     Even then, changing insurance plans to avoid a malfeasant specialty pharmacy entails more difficulty and fewer choices still. The high degree of concentration in the PBM industry means that two different insurance plans might both use Express Scripts and thus lead back to Accredo. And even if the new plan does not use Express Scripts, the PBM it uses might still itself contract with Express Scripts and thus again lead to Accredo for specialty pharmacy services. Often a patient will not even be able to determine in advance which PBM or specialty pharmacy a prospective insurer uses.

194.     For example, this means that a patient could switch employers from a company that provides pharmacy benefits via a BCBS affiliate that uses Prime Therapeutics to a new firm

with an insurance plan that uses Express Scripts. Despite seeming to experience a significant change in insurance, the patient will still be stuck with Accredo for their specialty pharmacy needs.

195.    In short, Defendants' contractual relationships with commercial health insurers, other PBMs serving commercial health insurers, and TRICARE lock millions of patients into using Accredo for their specialty pharmacy needs—with little to no opportunity to opt-out or use a different specialty pharmacy.

### D.    Defendants extract monopoly rents

196.    Having insulated Accredo from competitors, Defendants use their dominant position and captive patient base to extract supracompetitive profits from insureds who have no choice but to use Accredo.

197.    Accredo achieves this goal of extracting monopoly rents by increasing prices and degrading the quality and quantity of Accredo's specialty pharmacy services.

198.    As for prices, lack of competition enables Defendants to significantly mark up the per-unit cost of a medication above acquisition cost when calculating how much insurance should reimburse Accredo following a sale. These increased costs are passed on to patients in the form of higher cost-sharing expenses at the point of sale and higher premiums.

199.    For example, a recent Federal Trade Commission study of specialty generic drugs found that 63% of the drugs studied were marked up by more than double acquisition cost and that patient expenditures on the studied specialty drugs during the 2017–2021 study period rapidly increased at a compound annual growth rate of 21%.[4]

---

[4] *See* FED. TRADE COMM'N, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (2025), available at

200.     As for quality, lack of competition allows Accredo to offer specialty pharmacy services far below industry standards and the applicable standard of care (described at length above) without fear of patients abandoning Accredo for competing pharmacies.

201.     Defendants profit from this degradation in quality in at least two ways.

202.     First, providing sub-standard services allows Defendants to avoid substantial overhead costs that they would otherwise need to expend in a competitive market to effectively serve their patients.

203.     Second, the myriad delays patients experience when it is time to refill their prescriptions, aggregated across the millions of patients who use Accredo, amounts to a meaningful reduction in drug utilization and fewer prescription benefit claims that Defendants' insurer and plan sponsor clients must pay.

204.     Decreased utilization—especially of costly specialty drugs—is attractive to Defendants' actual and prospective health insurer and plan sponsor clients. Degrading the quality of Accredo's services provides an easy and cheap way for Defendants to deliver favorable utilization statistics to current and prospective clients, while—unbeknownst to those clients—externalizing the cost onto the patients, like Plaintiffs, who must go without.

205.     As a result, these favorable specialty drug utilization statistics help attract and retain clients. Defendants make the calculation that the short-term specialty pharmacy sales lost through their policy of delay are more than outweighed by the additional revenue gained by adding or maintaining clients and the many varied revenue streams Defendants can tap into for each such client.

---

https://www.ftc.gov/reports/specialty-generic-drugs-growing-profit-center-vertically-integrated-pharmacy-benefit-managers.

206.     Furthermore, on information and belief, Defendants use their superior access to and control of information and data about their own business operations and the broader pharmaceutical supply chain to prevent and/or hinder actual and potential clients from meaningfully investigating or reacting to Defendants' anticompetitive conduct and rent seeking.

207.     In sum, Defendants know that patients are locked in and must use specialty pharmacies included in the networks they create. Rather than using their authority over specialty drug definition and pharmacy networks to foster competition on price and quality among specialty pharmacies interested in serving these patients, Defendants instead force patients with severe and chronic illness to rely on Accredo to obtain their specialty drugs. Defendants then subject patients to inflated prices and low-quality pharmacy services, including frequent delays in the delivery of life-saving and life-sustaining medications—knowing that these patients have no choice but to endure such exploitation. In essence, Defendants use the misery of some of their sickest and most vulnerable patients to pad their bottom line.

## III.     Facts Specific to Plaintiffs

### A.     Private Insurance Plaintiffs

#### i.     *Kimberly Wolf*

208.     Plaintiff Kimberly Wolf is covered by a commercial insurance plan through Blue Cross and Blue Shield of Illinois, which uses Prime Therapeutics as its PBM.

209.     Because of contracts between Express Scripts, Evernorth, and Prime Therapeutics, Kimberly has been required to use Accredo since late 2022.

210.     Kimberly has asked her insurer to change specialty pharmacies multiple times, but these have all been denied. She has no choice but to use Accredo.

211.     Kimberly suffers from ankylosing spondylitis (a type of inflammatory disease that can cause spinal vertebrae to fuse together, resulting in pain and stiffness) and chronic urticaria

(chronic hives) and has used Accredo to fill prescriptions for Xolair, Humira, and Cimzia to treat these conditions.

212.     At the beginning of 2025, Kimberly was receiving prescriptions for both Humira and Xolair from Accredo. When her doctor recommended that she switch from Humira to Cimzia, she was shocked to learn that, without any notice from Accredo, her Xolair prescription had also been cancelled.

213.     When Kimberly called Accredo to reverse the mistake and keep her Xolair prescription on schedule, she was met with a number of baseless excuses, including issues with prior authorization, issues with the prescription sent by her doctor, and issues with patient level authorization. Despite having her doctor re-write and re-send all this information to Accredo, the issues persisted, and Kimberly's scheduled dosage date came and went without shipment.

214.     Over the next few weeks, Kimberly continued to spend hours on the phone struggling with Accredo's customer support. Without her Xolair prescription, Kimberly's symptoms began to flare, including episodes during which her eyes would swell completely shut. Even more concerning, however, were her doctor's warnings that going without medication for extended periods could lead to anaphylactic shock.

215.     Having already missed a dose, suffering from heightened symptoms, at risk of developing anaphylaxis, and making no progress resolving Accredo's issues, Kimberly was forced to make the three-hour round-trip drive to and from her allergist's office, where she was able to get an emergency sample dose of medication.

216.     Kimberly also experienced significant delays and missed doses of medication when her doctor recommended that she switch from Cimzia to a more frequent dose of Humira in June 2025.

217.     When her doctor submitted the new prescription to Accredo, Kimberly was met with excuses from Accredo about prior authorization and errors on the part of her doctor. Her doctor insisted that Accredo had received the necessary paperwork.

218.     Kimberly called Accredo to insist that her doctor had sent the necessary paperwork, but was told by an Accredo representative that her insurance had refused to cover the higher dosage. Kimberly called her insurance to clarify, and was told that this was unequivocally false, that the new dosage had already been authorized with approval sent to Accredo. Over the next several weeks, Accredo continued to insist that insurance had denied the prescription.

219.     Even a three-way phone call that Kimberly arranged between herself, Accredo, and her insurance, did not lead to resolution.

220.     In all, Kimberly went nearly two months without receiving a shipment of her medication from Accredo. Luckily, Kimberly had some medication stockpiled from previous occasions when she required surgery and had been directed by her doctors not to take the drugs. Eventually, however, this stockpile ran out and Kimberly—lacking any medication—began to experience worsening symptoms. Without her medication deliveries, Kimberly suffered from excruciating pain in her lower back, burning sensations in her hands and fingers, gastrointestinal pain, constipation, and unbearable nausea.

221.     Beyond the immediate physical consequences, Kimberly's time using Accredo has also been marred by spending countless hours on the phone with support, dealing with ongoing anxiety at the prospect of missing her medication, and living at heightened risk for developing resistance to her life-sustaining medication.

222.     Through their contracts with her insurance plan, Defendants continue to require that Kimberly use Accredo for future specialty fills, and she faces a real, immediate, and ongoing risk of recurring delays.

### ii.     Valerie Dellorto

223.     Plaintiff Valerie Dellorto's first experience with Accredo began in December 2023 when her doctor wrote a prescription for Fasenra to treat her severe asthma.

224.     At that time, Valerie was covered by a commercial health insurance plan through Cigna that used Express Scripts as its PBM.

225.     Despite her doctor submitting the appropriate prescription and prior authorization paperwork, Valerie discovered that her prescription had been denied. Confused as to what went wrong, and curious why nobody from Accredo reached out to her directly, Valerie called Accredo's customer support and began a months-long battle to receive her medication.

226.     Accredo gave Valerie several excuses, saying that, despite her doctor's orders, she did not necessarily need the medication her doctor had prescribed and that her doctor had not taken appropriate measures to rule out other conditions and medications. Valerie's doctor insisted that they had performed all appropriate tests, received results consistent with his conclusion, had successfully sampled Fasenra, and stood by his recommendation.

227.     When confronted with her doctor's insistence, Accredo made new excuses such as falsely telling Valerie that her insurance plan is the one who had not approved the prescription and that she would need to take several other steps to get the medication shipped.

228.     Over the next three months, Valerie fought through Accredo's roadblocks, spending hours on the phone with Accredo every week trying to resolve the issues. Often, Accredo placed her on hour-long holds, and, on one occasion, Accredo hung up on her. Valerie noticed that no two Accredo representatives seemed to share common information and that

Accredo's representatives could often offer no explanation beyond "delays" on Accredo's end. When Valerie sent emails to Accredo, she would often be ignored or forced to wait several days for a response.

229.     During this time, Valerie was forced to make extra appointments and three 55-mile round trip visits to her doctor in order to receive sample doses of Fasenra and avoid foregoing treatment altogether.

230.     Despite her doctor writing the prescription in December 2023, Valerie did not receive her first shipment of Fasenra until April 2024, and subsequently experienced similar issues when trying to get refills.

231.     At the same time Valerie was struggling to receive her Fasenra, she also started experiencing issues with an Otezla prescription her rheumatologist wrote in January 2024 to treat psoriatic arthritis.

232.     Valerie's doctor submitted the prescription and appropriate prior authorization paperwork to Accredo, but, without communication or explanation to Valerie, Accredo never shipped the medication.

233.     Valerie noticed that the prescription had been labeled in the mobile app as "not covered by insurance" and had to call customer support herself to learn that Accredo refused to fill the medication. When asked what the issue with insurance was, Accredo support representatives could offer no explanation.

234.     Valerie subsequently called her insurance provider and was told that her doctor needed to submit appropriate paperwork to Accredo—paperwork that her doctor insisted had already been submitted.

235.    Over the next six weeks, both Valerie and her doctor spent several hours on the phone with Accredo's customer service representatives, none of whom could provide satisfactory explanation as to why the paperwork had not been processed. During these calls, no progress was made towards getting Valerie her medication.

236.    Unlike the doctor that had prescribed Fasenra, Valerie's rheumatologist could not provide her with ongoing sample doses of Otezla. Worried about how long Valerie had gone without medication, and with no end in sight to her issues filling Otezla, Valerie's rheumatologist decided to write her a prescription for Humira in February 2024 with the hope that filling this medication would be easier.

237.    Valerie's luck with Humira proved no better. Immediately, Accredo claimed there were issues with insurance coverage and prior authorization.

238.    Valerie's doctor confirmed that all appropriate paperwork had been submitted and resubmitted to Accredo. On more than one occasion, her doctor called Accredo, left voicemails, resubmitted the prior authorization per their request, and never heard back about the matter.

239.    Accredo also told Valerie that her insurance had refused to cover the medication. When Valerie called her insurance provider, they insisted that the claim had not and would not be denied, and that the issue must be on Accredo's end.

240.    After filing multiple appeals and waiting months for resolution, Valerie received her first shipment of Humira on April 30, 2024, over two and a half months after her doctor had first prescribed it, and nearly four months after her doctor had first prescribed Otezla to treat her psoriatic arthritis.

241.    Throughout the four months Valerie was forced to forgo treatment, she experienced severe psoriatic arthritis flareups. Valerie's wrists and fingers became unusable, and

45

she struggled to type, cook, or perform normal, daily functions without severe pain in her bones and joints. Valerie's knees, hips, and neck were in constant pain, and she experienced severe migraines and headaches. Valerie lost her normal sleep schedule and was left in an ongoing state of fatigue and lethargy. During this time, Valerie was forced to call in sick to work several times due to her flaring symptoms.

242.    To this day, Valerie deals with ongoing pain and stiffness in one of her fingers that originated during this time. In addition to mitigating symptoms, Otezla and Humira stop psoriatic arthritis symptoms from progressing, and Valerie and her doctor believe the ongoing issue with her finger was caused by the months she spent without medication.

243.    Beyond the physical health consequences of Accredo's malfeasance, Valerie was forced to spend countless hours dealing with Accredo's customer support and driving to and from otherwise needless doctor appointments. Valerie also dealt with ongoing stress and anxiety over whether her medication would ever get filled and worrying about the medical implications of being without her prescribed meds.

244.    During these experiences, Valerie made several inquiries to both her insurance companies and her employer's human resources department asking whether she had specialty pharmacy options outside of Accredo. Consistently, she was told that she had no choice but to use Accredo to fill her medication.

245.    In recent months, Valerie's employer switched healthcare providers, to one that provides a different specialty pharmacy. Since switching to a new specialty pharmacy, Valerie has had no issues filling her medications.

### iii.    *Melissa Arredondo*

246.    Plaintiff Melissa Arredondo is insured through Anthem Blue Cross Blue Shield and has Express Scripts as her PBM.

247.    Melissa is prescribed adalimumab to treat ulcerative colitis and hidradenitis suppurativa (painful chronic inflammatory diseases effecting a patient's bowels and skin), conditions that are mitigated almost entirely when taking medication.

248.    Melissa is required to use Accredo to obtain this specialty drug.

249.    For Melissa, foregoing medication while suffering from these conditions can cause the painful growth of lumps, abscesses, and scarring across the body, and can lead to long term diarrhea, blood in her stool, and iron deficiency anemia.

250.    Melissa has consistently dealt with problems receiving her adalimumab prescription from Accredo in a timely manner. Several times, Melissa's medication has been delayed by days or weeks, leading to physical health complications as her symptoms worsened without treatment.

251.    On several occasions, Melissa has been unable to refill her prescription on time through Accredo, and has needed to source medication from elsewhere, including by taking sample doses of her prescription at her physician's office.

252.    In December 2024, Melissa's regularly-scheduled refill of Humira did not arrive. She was not notified that there was any issue with her prescription. When the refill was not delivered, she called Accredo to resolve the issue. She was met with excuses regarding prior authorization, including claims by Accredo that they had never received prior authorization from her doctor to begin with. When Melissa called her doctor's office, they confirmed that all the necessary authorizations and paperwork had already been delivered to Accredo.

253.    This December 2024 phone call was the start of a six-month period in which Accredo refused to deliver Melissa's prescription. Throughout these six months, Melissa spent nearly ten hours on the phone with Accredo every week, chronically unable to solve the issues

with her prescription. Accredo representatives told Melissa confounding stories and introduced a number of new, baseless issues beyond prior authorization, including problems with patient level authorization, miscommunication with Melissa's doctor, and internal miscommunication between Accredo representatives.

254.    Even after a scheduled conference call between a representative from Express Scripts, a representative from Accredo, Melissa's doctor, and Melissa's father (the subject matter was too emotionally distressing for Melissa to attend herself), no resolution was reached.

255.    In December 2024, Melissa had to receive iron infusions to prevent further flareups of iron deficiency anemia, a direct result of missing her ulcerative colitis medication.

256.    In March 2025, nearly four months since her last dose of Humira, and after two emergency room visits due to her unmedicated conditions, Melissa underwent emergency surgery to remove a large, painful, rapidly-growing lump from her underarm, a problem directly caused by missing her medication for four months.

257.    Melissa's Humira prescription still was not filled for nearly another four months after her surgery, in July 2025.

258.    Melissa has, on several other occasions, experienced chronic delays that have caused her to miss multiple doses of medication. Delays caused by Accredo have led to flares in Melissa's symptoms that leave her in excruciating pain, render her unable to work, and land her back in the hospital.

259.    Beyond the physical toll Accredo's delays have inflicted upon Melissa, she has been forced to spend dozens of hours on the phone with Accredo and deals with ongoing anxiety, emotional distress, and chronic worry about the prospect of missing her medication, building a resistance to a prescription that works for her, and experiencing further dire health consequences.

48

260.    Through their contracts with her insurance plan, Defendants continue to require that Melissa use Accredo for future specialty fills, and she faces a real, immediate, and ongoing risk of recurring delays.

   *iv.    Robin Betz*

261.    Plaintiff Robin Betz had a commercial insurance plan through Cigna and had Express Scripts as her PBM until July 2025 through her former employer.

262.    During this time, Robin had no choice but to use Accredo to fill her prescription for Xolair, a medication used to treat her chronic idiopathic urticaria (a chronic condition causing long-lasting hives).

263.    When left untreated, Robin's condition leads to severe rashes across the entirety of her body, rendering her unable to put on shoes, wear clothes, or even lie in bed without burning itching and pain. When sticking to her doctor's recommendations and taking Xolair on a concrete schedule, Robin can mitigate her symptoms almost entirely and lead a normal, healthy life.

264.    Robin experienced multiple lengthy delays with Accredo's delivery of Xolair and, on multiple occasions, missed doses of her medication altogether because of such delays.

265.    This includes during the summer of 2025, when Robin missed a dose of medication because Accredo, without explanation, placed a $1,331.58 charge on her account. Robin did not learn about the charge until she found herself unable to order the next dose of medication without resolving the charge. Until she paid it, Accredo insisted they would not fill her prescription.

266.    Robin called Accredo several times over the next few days and spent hours on the phone without receiving a satisfactory answer as to what the charge was for or how she could proceed fixing the issue.

267.     It was only when she thought to call her copay support program that Robin was told about a billing issue from nearly seven months earlier. Accredo had taken over half a year to charge her for the issue and had not been able to provide her with any explanation or support to resolve the issue.

268.     Robin's copay support program told her she could remove the charge if she was able to get Accredo to send them a handful of documents. Having already spent several hours on the phone with Accredo trying to resolve this issue, Robin thought it would be nearly impossible to get Accredo to perform this simple task. In danger of missing another upcoming dose, Robin submitted out of necessity to paying the fee.

269.     On this occasion and several others in which Robin spent time on the phone with Accredo, she dealt with Patient Care Advocates and other customer service representatives who did not have access to adequate or centralized information regarding her account or prescription, told contradicting stories about why Accredo could not deliver her Xolair, and failed—even after hours on the phone—to give complete answers or provide any of the help Robin needed in order to receive her prescription.

270.     Robin was also, on a number of occasions, fed a myriad of unsubstantiated, false excuses regarding delays and denials of her prescription. Such excuses given to Robin by Accredo include: that her prescription was placed on "hold" with no explanation of what that meant or why it happened; that her prescription had been previously "refilled too early" and could not be refilled again, even though the refills had not deviated from their prescribed schedule; that Accredo had not received prior authorization, even though her doctor insisted that all the necessary documents and forms had been provided as required; unexplained outstanding

charges on her account; and that Robin had never called Accredo back about a refill, when she had been explicitly told by Accredo that they would call her.

271.    When Robin tried to avoid the nightmare of customer service phone calls by using Accredo's website, she was unable to resolve any issues or even place orders for medication, and was only able to see a message prompting her to call the customer support hotline.

272.    As a direct result of Accredo's incompetence, Robin experienced severe delays in medication delivery and missed a dose of her medication. Delayed and missed doses from Accredo caused Robin's symptoms to flare, causing her tremendous physical pain and putting her at risk of developing resistance to her medication.

273.    During her time with Accredo, Robin also experienced ongoing emotional distress from the everlasting uncertainty of whether Accredo would deliver her next prescription on time and the constant threat of missing her scheduled dosage.

### v.    Nathan Clymer, as parent and next friend of P.C.

274.    Plaintiff Nathan Clymer is father to an eleven-year-old son, "P.C.," with Kabuki syndrome (a rare genetic disorder) and systemic juvenile idiopathic arthritis (a rare and painful form of arthritis that effects children), who has filled prescriptions for Ilaris and Xeljanz using Accredo since 2023.

275.    P.C. takes medications delivered by Accredo to prevent macrophage activation syndrome, a severe, life-threatening complication associated with rheumatic disease.

276.    Nathan has experienced chronic delays of his son's medication and spent countless hours on the phone with Accredo listening to unfounded excuses about delays and denials of his son's medication delivery.

277.    On several occasions, when P.C.'s medication had been delayed by multiple days, Nathan reached out to Accredo only to be told falsely that problems with the prescription were

the fault of his doctor. Nathan's doctor repeatedly insisted that he had sent Accredo all relevant documentation, that the problem must be on Accredo's end, and that he has had similar problems dealing with Accredo on behalf of other patients.

278.    On one such occasion, in April 2024, Accredo insisted to Nathan that he needed to supply prior authorization documents despite the fact they had been regularly delivering this prescription to Nathan's address for several months. Nathan confirmed with his doctor that they had provided such information to Accredo multiple times.

279.    In the coming days, Nathan was forced to spend several hours on the phone with customer support agents, insisting that his call be elevated to a supervisor. Finally, Nathan received verbal confirmation that the medication would be shipped overnight.

280.    The following morning, Nathan received an automated phone call notifying him that the shipment would be delayed by another four days. Nathan called Accredo again and was only able to confirm same-day shipping after spending over five hours on the phone with customer support. The result was a deviation of two days from the doctor's schedule for P.C.'s medication.

281.    The next month, in May 2024, Nathan was informed that his son's prescription was not ready to ship due to Accredo having two accounts on record in P.C.'s name. When Nathan asked that they close the duplicate account and deliver the medication, he was told that Accredo could not close the second account or resolve the issue. When Nathan insisted that they disregard the second account, Accredo told him that there was now a problem with insurance denying the refill. Knowing this could not be true, Nathan threatened to take legal action and was immediately transferred to a supervisor who was able to confirm shipment. This experience also resulted in a two-day gap without medication for P.C.

282.    One month later, in June 2024, Nathan was told again that the two accounts in Accredo's system made refilling PC's prescription impossible. Already having jumped through the hoops of customer support to resolve this issue the previous month, Nathan spent several more hours on the phone with Accredo, who provided no answer as to why two accounts existed or what could be done to permanently resolve the issue. Unable to produce a satisfactory answer regarding the duplicate account, Accredo changed tactics and told Nathan that P.C.'s prescription had run out of refills.

283.    On multiple occasions, Nathan has been forced to spend four or more hours on the phone with Accredo, bouncing between customer service representatives, supervisors, and the billing department who possessed asymmetric information, provided baseless excuses, and showed remarkable ignorance as to P.C.'s medical records.

284.    More than once, including in May 2025, after already spending hours on the phone, Nathan's calls have been disconnected with no explanation or callback number, and Nathan has been forced to start the entire process over with a new customer service representative who reads from the top of a script Nathan has heard dozens of times, and possesses no knowledge or information regarding the call Nathan had just placed.

285.    More than once, Nathan has called Accredo in the early hours of the morning to resolve an issue and get P.C.'s prescription shipped overnight, only to stay on the phone for over six hours before being told that it was now too late in the day to provide overnight shipping.

286.    On these occasions and several others, Accredo has delayed or denied refills of P.C.'s medication for a variety of unfounded reasons. Excuses given to Nathan include false claims of outstanding balance, false claims about issues with prior authorization, false claims about P.C.'s doctor cancelling a prescription, false claims about issues with insurance coverage,

false claims about missing documents or account information, unwarranted charges for additional copay, and more.

287.    The doctor-recommended schedule for P.C.'s medication has, in several instances, been delayed by multiple days, causing P.C.'s symptoms to flare and heightening the risk for life-threatening macrophage activation syndrome.

288.    With the health of his son in jeopardy, Nathan routinely endures hours on the phone with customer support just to get the medication shipped and has been subject to immense emotional distress and ongoing anxiety regarding the uncertainty of whether his son will be able to receive the life-sustaining medication or avoid the deleterious effects of delayed doses.

289.    Through their contracts with their insurance plan, Defendants continue to require that the Clymer family use Accredo for future specialty fills, and they face a real, immediate, and ongoing risk of recurring delays.

### vi.    *Shay Jarm*

290.    Plaintiff Shay Jarm is insured through Common Ground Healthcare Cooperative and is required to use Accredo to fill prescriptions to treat her psoriatic arthritis.

291.    Throughout her time filling Rinvoq and Cosentyx prescriptions with Accredo, Shay has been given the runaround by Accredo customer service causing delays of medication shipments and missed doses of needed medication.

292.    In early January 2025, issues arose with Shay's scheduled shipment of Rinvoq. When she called Accredo to try and resolve the issue, she was told that there were problems on her end and her doctor's end with proper prior authorization documents. When Shay insisted that this information had been sent several times in the past, Accredo had no explanation for where the previously-sent paperwork was or why a new prior authorization was suddenly needed.

293. Despite spending hours on the phone with Accredo trying to get the issue resolved, Shay missed her scheduled doses and didn't receive her medication until over a month later, on February 6, 2025.

294. Later, more issues arose. When her doctor recommended that she switch medications from Rinvoq to Cosentyx, Accredo immediately raised issues about prior authorization and patient-level authorization. Shay's doctor confirmed that all appropriate paperwork had been sent to Accredo, but Accredo continued to insist there were problems.

295. Again, Shay spent hours on the phone with Accredo with no resolution. No explanation could be given for why Accredo was unable to confirm her doctor's paperwork.

296. Shay's Cosentyx prescription was supposed to consist of five weekly start-up "loading" doses, followed by regularly scheduled "maintenance" doses. Shay's doctor intended for her to start loading doses in mid-February, but Shay did not receive her first dose until mid-April because of Accredo's delays.

297. Despite not having shipped even her loading doses, Accredo began charging Shay's insurance for maintenance doses in March. While in the midst of fighting Accredo to approve shipment of her medication, Shay now had to wage a separate battle about these insurance charges.

298. A number of phone calls, including a conference call between Accredo, Shay, and an insurance representative, could not resolve this issue for several weeks.

299. Shay's troubles were not over when she finally received her first loading dose in April. Her fifth loading dose was delayed in May, and, without a warning or explanation from Accredo, her first maintenance dose never arrived.

300.    When Shay called to inquire, she was told that, yet again, there were issues with patient-level authorization for her prescription, despite these issues having been resolved the previous month, and despite her doctor's insistence that all appropriate paperwork had been sent to Accredo.

301.    Shay missed months worth of medication, and her symptoms worsened without treatment. During these delays, Shay developed extreme pain and swelling in her bones and joints, constant muscular fatigue and sleeplessness from her pain, and was forced to miss several days of work, including exhausting her allotted paid leave. Shay also developed a resistance to her medication, which her doctor speculated to be a direct result of her missed doses.

302.    Shay also experienced, and continues to experience, significant emotional distress as a result of threats to her health due to Accredo's delays. Shay deals with constant stress about having missed such a significant number of her Cosentyx doses and has ongoing anxiety at the uncertainty of whether her future dealings with Accredo will reflect what she has dealt with in the first half of 2025.

303.    Through their contracts with her insurance plan, Defendants continue to require that Shay use Accredo for future specialty fills, and she faces a real, immediate, and ongoing risk of recurring delays.

### vii.    Heather Lisser

304.    Plaintiff Heather Lisser is insured through her employer and receives pharmacy benefits from Express Scripts. Heather has no choice but to use Accredo as her specialty pharmacy.

305.    In 2017, Heather received an organ transplant and was prescribed life-sustaining anti-rejection medications to ensure the post-operation success of her transplant.

306. Soon after, Heather was prescribed Astagraf XL, an antirejection medication, and has since dealt with ongoing issues with getting timely refills of her medication from Accredo.

307. On dozens of occasions, Heather has been forced to spend multiple hours on the phone with Accredo's customer support after being informed that there were problems refilling her medication.

308. Consistently, Heather found that the reasons given by Accredo for delays or inability to fill prescriptions did not make sense and were sometimes demonstratively false.

309. Heather also noticed that all Accredo customer support representatives seemed to read from a single, basic script, and that no two Accredo representatives had access to shared information regarding previous calls as with a minimally sufficient CRM database. When Heather would call Accredo to continue discussing a previous issue, a new representative would start at the top of the call script she had already heard and would often tell her a confounding story with a different central issue that made filling her prescription impossible.

310. Accredo has given Heather several excuses for delays and denials of her anti-rejection medication. These include not having received prior authorization (despite her doctor having proof that it was sent to Accredo), receiving prior authorization that only listed the "brand name", and not the generic drug (her doctor also disproved this), that her internal Accredo account records had been deleted without explanation, that her prescription had been cancelled for no explicable reason, various invoicing problems, and, in February 2025, insistence by Express Scripts that she had already received a refill of medication from Accredo that had never been delivered.

311.    More than once, and most recently in February 2025, Heather has been forced to drive over an hour to Middleton, Wisconsin, to pick up an emergency dose of medication from UW Health after Accredo refused to deliver her prescription refill.

312.    Heather has had to take extraordinary measures to prevent missing a dose of her medication. Through the efforts of driving to Middleton and the dozens of episodes in which she has spent multiple hours on the phone with Accredo's support, Heather has only missed her medication schedule by one or two days on a handful of occasions.

313.    Still, Heather has sacrificed tremendous amounts of time in dealing with Accredo and has been subject to immense stress and anxiety caused by ongoing issues in delivering refills of her medication, including concerns that missing a dose of her anti-rejection medication could lead to her body rejecting a life-saving transplant.

314.    Through their contracts with her insurance plan, Defendants continue to require that Heather use Accredo for future specialty fills, and she faces a real, immediate, and ongoing risk of recurring delays.

### B.    TRICARE Plaintiffs

#### i.    *Jennifer Bellucci, as parent and next friend of A.J.B., A.E.B., and A.O.B.*

315.    Plaintiff Jennifer Bellucci's husband is a military veteran, and her family is insured by TRICARE West, which uses Express Scripts as its pharmacy benefit manager.

316.    Under her current plan, Jennifer must either travel to a pharmacy on a military base or use Accredo to fill prescriptions for her four children who suffer from juvenile idiopathic arthritis, including for Ilaris, Actemra, and Orencia. Because military pharmacies generally do not stock the medications her children require, Jennifer and her children effectively have no choice but to use Accredo to obtain their medications.

317. Jennifer has experienced delays with medication delivery for all four of her children who use Accredo to fill prescriptions.

318. For example, on one occasion, in January 2025, Jennifer learned that Accredo would no longer be covering A.J.B.'s prescription for Ilaris. Jennifer they were cancelling this only discovered the cancellation when Accredo made an automated phone call to notify her, which, even then, it delayed doing until the scheduled date of delivery.

319. Jennifer spent several weeks navigating Accredo's customer support trying to resolve the issue. Throughout her Sisyphean efforts, she was given several different excuses by Accredo's customer support representatives, who told contradictory stories and lacked access to records of previous phone calls or documents that previous representatives had received.

320. Unwilling to let A.J.B. miss another dose of medication, Jennifer was forced to drive over seven hours to pick up a "sample" dose of Ilaris for her son from Texas Children's Hospital in Houston.

321. On another occasion, Jennifer's doctor recommended that her daughter, A.O.B., start taking Actemra, and the child quickly found success with the medication.

322. Soon after, Jennifer's doctor recommended that another one of her children, A.E.B., switch to Actemra to treat a very similar condition. After Jennifer's doctor called in a new prescription, she was forced to spend hours on the phone with Accredo's customer support and was told several different reasons why Accredo would not fill the new prescription. At one point, Jennifer was told that Accredo did not, under any circumstances, fill prescriptions for Actemra—despite the fact that Accredo was actively delivering this medication to her house for A.O.B.

323.    In another instance, in June 2025, Jennifer was told that A.E.B.'s Orencia prescription was denied. When Jennifer called support, Accredo recommended that she divert from her doctor's orders and get a prescription for a medication that is not FDA-approved to treat her daughter's systemic juvenile idiopathic arthritis. When Jennifer refused to put her daughter on a medication that is not FDA approved for her condition, Accredo recommended yet another medication, this one on national backorder.

324.    Jennifer experienced similar instances of delayed medication and impossible customer service conversations. Excuses given to Jennifer for delayed or denied medication included not receiving prior authorization (despite Jennifer confirming that her doctor had sent it), that prior authorization had been denied (but with no valid explanation), that prescriptions had been written for syringes (as opposed to injectable pens), that Accredo did not deliver such medications (even though they do), that medications would be delivered the next day (only to receive a phone call from Accredo the following morning informing her of further delays), that her doctor had cancelled the prescription (despite her doctor confirming this was not true), and more.

325.    On many occasions, Accredo provided Jennifer with no explanation whatsoever as to why a medication could not be filled.

326.    A.J.B, A.E.B., and A.O.B. have all missed doses of medication and experienced significant delays, leading them to deviate from their physician's time-sensitive care plans, causing them physical pain and suffering, leading Jennifer to sacrifice dozens of hours of time on the phone with Accredo, and putting Jennifer through unconscionable stress as Accredo plays games with the health of her children.

327.    Through their contracts with TRICARE, Defendants continue to require that the Bellucci family use Accredo for future specialty fills, and they face a real, immediate, and ongoing risk of recurring delays.

### ii.    *Amy King*

328.    Plaintiff Amy King belongs to a military family and is insured through TRICARE, which uses Express Scripts as its PBM.

329.    Amy must use Accredo or drive out of her way to a military pharmacy to fill her prescription for Entyvio, a medication used to treat her ulcerative colitis.

330.    Since she started using Accredo in 2021, Amy has spent dozens of hours on the phone with Accredo in attempts to ensure timely delivery of her medication.

331.    Amy used Accredo to order Botox for migraine treatment from 2021-2023 and began using Accredo for delivery of her Entyvio pen prescription in January 2024

332.    Throughout her many phone calls with Accredo, Amy has been driven to tears while listening to false explanations regarding the delay or denial of her medication. These excuses include issues with prior authorization (that Amy confirmed with her doctor to be false), that her prescription had been written for an incorrect dose (Amy's doctor also confirmed this to be false), and that Accredo had not received contact from Amy's doctor's office, despite the fact that the doctor had called Accredo several times in the previous weeks.

333.    Amy is fortunate that she has not yet suffered physical health consequences from the refusals and delays, however the stress she has experienced and time she has spent dealing with Accredo continues to negatively impact her work abilities and mental wellbeing, and contributes to ongoing anxiety about building up antibody resistance to Entyvio.

334. Through their contracts with TRICARE, Defendants continue to require that Amy use Accredo for future specialty fills, and she faces a real, immediate, and ongoing risk of recurring delays with adverse consequences to her physical and emotional wellbeing.

## CLASS ACTION ALLEGATIONS

335. Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(1)(A), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Classes.

336. Private Insurance Statutory Claims Class: All individuals under the age of 65 in the United States who, during the Private Insurance Statutory Claims Class Period (defined below), (i) were enrolled in or covered by a commercial health insurance plan administered in whole or in part by Evernorth or its affiliates; (ii) were required by the terms of that health plan to obtain drugs designated as "specialty" exclusively from Accredo in order to apply their pharmacy benefits; and either (iii.a) paid any portion of the purchase price for such specialty drugs dispensed by Accredo, or (iii.b) submitted to Accredo a fill or refill request for one or more such specialty drugs on or before a physician-directed dosing date (or depletion date for maintenance therapies) but not receive the drug by that date absent a documented prescriber hold or clinical contraindication.

      a.      California Subclass: All members of the Private Insurance Statutory Claims Class residing in California.

      b.      Illinois Subclass: All members of the Private Insurance Statutory Claims Class residing in Illinois.

337. The Private Insurance Statutory Claims Class brings federal statutory claims for antitrust violations.

338.    The California and Illinois Private Insurance Statutory Claims Subclasses bring additional claims for unfair business practices under the California Unfair Competition Law and the Illinois Consumer Fraud and Deceptive Business Practices Act, respectively.

339.    The Private Insurance Statutory Claims Class Period starts on January 6, 2022, and is continuing.

340.    The TRICARE Class: All individuals under the age of 65 in the United States who, during the TRICARE Class Period (defined below), (i) were enrolled in or covered by a TRICARE health plan, (ii) submitted to Accredo a fill or refill request for one or more such specialty drugs on or before a physician-directed dosing date (or depletion date for maintenance therapies), and either (iii.a) paid any portion of the purchase price for such specialty drugs dispensed by Accredo, or (iii.b) did not receive the drug by that date absent a documented prescriber hold or clinical contraindication.

341.    The TRICARE Class brings federal statutory claims for antitrust violations.

342.    The TRICARE Class period starts on January 6, 2022, and is continuing.

343.    The Accredo Common Law Claims Class: All individuals in the United States who, during the Accredo Common Law Claims Class Period (defined below), (i) submitted to Accredo a fill or refill request for one or more such specialty drugs on or before a physician-directed dosing date (or depletion date for maintenance therapies), and (ii) did not receive the drug by that date absent a documented prescriber hold or clinical contraindication. The Accredo Common Law Claims Class's claims for negligence, public nuisance, breach of contract, and promissory estoppel arise under the substantially similar common-law duties imposed in the states where Class members reside and received services. Any differences among state laws can be addressed through subclasses or jury instructions at class certification or trial.

344.    The Accredo Common Law Claims Class brings state common law claims for negligence, public nuisance, breach of contract, and promissory estoppel.

345.    The Accredo Common Law Claims Class Period starts on January 6, 2024, and is continuing.

346.    Background facts predating the Class Periods are alleged to establish Defendants' knowledge, notice, and ongoing course of conduct and do not limit class membership or damages accrual.

347.    Excluded from the Classes are: (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

348.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the prerequisites of Rule 23 of the Federal Rules of Civil Procedure.

349.    Ascertainability: On information and belief, Accredo, Express Scripts, Evernorth, and carriers maintain contemporaneous business records—including, for example, order/intake and refill-request logs, shipment/dispense records, carrier tracking/POD (proof of delivery) data, and PBM eligibility/adjudication files—that will allow Class members to be identified through objective queries and record-linkage using unique patient/order/claim identifiers.

350.    Numerosity: The Classes are sufficiently numerous such that individual joinder of all Class members is impracticable. Accredo has millions, if not tens of millions of customers in the United States. Furthermore, on information and belief, a substantial portion of these

customers have commercial health insurance or TRICARE plans that require them to use Accredo.

351. <u>Commonality and Predominance</u>: This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

    a.    Whether Defendants engaged in the wrongful conduct alleged herein;

    b.    Whether Defendants' actions violate federal and state statutory and common law;

    c.    With regard to the Private Insurance Statutory Claims Class, whether Defendants have illegally restrained trade through the use of contracts that require patients to use Accredo in order to purchase specialty medications with their pharmacy benefits;

    d.    With regard to the Private Insurance Statutory Claims Class, whether Defendants have actually monopolized or attempted to monopolize the nationwide market to provide specialty pharmacy services to patients with commercial health plans that receive PBM services from Express Scripts and Evernorth;

    e.    With regard to the Private Insurance Statutory Claims California and Illinois Subclasses, whether Defendants' conduct constitutes unfair business practices in violation of the California Unfair Competition Law and the Illinois Consumer Fraud and Deceptive Business Practices Act;

    f.    With regard to the TRICARE Class, whether Defendants have actually monopolized or attempted to monopolize the nationwide market to

provide specialty pharmacy services to patients with TRICARE health plans;

g. With regard to the Accredo Common Law Claims Class, whether Accredo lacks adequate systems, infrastructure, staffing, and training such that the specialty pharmacy services it provides fail to satisfy the applicable standard of care;

h. With regard to the Accredo Common Law Claims Class, whether Accredo's conduct was and is negligent;

i. With regard to the Accredo Common Law Claims Class, whether Accredo's conduct constitutes a public nuisance;

j. With regard to the Accredo Common Law Claims Class, whether Accredo's conduct constitutes a breach of contract;

k. With regard to the Accredo Common Law Claims Class, whether, in the alternative, Accredo's conduct constitutes a breach of a legally enforceable promise under a promissory estoppel theory;

l. The appropriate measure of damages to award Plaintiffs and members of the Classes; and,

m. The appropriate injunctive relief to award Plaintiffs and members of the Classes.

These questions are common because they arise from Defendants' uniform policies, systemic information-technology and staffing deficiencies, and standardized contractual arrangements, not from individualized interactions unique to each patient.

352. <u>Typicality</u>: Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and each of the other Class members are all required to use Accredo and have all have been harmed in similar ways by the same set of Accredo's business practices.

353. <u>Adequacy of Representation</u> (Fed. R. Civ. P. 23(a)(4)): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and other consumer protection litigation, and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

354. <u>Risk of Inconsistent or Varying Adjudications</u> (Fed. R. Civ. P. 23(b)(1)(A)): Prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications. Plaintiffs and Class Members allege that they were all harmed by the same systemic business practices. Individual adjudications that might find Defendants liable in some instances and not liable in other instances for the same business policies and practices would establish incompatible standards of conduct for the party opposing the Class.

355. <u>Declaratory and Injunctive Relief</u> (Fed. R. Civ. P. 23(b)(2)): Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

356. <u>Superiority</u> (Fed. R. Civ. P. 23(b)(3)): A class action is superior to individual adjudications because joinder of all class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial

system. The amount-in-controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. Further, a damages measurement will use common methodologies. For example, econometric methods can estimate: overcharges, increased effected prices and out-of-pockets payments incurred by Class Members as a result of anticompetitive behaviors; the value of lost drugs that Class Members were entitled to receive but did not; and the monetizable value of time expended by patients and caregivers to secure medication that should have been timely dispensed, among others. Additionally, injunctive relief is uniform for the class. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

## CLAIMS FOR RELIEF

### COUNT I
**Illegal Restraints of Trade or Commerce**
**Violation of the Sherman Act, 15 U.S.C. § 1**
**Private Insurance Statutory Claims Class Against All Defendants**

357.     Plaintiffs Wolf, Dellorto, Arredondo, Betz, Clymer, P.C., Jarm, and Lisser ("the Private Insurance Statutory Claims Plaintiffs") reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

358.     The Private Insurance Plaintiffs bring this claim individually and on behalf of all other Private Insurance Statutory Claims Class Members.

359.     The Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

360.     Express Scripts, with the assistance of its corporate parent Evernorth and under the oversight and direction of Cigna, contracts with insurers, plan sponsors, and other PBMs to administer and manage pharmacy benefits included in commercial health insurance plans.

361.     Members of commercial health insurance plans served by Express Scripts, including the Private Insurance Plaintiffs and other Class Members, have no meaningful ability to choose their insurer. Such decisions are made by their employer. Short of changing employment or experiencing a major life event that may enable them to switch health insurers, they are locked in with Express Scripts.

362.     In other words, although the Private Insurance Plaintiffs and other Class Members did not choose Express Scripts, they must go through Express Scripts to access their pharmacy benefits because of the contracts Express Scripts and Evernorth have made with their insurer, plan sponsor, or other PBM.

363.     As a result, Express Scripts and Evernorth have market power over Plaintiffs and other Class Members.

364.     As a provision of their contracts with insurers, plan sponsors, and other PBMs, Evernorth and Express Scripts require that insureds, including Plaintiffs and other Private Insurance Statutory Claims Class Members, exclusively use their Cigna Group affiliate Accredo to fill prescriptions for specialty drugs (as defined by Express Scripts).

365.     For insureds, including Plaintiffs and Class Members, none of whom had any say in any of this, such contracts tie mandatory use of Accredo for specialty pharmacy needs to their pharmacy benefits.

366.     In other words, Express Scripts and Evernorth, acting under the oversight and direction of Cigna, leverage their power as the gatekeeper of Plaintiffs' and Class Members'

pharmacy benefits to cut out independent competitors and fully capture the market for Plaintiffs'
and Class Members' specialty pharmacy needs on behalf of their Cigna affiliate, Accredo.

367.    Defendants' conduct harms competition, not merely competitors. Because of the
restraints of trade imposed by Defendants, rivals are excluded from access to Express Scripts-
covered demand and patients experience reduced output (fewer timely fills), lowered quality
pharmacy services, and higher prices and effective costs (time, medical complications).

368.    Defendants use the thicket of contractual arrangements they have built with
insurers, plan sponsors, and other PBMs to hold Plaintiffs' and Class Members' pharmacy
benefits hostage unless they acquiesce to using Accredo.

369.    Such contracts and agreements in restraint of trade constitute *per se* illegal tying
and are otherwise contrary to the Rule of Reason.

370.    As a direct and proximate result of Defendants' scheme to restrain trade, the
Private Insurance Plaintiffs and Class Members have suffered actual damages in that they face
higher effective costs and increased out-of-pocket payments for medications, are forced to use
inferior specialty pharmacy services, have lost many hours of time and attention that could have
been spent on more valuable pursuits navigating Accredo's broken systems (representing an
economic loss of time and labor), and are denied the full benefit of their insurance plan's
pharmacy coverage.

371.    Plaintiffs and Class Members seek compensatory and treble damages, injunctive
relief, and reasonable attorney's fees, costs, and expenses relating to this action.

## COUNT II
**Monopolization**
**Violation of the Sherman Act, 15 U.S.C. § 2**
**Private Insurance Statutory Claims Class Against All Defendants**

372. The Private Insurance Plaintiffs reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

373. The Private Insurance Plaintiffs bring this claim individually and on behalf of all other Private Insurance Statutory Claims Class Members.

374. The Sherman Act makes illegal efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

375. The national market for specialty pharmacy services is deeply fractured and balkanized.

376. These fractures do not run on geographic lines, but rather according to the tangled web of contracts and corporate affiliations that make up the pharmaceutical supply chain.

377. As explained in this complaint, patients with commercial health plans are only able to access their pharmacy benefits when they fill prescriptions from in-network pharmacies, as defined by the PBM used by their insurance plan.

378. Also as explained in this complaint, PBMs define which drugs are considered specialty drugs, and such specialty drugs are usually cost-prohibitive for most people to purchase on a cash-basis without the assistance of insurance.

379. Patients with commercial health insurance coverage cannot easily switch insurance plans due to the high cost (e.g. changing employment) and enrollment cycles, as well as ineligibility for government health insurance programs such as Medicare or Medicaid; cannot foresee or negotiate specialty drug designations or pharmacy network restrictions; and are

generally locked in with an insurer, the insurer's PBM, and the pharmacy network created and managed by that PBM, for an extended period of time (often due to multi-year contracts).

380.    As a result of these features of the pharmaceutical supply chain, all pharmacies capable of dispensing a medication to a patient with commercial coverage do not and cannot compete for that patient's business.

381.    Instead, the marketplace is narrowed according to the PBM used by the patient's insurance, whether that PBM defines the drug as "specialty," and the in-network pharmacies at which the PBM permits the patient to use their insurance benefits.

382.    In this context, the only reasonably interchangeable alternatives available to patients with commercial health plans, such as the Private Insurance Plaintiffs, whose pharmacy benefits are provided or managed in whole or part by Express Scripts and Evernorth and who need to fill a prescription for a drug Express Scripts and Evernorth define as specialty are specialty pharmacies with in-network status in Express Scripts-defined pharmacy networks.

383.    Accordingly, the product market relevant for purposes of this claim is the Express Scripts specialty pharmacy commercial aftermarket; that is, the market to provide specialty pharmacy services to patients with commercial health plans that receive PBM services from Express Scripts and Evernorth.

384.    Because Express Scripts and Evernorth administer the pharmacy benefits of insureds across the country and the availability and ease of use of mail order specialty pharmacies means that pharmacies do not need local brick and mortar locations to compete for market share, the geographic market is nationwide in scope.

385.    In a well-functioning specialty pharmacy market, one would reasonably expect to see many brick-and-mortar and mail order pharmacies compete with each other to obtain in-

network status with Express Scripts and Evernorth, and then—for those that successfully join the specialty pharmacy network—to dispense drugs to patients.

386. In reality, patients—including the Private Insurance Plaintiffs and Private Insurance Statutory Claims Class Members—with Express Scripts as their PBM almost always must obtain specialty drugs from Accredo because of the exclusivity provisions Express Scripts and Evernorth, acting under the oversight and direction of Cigna, succeed in including in the great majority of their contracts with clients.

387. Because Accredo is almost always the only specialty pharmacy with "in-network" status, Defendants have monopoly power in the Express Scripts specialty pharmacy commercial aftermarket.

388. Accredo did not gain its market dominance through a naturally selective process of competition on the merits, or through any kind of competitive bidding process that required it to beat out other potential specialty pharmacy providers. On information and belief, no such competitive bidding process exists.

389. Instead, Accredo has monopoly power in this market because it works with its vertically integrated Cigna corporate affiliates Express Scripts and Evernorth to exclude potential competitors from the market and operate as the sole in-network specialty pharmacy for most commercial plans that Express Scripts provides services to.

390. Accredo's in-network share of the Express Scripts specialty pharmacy commercial aftermarket equals approximately 70% or more and has been maintained over multi-year cycles without meaningful opportunity for rival specialty pharmacies to obtain Express Scripts in-network status. Express Scripts does not conduct competitive bidding for in-network specialty pharmacy access, and vertically integrated favoritism and gatekeeping

forecloses rival entry. Moreover, even in the rare cases where Express Scripts permits rival specialty pharmacies to obtain in-network status, contractual provisions that require patients using those pharmacies to pay higher out-of-pocket costs than they would if using Accredo effectively prohibits rivals from engaging in any price competition with Accredo.

391.    Such conduct is blatantly anticompetitive.

392.    Rather than fostering a competitive atmosphere that drives down cost and encourages competition as to quality of services provided, Evernorth, Express Scripts, and Accredo have instead chosen to capture the market and exclude rivals for their own gain.

393.    Defendants use their monopoly power to increase prices to supracompetitive levels and degrade the quality and quantity of Accredo's specialty pharmacy services below what would be offered in a competitive equilibrium.

394.    Because patients cannot practicably switch insurance plans or PBMs in response to anti-competitive behavior in the specialty pharmacy aftermarket, competition in the primary market for commercial insurance is an insufficient check on Defendants' illegal monopolization of the Express Scripts specialty pharmacy commercial aftermarket.

395.    As a direct and proximate result of Defendants' exploitation of their monopoly power, the Private Insurance Plaintiffs and Private Insurance Statutory Claims Class Members have suffered actual damages in that they are forced to pay inflated out of pocket costs and premiums, use inferior specialty pharmacy services, have lost many hours of time and attention that could have been spent on more valuable pursuits navigating Accredo's broken systems (representing an economic loss of time and labor), and are denied the full benefit of their insurance plan's pharmacy coverage.

396.    The Private Insurance Plaintiffs and Private Insurance Statutory Claims Class Members seek compensatory and treble damages, injunctive relief, and reasonable attorneys' fees, costs, and expenses relating to this action.

**COUNT III**
**Attempted Monopolization**
**Violation of the Sherman Act, 15 U.S.C. § 2**
**Private Insurance Statutory Claims Class Against All Defendants**

397.    The Private Insurance Plaintiffs reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

398.    The Private Insurance Plaintiffs bring this claim individually and on behalf of all other Private Insurance Statutory Claims Class Members.

399.    The Sherman Act makes illegal efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

400.    The conduct alleged in this Complaint evidences the specific intent of Express Scripts, Evernorth, Cigna, and Accredo to capture and monopolize the Express Scripts specialty pharmacy commercial aftermarket for their own benefit.

401.    To advance this goal, Defendants engage in blatantly anticompetitive conduct to capture business for Accredo, primarily through the use of contracting strategies that require commercial plans to use Accredo as their sole designated in-network specialty pharmacy while excluding other rival specialty pharmacies from network access.

402.    Defendants' role as gatekeepers of pharmacy network access, exploitation of informational asymmetries, and the inability of the Private Insurance Plaintiffs to readily switch insurance plans or PBMs, creates a dangerous probability that Defendants will achieve the monopoly power they seek.

403.     As a direct and proximate result of Defendants' exploitation of their monopoly power, the Private Insurance Plaintiffs and Private Insurance Statutory Claims Class Members have suffered actual damages in that they are forced to pay inflated out of pocket costs and premiums, use inferior specialty pharmacy services, have lost many hours of time and attention that could have been spent on more valuable pursuits navigating Accredo's broken systems (representing an economic loss of time and labor), and are denied the full benefit of their insurance plan's pharmacy coverage.

404.     The Private Insurance Plaintiffs and Private Insurance Statutory Claims Class Members seek compensatory and treble damages, injunctive relief, and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT IV
### Unlawful and Unfair Business Practices
### Violation of California Unfair Competitions Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### California Private Insurance Statutory Claims Subclass Against All Defendants

405.     Plaintiffs Arrendondo and Betz ("the California Plaintiffs") reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

406.     The California Plaintiffs bring this claim individually and on behalf of all other California Private Insurance Statutory Claims Subclass Members.

407.     Defendants have engaged in unfair competition within the meaning of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, because Defendants' conduct alleged herein is unlawful and unfair.

408.     California Plaintiffs and the members of the California Private Insurance Statutory Claims Subclass are "persons" within the meaning of Section 17201 of the California Unfair Competition Law.

409. The California Unfair Competition Law prohibits any unlawful and unfair business practices or acts. Defendants' conduct, as alleged herein, constitutes an unfair business practice that occurred in connection with the conduct of its professional services.

410. Defendants' conduct, as described herein, violated the Unfair Competition Law's "unfair" prong because its conduct violates established public policy and because it is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

411. As alleged in this Complaint, Accredo's conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers because—under the guise of offering high quality care and explicit promises to do the same, including in its "Patient Bill of Rights" and other promotional material—Accredo in fact provides services so far below industry as to harm patients' mental and physical health as described at length in this complaint.

412. As alleged in this Complaint, Defendants' conduct is also immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers because it:

      a.   Requires patients, including California Subclass members, to use Accredo as the sole available specialty pharmacy, and prohibits them from using their pharmacy benefits at any other specialty pharmacy—despite the poor quality of the services Accredo provides;

      b.   Imposes such restriction for the purpose of excluding any specialty pharmacy that could compete with Accredo for the business of patients in the Express Scripts network, allowing Defendants to capture all such dispensing revenue;

      c.   Imposes such restriction for the further purpose of avoiding substantial overhead costs that Defendants would otherwise need to expend to

compete on the quality of specialty pharmacy services provided to patients;

d.    Imposes such restriction for the additional purpose of artificially reducing drug utilization to attract and maintain upstream insurer, plan sponsor, and PBM clients.

413.    The injuries caused by Defendants' conduct are not outweighed by any purported benefit to consumers or competition.

414.    Defendants' conduct, as described herein, violated the Unfair Competition Law's "unlawful" prong because its conduct violates federal and state law, including the federal Sherman Act, as alleged herein.

415.    As a direct and proximate result of Defendants' unlawful and unfair business practices, the California Plaintiffs and Subclass Members have suffered actual damages in that they are forced to use inferior specialty pharmacy services; have lost many hours of time and attention that could have been spent on more valuable pursuits navigating Accredo's broken systems (representing an economic loss of time and labor); are denied the full benefit of their insurance plan's pharmacy coverage; have suffered physical harm and reduced quality of life; endured significant emotional distress; and have lost money and property in the form of increased out-of-pocket payments, premium contributions, and the loss of the economic value of specialty drugs and pharmacy benefits for which they paid but did not timely receive..

416.    The California Plaintiffs and Subclass Members seek restitution, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

**COUNT V**
**Unfair Business Practices**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.***
**Illinois Private Insurance Statutory Claims Subclass Against All Defendants**

417.    Plaintiffs Dellorto and Wolf ("the Illinois Plaintiffs") reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

418.    The Illinois Plaintiffs bring this claim individually and on behalf of all other Illinois Private Insurance Statutory Claims Subclass Members.

419.    The Illinois Plaintiffs and members of the Illinois Private Insurance Statutory Claims Subclass are "persons" within the meaning of 815 ILCS 505/10a.

420.    Defendants have engaged in unfair business practices within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, because Defendants' conduct violates established public policy; is immoral, unethical, oppressive, and unscrupulous; and is substantially injurious to consumers.

421.    Defendants' conduct violates public policy because the 2025 Prescription Drug Affordability Act, HB 1697, expresses a clear legislative policy to prohibit, going forward, PBMs from steering business to their affiliated specialty pharmacy—such as Express Scripts does by requiring patients use Accredo.

422.    As alleged in this Complaint, Accredo's conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers because—under the guise of offering high quality care and explicit promises to do the same, including in its "Patient Bill of Rights" and other promotional material—Accredo in fact provides services so far below industry as to harm patients' mental and physical health as described at length in this complaint.

423.     As alleged in this Complaint, Defendants' conduct is also immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers because it:

- Requires patients, including Illinois Subclass members, to use Accredo as the sole available specialty pharmacy, and prohibits them from using their pharmacy benefits at any other specialty pharmacy—despite the poor quality of the services Accredo provides;

- Imposes such restriction for the purpose of excluding any specialty pharmacy that could compete with Accredo for the business of patients in the Express Scripts network, allowing Defendants to capture all such dispensing revenue;

- Imposes such restriction for the further purpose of avoiding substantial overhead costs that Defendants would otherwise need to expend to compete on the quality of specialty pharmacy services provided to patients;

- Imposes such restriction for the additional purpose of artificially reducing drug utilization to attract and maintain upstream insurer, plan sponsor, and PBM clients.

424.     The injuries caused by Defendants' conduct are not outweighed by any purported benefit to consumers or competition.

425.     As a direct and proximate result of Defendants' unlawful and unfair business practices, the Illinois Plaintiffs and Subclass Members have suffered actual damages in that they are forced to use inferior specialty pharmacy services; have lost many hours of time and attention that could have been spent on more valuable pursuits navigating Accredo's broken systems

(representing an economic loss of time and labor); are denied the full benefit of their insurance plan's pharmacy coverage; have suffered physical harm and reduced quality of life; endured significant emotional distress; and have lost money and property in the form of increased out-of-pocket payments, premium contributions, and the loss of the economic value of specialty drugs and pharmacy benefits for which they paid but did not timely receive.

426.    The Illinois Plaintiffs and Subclass Members seek compensatory and punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

## COUNT VI
### Monopolization
### Violation of the Sherman Act, 15 U.S.C. § 2
### TRICARE Class Against All Defendants

427.    Plaintiffs Bellucci, A.J.B., A.E.B., A.O.B, and King ("the TRICARE Plaintiffs") reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

428.    The TRICARE Plaintiffs bring this claim individually and on behalf of all other TRICARE Class Members.

429.    The Sherman Act makes illegal efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

430.    As explained in this complaint, patients with TRICARE health plans are only able to access their pharmacy benefits when they fill prescriptions from in-network pharmacies.

431.    As TRICARE's PBM, Express Scripts builds, manages, and administers pharmacy networks for TRICARE plans.

432.    Patients with TRICARE health insurance coverage cannot easily switch insurance plans due to the high cost (e.g. changing employment and significant cost savings provided

through TRICARE as compared to the commercial market) and enrollment cycles, as well as ineligibility for other government health insurance programs such as Medicare or Medicaid; cannot negotiate specialty drug designations or pharmacy network restrictions; and are generally locked in with Express Scripts and the pharmacy network it creates and manages for TRICARE for an extended period of time (due to multi-year contracts between Express Scripts and TRICARE). Express Scripts and TRICARE renewed their contract in 2021, extending the Express Scripts-TRICARE relationship through at least 2029.

433.    In this context, the only reasonably interchangeable alternatives available to patients with TRICARE health plans, such as the TRICARE Plaintiffs, who need to fill a prescription for a specialty drug are specialty pharmacies included in the Express Scripts-created TRICARE specialty pharmacy network.

434.    Accordingly, the product market relevant for purposes of this claim is the Express Scripts specialty pharmacy TRICARE aftermarket; that is, the market to provide specialty pharmacy services to patients with TRICARE health plans.

435.    Because Express Scripts administers the pharmacy benefits of TRICARE insureds across the country and the availability and ease of use of mail order specialty pharmacies means that pharmacies do not need local brick and mortar locations to compete for market share, the geographic market is nationwide in scope.

436.    In a well-functioning specialty pharmacy market, one would reasonably expect to see many brick-and-mortar and mail order pharmacies compete with each other to obtain in-network status with Express Scripts, and then—for those that successfully join Express Scripts's specialty pharmacy network—dispense drugs to patients.

437.    Express Scripts creates the appearance of patient choice by purporting to give insureds on TRICARE plans the option of using Accredo, independent pharmacies, or pharmacies on military bases for their specialty pharmacy needs.

438.    In practice, Express Scripts provides only the illusion of choice. Express Scripts maintains an extensive list of valuable maintenance drugs used to treat chronic conditions, and insureds are required to fill specialty drugs on the list either through home delivery via Accredo or at a military pharmacy. Military pharmacies often do not stock such specialty drugs and are only located on military bases, leaving Accredo as the only option reasonably available to patients (particularly civilians with TRICARE coverage who do not live on or in the vicinity of military bases).

439.    Indeed, the TRICARE Plaintiffs all have chronic conditions that require them to take specialty drugs included on this list of maintenance drugs. As result, the TRICARE Plaintiffs have no meaningful choice but to rely on Accredo for access to their medications.

440.    Even for patients filling specialty drugs that do not appear on the list of maintenance drugs, Express Scripts goes out of its way to make it inconvenient for patients to choose to use independent pharmacies rather than Accredo. Patients are limited to obtaining a 30-day supply of medication if they choose to use an independent pharmacy but are allowed to obtain a 90-day supply through Accredo, and patients are generally required to pay a higher out-of-pocket cost to obtain the same drug from an independent pharmacy instead of Accredo.

441.    The cumulative effect of these provisions is that Accredo is believed to capture a majority—and very likely a substantial majority—of specialty drug dispensing revenue from patients insured by TRICARE.

442.     As a result, Defendants have monopoly power in the Express Scripts specialty pharmacy TRICARE aftermarket.

443.     As in the Express Scripts specialty pharmacy commercial aftermarket, Accredo did not gain its market dominance through a naturally selective process of competition on the merits, or through any kind of competitive bidding process that required it to beat out other potential specialty pharmacy providers. On information and belief, no such competitive bidding process exists.

444.     Instead, Accredo has monopoly power in this market because it works with its vertically integrated affiliates Express Scripts, Evernorth, and Cigna to wholly exclude competitor specialty pharmacies from dispensing valuable maintenance drugs to TRICARE insureds and to dispense other specialty drugs on significantly less favorable terms than Accredo.

445.     At the same time, such vertically integrated favoritism and gatekeeping strictly regulates rival entry and regulates potential competitors to the margins where they cannot challenge Accredo for market share. This has allowed Accredo to maintain its dominant market position over multi-year cycles without any real fear of competition.

446.     Such conduct is blatantly anticompetitive.

447.     Defendants use their monopoly power to increase prices to supracompetitive levels and degrade the quality and quantity of Accredo's specialty pharmacy services below what would be offered in a competitive equilibrium.

448.     Because patients cannot practicably switch insurance plans or PBMs in response to anticompetitive behavior in the specialty pharmacy aftermarket, competition in the primary market for commercial insurance is an insufficient check on Defendants' illegal monopolization of the Express Scripts specialty pharmacy TRICARE aftermarket.

449.    As a direct and proximate result of Defendants' exploitation of their monopoly power, the TRICARE Plaintiffs and Class Members have suffered actual damages in that they are forced to pay inflated out of pocket costs, use inferior specialty pharmacy services, have lost many hours of time and attention that could have been spent on more valuable pursuits navigating Accredo's broken systems (representing an economic loss of time and labor), and are denied the full benefit of their insurance plan's pharmacy coverage.

450.    The TRICARE Plaintiffs and Class Members seek compensatory and treble damages, injunctive relief, and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT VII
### Attempted Monopolization
### Violation of the Sherman Act, 15 U.S.C. § 2
### TRICARE Class Against All Defendants

451.    The TRICARE Plaintiffs reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

452.    The TRICARE Plaintiffs bring this claim individually and on behalf of all other TRICARE Class Members.

453.    The Sherman Act makes illegal efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

454.    The conduct alleged in this Complaint evidences the specific intent of Express Scripts, Evernorth, Cigna, and Accredo to capture and monopolize the Express Scripts specialty pharmacy TRICARE aftermarket for their own benefit.

455.    Defendants engage in blatantly anticompetitive conduct to capture business for Accredo, primarily through the use of contracting strategies that require TRICARE plans to use

Accredo as their sole designated in-network specialty pharmacy while excluding other rival specialty pharmacies from network access.

456.     Defendants' role as gatekeepers of pharmacy network access, exploitation of informational asymmetries, the long-term nature of the TRICARE-Express Scripts contract (set to last through 2029), as well as the inability of the TRICARE Plaintiffs to readily switch insurance plans or PBMs, creates a dangerous probability that Defendants will achieve the monopoly power they seek.

457.     As a direct and proximate result of Defendants' exploitation of their monopoly power, the TRICARE Plaintiffs and Class Members have suffered actual damages in that they are forced to pay inflated out of pocket costs, use inferior specialty pharmacy services, have lost many hours of time and attention that could have been spent on more valuable pursuits navigating Accredo's broken systems, and are denied the full benefit of their insurance plan's pharmacy coverage.

458.     The TRICARE Plaintiffs and Class Members seek compensatory and treble damages, injunctive relief, and reasonable attorneys' fees, costs, and expenses relating to this action.

**COUNT VIII**
**Common Law Negligence**
**Violation of State Law**
**Accredo Common Law Claims Class against Accredo**

459.     Plaintiffs reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

460.     Plaintiffs bring this claim individually and on behalf of all other Accredo Common Law Claims Class Members.

461.    Accredo voluntarily undertakes to provide Plaintiffs and other Class Members specialty pharmacy services.

462.    Such specialty pharmacy services include accurately and timely filling and refilling prescriptions for specialty medications, delivering those medications to patients, coordinating with Express Scripts to verify insurance coverage and facilitate payment for those medications, and communicating with patients' medical providers when necessary.

463.    Accredo patients, including Plaintiffs and other Class Members, have serious and/or chronic medical conditions, and they rely on the specialty medications Accredo dispenses to both treat the underlying conditions and alleviate symptoms.

464.    Accredo knows that the specialty medications it dispenses treat serious and chronic conditions, and that patients rely on Accredo to access such life-sustaining medications.

465.    Failure to take medications on time as prescribed by a medical provider can result in serious medical consequences, including the return of painful and debilitating symptoms, development of drug resistance that reduces the efficacy of prescribed medications, and disease progression. It can also force patients to seek emergency medical treatment.

466.    Accredo knows that the patients it provides specialty pharmacy services to face the risk of serious medical harm if they are unable to access to their prescription drugs.

467.    Accredo therefore voluntarily undertakes to provide specialty pharmacy services to patients, including Plaintiffs and other Class Members, in full knowledge of patients' medical need for specialty drugs, patients' reliance on Accredo for access to such drugs, and the serious medical consequences that can follow if Accredo fails to reliably provide such drugs.

468.    Having voluntary undertaken to render services to Plaintiffs and other Class Members that aid in the treatment of their serious and chronic medical conditions, Accredo has a

duty to exercise reasonable care in the provision of such services, and to perform such services in a reasonably skillful manner.

469.    Accredo further owes Plaintiffs and other Class Members a general common law duty to act with reasonable care to prevent its conduct from causing an unreasonable risk of foreseeable harm.

470.    As alleged in this Complaint, Accredo breached and continues to breach these duties because it:

        a.    Lacks adequate systems to organize patient account information and record communications and interactions patients have with Accredo;

        b.    Lacks adequate systems to identify issues and problems experienced by patients, track progress toward resolutions, and mark them as closed/resolved when appropriate;

        c.    Lacks adequate systems to communicate important information about the handling of medications to the customer service reps scheduling it for delivery (for example, if it must be kept refrigerated);

        d.    Lacks adequate systems to efficiently inform patients of problems with their account or prescription that require attention;

        e.    Lacks adequate systems to effectively communicate with third parties—including insurers, copay assistance programs, and medical providers—to resolve problems preventing the dispensing of medications to patients;

        f.    Lacks adequate systems to ensure that patients are provided accurate information;

g. Lacks adequate systems to allow patients in urgent need of their medication to obtain that medication.

h. Fails to deliver medications in a timely fashion.

471. As a result of these breaches, Plaintiffs and Class Members regularly miss doses of their medication or are put in imminent fear of missing a dose, and must expend enormous amounts of time and energy to try to make sure they can take their medicine on time.

472. This failure is not just negligence. It is a conscious, structural strategy to increase margin and reduce drug utilization across a captive population.

473. As a direct and proximate result of these breaches, Plaintiffs and Class Members have suffered physical harm and reduced quality of life, endured significant emotional distress, and lost many hours of time and attention that could have been spent on more valuable pursuits.

474. Plaintiffs and Class Members seek compensatory and punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

**<u>COUNT IX</u>**
**Public Nuisance**
**Violation of State Law**
**Accredo Common Law Claims Class Against Accredo**

475. Plaintiffs reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

476. Plaintiffs bring this claim individually and on behalf of all other Accredo Common Law Claims Class Members.

477. The common law recognizes public health as a long-established right held by the general public.

478. Accredo unreasonably interferes with public health by needlessly burdening public health infrastructure in at least three ways.

479.    First, medical complications resulting from missed doses of medication force patients to seek out unnecessary additional medical treatment—sometimes including costly surgeries—that could have been avoided had Accredo's delays not prevented patients from taking their medications as prescribed. For example, Plaintiff Arredondo required two emergency room visits and emergency surgery as a direct result of Accredo's months-long failure to deliver her Humira prescription.

480.    Second, Accredo wastes the time of doctors and other medical providers with unnecessary bureaucratic messes that it creates. These include:

a.     Requiring providers to use the same telephone line as patients calling for customer support, forcing doctors to sit in a congested queue with lengthy hold times.

b.     Once through the queue, forcing doctors to spend long periods of time on the phone with Accredo—sometimes lasting more than an hour—to resolve routine prescription processing issues instead of spending that time seeing patients. In many instances, these lengthy calls are the direct result of Accredo's own shoddy record-keeping and systems, such as Accredo's difficulty processing prescriptions written to include both the brand and generic name of a medication (e.g. Humira and adalimumab).

c.     Not resolving issues even after getting contacted by a patient's medical provider, and instead reporting to the patient that the medical provider is the cause of the delay. Such inexplicable misinformation not only results in delay for the patient, but also forces the doctor to spend even more time on the phone with Accredo in an effort to resolve the problem.

d.      Similarly, medical providers frequently waste time providing the same

forms or documentation to Accredo over and over again without Accredo

marking the issue as resolved.

481.    Third, Accredo explicitly directs patients to try to obtain "sample" doses from

their medical providers or seek out emergency medical services when their medications do not

get delivered on time—forcing patients to make trips to their doctor or the emergency room that

could have been avoided if Accredo had simply delivered their medications on time.

482.    Each of these problems individually and especially in the aggregate represents a

substantial use of medical resources that makes it more difficult and costly for others to receive

care.

483.    In each circumstance, the problem is not the complexities of the American

healthcare system, but Accredo itself. But for Accredo's inadequate and substandard systems and

training, patients would be able to take their medications on time and avoid complications from

missing doses, doctors would not regularly get stuck in endless cycles of long phone calls that

take them away from clinical work, and patients would not need follow-up visits or trips to the

hospital to obtain emergency bridge doses.

484.    These problems are commonplace and systemic to the way Accredo operates, and

as alleged in this complaint, reflect a conscious, structural strategy to increase margin and reduce

drug utilization across a captive population. In essence, Accredo relies on public health

infrastructure to pick up the burden and cover the costs it creates by exploiting for profit the

chronically and/or severely ill patients who rely on it. The nuisance alleged here is not merely the

sum of private injuries, but the systemic diversion and overburdening of public health

infrastructure, including emergency rooms, public hospitals, and publicly funded healthcare resources, caused by Accredo's business practices.

485.     While the public as a whole is harmed by Accredo's unreasonable interference with public health, Plaintiffs and Accredo Common Law Claims Class Members have suffered and continue to suffer an injury different in kind from that of the general public. Plaintiffs and Class Members are the patients Accredo exploits. Because of Accredo's inadequate systems and training, Plaintiffs and Class Members regularly miss doses of their medication or are put in imminent fear of missing a dose, and must expend enormous amounts of time and energy to try to make sure they can take their medicine on time.

486.     As a direct and proximate result of these breaches, Plaintiffs and Accredo Common Law Claims Class Members have suffered physical harm and reduced quality of life, endured significant emotional distress, and lost many hours of time and attention that could have been spent on more valuable pursuits.

487.     Plaintiffs and Class Members seek compensatory and punitive damages, injunctive relief and abatement of the public nuisance, and reasonable attorney's fees, costs, and expenses relating to this action.

## COUNT X
### Breach of Contract
### Violation of State Law
### Accredo Common Law Claims Class Against Accredo

488.     Plaintiffs reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

489.     Plaintiffs bring this claim individually and on behalf of all other Accredo Common Law Claims Class Members.

490.   The ongoing commercial relationship between Plaintiffs and Accredo by which Accredo provides patients with specialty pharmacy services is described in and governed by the Accredo Patient Handbook.

491.   The Accredo Patient Handbook includes a mutual exchange of promises whereby Accredo describes its policies for ordering medications and refills, tendering payment, providing clinical support, its "Patient Bill of Rights," and the responsibilities expected from patients.

492.   Plaintiffs' use of and tender of payment to Accredo consistent with the Patient Handbook constitutes acceptance, supported by consideration, of the terms laid out in the Patient Handbook.

493.   Taking payments and undertaking to fill prescriptions constitutes acceptance, supported by consideration, by Accredo of the terms laid out in the Patient Handbook.

494.   The Patient Handbook therefore provides the terms of a valid and enforceable contract between Plaintiffs and Accredo.

495.   The Patient Handbook describes that "[w]ith Accredo, your specialty medications are quickly delivered to a location of your choice, or your prescriber's choice, at no additional charge."

496.   The Patient Handbook further describes that "At Accredo, we do everything we can to simplify your treatment with specialty medications. We understand that each patient is unique and has different needs. . . . Our team of specialty-trained pharmacists, nurses, patient care advocates, social workers and insurance coordinators are here to help you achieve the best possible outcomes from your therapy."

497.   And as described above, the "Patient Bill of Rights" in the Patient Handbook provides that:

As an Accredo patient, you have the right to:
1.      Be treated with dignity, courtesy and respect.
. . .
6.      Receive information in a way you can understand to help you make informed decisions about your care.
7.      Be involved in decisions regarding your care.
8.      Be informed of the nature, purpose, frequency and outcomes, including potential unexpected outcomes of service.
. . .
10.     Expect timely delivery of service.
. . .
12.     Expect us to coordinate care with your prescriber and other providers.
. . .
18.     Be free from mental, physical, sexual and verbal abuse, neglect or exploitation.

498.    Plaintiffs are in substantial compliance with all the policies and responsibilities the Patient Handbook imposes upon them.

499.    Accredo has failed to substantially perform on these promises.

500.    As alleged in this complaint, Accredo routinely:

a.     Fails to quickly or timely deliver service to Plaintiffs.

b.     Fails to timely provide information in a manner that will allow Plaintiffs to make informed decisions about their care.

c.     Provides inaccurate or false information.

d.     Denies Plaintiffs the ability to communicate directly with backend teams authorized to actually resolve patient issues.

e.     Fails to effectively communicate with Plaintiffs' providers and insurance plans.

f.     Neglects Plaintiffs' physical well-being and reduces the efficacy of treatment by forcing them to endure delays in the shipment of life-saving and life sustaining medication, thereby putting them at risk of life-

threatening complications, disease progression, the development of drug resistance, and the resurgence of painful symptoms.

    g.    Neglects Plaintiffs' mental well-being by forcing them to endure constant uncertainty as to whether their medications will arrive on time.

    h.    Exploits Plaintiffs by using such myriad delays as part of a conscious strategy to increase margin and reduce drug utilization.

501.    As a direct and proximate result of such breaches, Plaintiffs and Accredo Common Law Claims Class Members have suffered and will continue to suffer injury in that Class Members were denied the benefit of their bargain with Accredo.

502.    Plaintiffs and Class Members seek compensatory and punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

**<u>COUNT XI</u>**
**Promissory Estoppel**
**Violation of State Law**
**Accredo Common Law Claims Class Against Accredo**

503.    Plaintiffs reassert, reallege, and incorporate by reference all of the paragraphs of this Complaint.

504.    Plaintiffs bring this claim individually and on behalf of all other Accredo Common Law Claims Class Members.

505.    Plaintiffs bring this claim in the alternative to their Breach of Contract Claim.

506.    If the Accredo Patient Handbook does not constitute a valid and enforceable contract, the representations therein, including those in the Patient Bill of Rights, constitute promises on which Accredo intended patients to rely.

507.     Plaintiffs in fact did and do rely on Accredo's repeated promises in its Patient Handbook, including those that it will timely and quickly deliver their medications, keep them reasonably and fully informed, and not act in a manner detrimental to their mental and physical.

508.     As explained in this Complaint, such reliance was to Plaintiffs' detriment, for reasons including that they have endured frequent delays in the delivery of their prescription medications and have suffered resulting physical and mental harm.

509.     As a direct and proximate result of such reliance, Plaintiffs and Accredo Common Law Claims Class Members have suffered and will continue to suffer injury in that Class Members were denied the benefit of the promises made by Accredo in the Patient Handbook.

510.     Plaintiffs and Class Members seek compensatory and punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

## PRAYER FOR RELIEF

511.     Plaintiffs, individually and on behalf of all others similarly situated, respectfully request the following relief:

a.     Finding that this action satisfies the requirements for maintenance as a class action as set forth in Rule 23 of the Federal Rules of Civil Procedure and certifying the Classes defined herein;

b.     Appointing Plaintiffs as representatives of the Classes defined herein;

c.     Appointing undersigned counsel as class counsel;

d.     Entering judgment in favor of Plaintiffs and the other Class members and against Defendants;

e.     Awarding Plaintiffs actual and punitive damages;

f.     Awarding Plaintiffs treble damages under 15 U.S.C. § 15.

g.      Issuing an injunction prohibiting Defendants from engaging in the conduct alleged herein;

h.      Finding that Defendants have engaged in conduct, as alleged herein, constituting a public nuisance and ordering abatement of that nuisance;

i.      Awarding reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses; and

j.      Granting such other and further relief as the Court deems appropriate.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class Members, request a trial by jury on all claims so triable.

Respectfully submitted,

/s/ Michael Kanovitz

Michael Kanovitz
Jon Loevy
Scott Rauscher
Ross Kimbarovsky
Aaron Tucek
Alexandra Wolfson
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(P) (312) 243-5900
(F) (312) 243-5902
mike@loevy.com
jon@loevy.com
scott@loevy.com
ross@loevy.com
aaron@loevy.com
wolfson@loevy.com

Isaac Green
LOEVY & LOEVY
2060 Broadway Street, Suite 280
Boulder, CO 80302
(P) (720) 583-6514
(F) (312) 243-5902
green@loevy.com