**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KIMBERLY WOLF, VALERIE DELLORTO, MELISSA ARREDONDO, JENNIFER BELLUCCI, on her own behalf and as parent and next friend to A.J.B., A.E.B., and A.O.B., minors, ROBIN BETZ, NATHAN CLYMER, on his own behalf and as parent and next friend of P.C., a minor, SHAY JARM, AMY KING, and HEATHER LISSER, each individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ACCREDO HEALTH GROUP, INC., EXPRESS SCRIPTS, INC., EVERNORTH HEALTH, INC., and THE CIGNA GROUP, <br><br> Defendants. | No. 1:26-cv-00098 <br><br> Hon. Andrea R. Wood |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR MOTION TO DISMISS AND TO STRIKE CLASS ALLEGATIONS**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

     A.     Pharmacy Benefit Managers and Pharmacy Networks ................................... 3

     B.     Defendants ...................................................................................................... 5

     C.     The Complaint ................................................................................................ 8

LEGAL STANDARD .......................................................................................................... 10

ARGUMENT ...................................................................................................................... 10

I.      PLAINTIFFS' CLAIM UNDER SECTION 1 OF THE SHERMAN ACT (COUNT I)
      FAILS ............................................................................................................... 10

     A.     Plaintiffs' *Per Se* Tying Claim Fails ........................................................ 11

          1.     Plaintiffs do not plausibly allege a tying arrangement ............................. 11

          2.     Plaintiffs have not alleged market power in any tying
                market .................................................................................................... 14

          3.     Plaintiffs fail to allege a substantial effect on interstate
                commerce ............................................................................................... 14

          4.     Plaintiffs lack antitrust standing to assert their tying claim ...................... 15

     B.     Plaintiffs Have Not Plausibly Alleged a Claim Under the Rule of
          Reason ........................................................................................................... 16

II.     PLAINTIFFS' SECTION 2 CLAIMS (COUNTS II, III, VI, AND VII) FAIL ................ 17

     A.     Plaintiffs Fail to Plausibly Allege a Relevant Product Market ..................... 18

     B.     Plaintiffs Have Not Alleged Exclusionary Conduct ..................................... 22

     C.     Plaintiffs Have Not Adequately Pled an Intent to Monopolize ..................... 24

III.    PLAINTIFFS' TRICARE CLAIMS (COUNTS VI AND VII) ARE
      INDEPENDENTLY BARRED BY FEDERAL INSTRUMENTALITY IMMUNITY .......... 24

i

IV.     PLAINTIFFS' STATE-LAW CLAIMS FAIL ................................................................. 27

       A.     Plaintiffs Fail to State a California Unfair Competition Law Claim (Count IV)................................................................................................. 27

       B.     Plaintiffs Fail to State an Illinois Consumer Fraud Claim (Count V).................. 29

       C.     Plaintiffs Fail to State a Negligence Claim (Count VIII) .................................... 31

       D.     Plaintiffs Fail to State a Public Nuisance Claim (Count IX) ............................... 33

       E.     Plaintiffs Fail to State a Breach of Contract Claim (Count X) ............................ 34

       F.     Plaintiffs Fail to State a Promissory Estoppel Claim (Count XI) ........................ 35

       G.     This Court Lacks Personal Jurisdiction over Defendants as to the Non-Illinois State-Law Claims ............................................................................ 36

V.     AT A MINIMUM, THE COURT SHOULD STRIKE PLAINTIFFS' COMMON-LAW CLASS ALLEGATIONS.................................................................................................. 38

VI.    CIGNA AND EVERNORTH SHOULD BE DISMISSED AS DEFENDANTS .................................. 42

VII.   THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS WITH PREJUDICE .............................. 43

CONCLUSION..................................................................................................................... 43

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) ...................................................................................10, 11, 16

*AgReliant Genetics, LLC v. Gary Hamstra Farms, Inc.*,
213 N.E.3d 1087 (Ind. Ct. App. 2023)........................................................................41

*Aisenman v. City & County of San Francisco*,
2005 WL 43497 (N.D. Cal. Jan. 6, 2005) ...................................................................34

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
2 F.4th 695 (7th Cir. 2021) .........................................................................................10

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)........................................................................................16, 17, 18

*Art Akiane LLC. v. Art & SoulWorks LLC*,
2020 WL 6733681 (N.D. Ill. Nov. 5, 2020) ...............................................................41

*Babbitt Muns., Inc. v. Health Care Serv. Corp.*,
64 N.E.3d 1178 (Ill. App. Ct. 2016) ...........................................................................34

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) .....................................................................................22

*Barker v. Miller*,
2022 WL 1843211 (C.D. Cal. Feb. 24, 2022)..............................................................32

*Batton v. Nat'l Ass'n of Realtors*,
2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ................................................................36

*Bauer v. Armslist, LLC*,
572 F. Supp. 3d 641 (E.D. Wis. 2021).........................................................................33

*Baylor Scott & White v. Project Rose MSO, LLC*,
633 S.W.3d 263 (Tex. App. 2021)................................................................................35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................36

*Benson v. Fannie May Confections Brands, Inc.*,
944 F.3d 639 (7th Cir. 2019) .......................................................................................31

*Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*,
 624 S.E.2d 55 (Va. 2006)..................................................................................31

*Bober v. Glaxo Wellcome PLC*,
 246 F.3d 934 (7th Cir. 2001) ...........................................................................32

*Bolton v. Fisher*,
 528 S.W.3d 770 (Tex. App. 2017).................................................................33, 40

*Brandywine Hosp., LLC, v. CVS Health Corp.*,
 2026 WL 607526 (E.D. Pa. Mar. 3, 2026)...................................................19

*In re Bridgestone/Firestone, Inc.*,
 288 F.3d 1012 (7th Cir. 2002) ..................................................................38, 39, 41

*Brillhart v. Mutual Medical Ins., Inc.*,
 768 F.2d 196 (7th Cir. 1985) .............................................................................1

*Byers v. Intuit, Inc.*,
 564 F. Supp. 2d 385 (E.D. Pa. 2008) ..............................................................25

*Cal. Crane Sch., Inc. v. Google LLC*,
 722 F. Supp. 3d 1026 (N.D. Cal. 2024) ...........................................................29

*Car Carriers, Inc. v. Ford Motor Co.*,
 561 F. Supp. 885 (N.D. Ill. 1983) ....................................................................16

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
 20 Cal. 4th 163 (1999) .....................................................................................28

*Chaconas v. JP Morgan Chase Bank*,
 713 F. Supp. 2d 1180 (S.D. Cal. 2010)............................................................31

*Chicago Studio Rental, Inc. v. Ill. Dep't of Com.*,
 940 F.3d 971 (7th Cir. 2019) ............................................................................22

*Corcoran v. CVS Health Corp.*,
 169 F. Supp. 3d 970 (N.D. Cal. 2016) .............................................................32

*Creative Mobile Techs., LLC v. Flywheel Software, Inc.*,
 2017 WL 679496 (N.D. Cal. Feb. 21, 2017) ....................................................28

*Daimler AG v. Bauman*,
 571 U.S. 117 (2014)...........................................................................................37

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
 360 F. Supp. 3d 788 (N.D. Ill. 2019) ...............................................................15

*Demedicis v. CVS Health Corp.*,
  2017 WL 569157 (N.D. Ill. Feb. 13, 2017) ...................................................38

*Doe v. Princeton Univ.*,
  790 F. App'x 379 (3d Cir. 2019) ...................................................................35

*Doe v. Regents of Univ. of Cal.*,
  672 F. Supp. 3d 813 (N.D. Cal. 2023) ...........................................................34

*Don-Rick, Inc. v. QBE Ams.*,
  995 F. Supp. 2d 863 (W.D. Wis. 2014) ..........................................................34

*Dudley v. API Indus., Inc.*,
  2025 WL 3769876 (N.Y. App. Div. Dec. 31, 2025).........................................40

*Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constructors, Inc.*,
  255 P.3d 286 (Nev. 2011) ...............................................................................41

*E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*,
  496 F. Supp. 3d 338 (D.D.C. 2020)................................................................34

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)..........................................................................11, 20, 21

*Elliott v. United Ctr.*,
  126 F.3d 1003 (7th Cir. 1997) ..................................................................18, 20

*Fourqurean v. NCAA*,
  143 F.4th 859 (7th Cir. 2025) ....................................................................11, 18

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) .............................................................................27

*Gabriel v. Giant Eagle, Inc.*,
  124 F. Supp. 3d 550 (W.D. Pa. 2015)........................................................32, 39

*People ex rel. Gallo v. Acuna*,
  14 Cal. 4th 1090 (1997) ..................................................................................33

*Great Escape, Inc. v. Union City Body Co.*,
  791 F.2d 532 (7th Cir. 1986) ...........................................................................24

*Gustafson v. BAC Home Loans Servicing, LP*,
  294 F.R.D. 529 (C.D. Cal. 2013).....................................................................41

*Hack v. President & Fellows of Yale College*,
  237 F.3d 81 (2d Cir. 2000)...............................................................................20

v

*Hamus v. Bank of N.Y. Mellon*,
  2011 WL 13266806 (W.D. Wis. May 13, 2011) ...................................................................32

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
  151 F.4th 922 (7th Cir. 2025) ...........................................................................................19, 21

*Harris v. Rust-Oleum Corp.*,
  2022 WL 952743 (N.D. Ill. Mar. 30, 2022)......................................................................38, 42

*Huddleston v. Am. Airlines, Inc.*,
  2018 WL 4742097 (N.D. Ill. Oct. 2, 2018).......................................................................10, 38

*Hughes v. Nw. Univ.*,
  63 F.4th 615 (7th Cir. 2023) .................................................................................................32

*Ill. Tool Works Inc. v. Independent Ink, Inc.*,
  547 U.S. 28 (2006).................................................................................................................14

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
  2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ........................................................................18

*In re iPhone Application Litig.*,
  6 F. Supp. 3d 1004 (N.D. Cal. 2013) ....................................................................................28

*Irvin v. Exeter Fin. LLC*,
  2024 WL 3398348 (N.D. Ill. July 11, 2024)..........................................................................43

*Iseberg v. Gross*,
  227 Ill. 2d 78 (2007) .............................................................................................................31

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)..................................................................................................................11

*Jones v. Bank of Am., N.A.*,
  2012 WL 405053 (E.D. Va. Feb. 7, 2012).............................................................................34

*Jones v. BRG Sports, Inc.*,
  2019 WL 3554374 (N.D. Ill. Aug. 1, 2019) ..........................................................................38

*Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*,
  55 F.4th 517 (7th Cir. 2022) .................................................................................................34

*Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau*,
  701 F.2d 1276 (9th Cir. 1983) ..............................................................................................13

*Kroger Co. v. Elwood*,
  197 S.W.3d 793 (Tex. 2006)..................................................................................................31

vi

*Lagrisola v. N. Am. Fin. Corp.*,
    314 Cal. Rptr. 3d 941 (Ct. App. 2023) ...................................................................29

*Lazarou v. Am. Bd. of Psychiatry & Neurology*,
    2023 WL 6461255 (N.D. Ill. Oct. 4, 2023).............................................................12

*Loakes v. Wells Fargo Bank*, *N.A.*,
    2016 WL 6666813 (C.D. Cal. June 27, 2016) ........................................................29

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*,
    41 F.4th 787 (7th Cir. 2022) ..................................................................................23

*McKee v. Am. Home Prods., Corp.*,
    113 Wash. 2d 701 (1989)........................................................................................32

*McLaughlin Equip. Co. v. Servaas*,
    2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ........................................................20

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ..................................................................................23

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    859 F.3d 408 (7th Cir. 2017) ..................................................................................23

*Mirabile v. Bank of Am., Nat'l Ass'n*,
    2024 WL 1250265 (N.D. Ill. Mar. 22, 2024)..........................................................30

*Morris v. Harvey Cycle & Camper, Inc.*,
    392 Ill. App. 3d 399 (App. Ct. 2009)......................................................................31

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
    162 F.4th 1268 (10th Cir. 2025) .............................................................................15

*Name.Space, Inc. v. Network Sols., Inc.*,
    202 F.3d 573 (2d Cir. 2000)..............................................................................24, 25

*Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*,
    2012 WL 1886440 (N.D. Ill. May 22, 2012)......................................................42, 43

*In re NCAA Student-Athlete Concussion Inj. Litig.*,
    314 F.R.D. 580 (N.D. Ill. 2016)..............................................................................40

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)..................................................................................................10

*Norris Sales Co. v. Target Div. of Diamant Boart, Inc.*,
    2002 WL 31771169 (E.D. Pa. Dec. 11, 2002)........................................................35

*Nowaczyk v. Joliet Cath. Acad.*,
2014 WL 3642197 (N.D. Ill. July 23, 2014)................................................................35

*Om v. Weathers*,
1992 WL 151553 (N.D. Ill. June 23, 1992) ...............................................................24

*People's Choice Wireless, Inc. v. Verizon Wireless*,
131 Cal. App. 4th 656 (2005) ....................................................................................28

*Pittman v. Upjohn Co.*,
890 S.W.2d 425 (Tenn. 1994)....................................................................................39

*Pollard v. GEO Grp., Inc.*,
607 F.3d 583 (9th Cir. 2010) .....................................................................................39

*Prime Aid Pharmacy Corp. v. Humana Inc.*,
2017 WL 2889677 (D.N.J. Mar. 2, 2017)...................................................................22

*Prime Aid Pharmacy Corp. v. Humana Inc.*,
2017 WL 3420933 (D.N.J. Aug. 9, 2017) ............................................................13, 22

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*,
338 F.3d 773 (7th Cir. 2003) ...............................................................................10, 37

*State v. Quality Egg Farm, Inc.*,
104 Wis. 2d 506, 311 N.W.2d 650 (1981)................................................................40

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997).........................................................................18, 19, 20

*Ramirez v. LexisNexis Risk Sols.*,
729 F. Supp. 3d 838 (N.D. Ill. 2024) .........................................................................30

*RAR, Inc. v. Turner Diesel, Ltd.*,
107 F.3d 1272 (7th Cir. 1997) ...................................................................................37

*Reason v. Kathryn's Korner Thrift Shop*,
169 A.3d 96 (Pa. Super. 2017)...................................................................................31

*Reifert v. S. Cent. Wis. MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ..........................................................................11, 14, 15

*Reynolds v. Bank of Am., N.A.*,
2013 WL 1904090 (N.D. Tex. May 8, 2013) ..............................................................34

*Ricchiuti v. Home Depot, Inc.*,
412 F. Supp. 2d 456 (E.D. Pa. 2005) .........................................................................33

*Robinson v. HP, Inc.*,
2025 WL 2802077 (N.D. Ill. Sept. 30, 2025) ..................................................................12, 17

*Robinson v. Toyota Motor Credit Corp.*,
201 Ill. 2d 403 (Ill. 2002)...............................................................................................30

*Sabol v. PayPal Holdings, Inc.*,
2024 WL 3924686 (N.D. Cal. Aug. 23, 2024) ........................................................29

*Scholl v. Walgreens Specialty Pharmacy*,
LLC, 2025 WL 950866 (N.D. Okla. Mar. 28, 2025)........................................32, 39

*Serfecz v. Jewel Food Stores*,
67 F.3d 591 (7th Cir. 1995) ............................................................................................15

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020) ...........................................................................16, 17, 18

*Siva v. Am. Bd. of Radiology*,
38 F.4th 569 (7th Cir. 2022) ........................................................................................12, 14

*Siva v. Am. Bd. of Radiology*,
512 F. Supp. 3d 864 (N.D. Ill. 2021) ...........................................................................16

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) .........................................................................................39

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) ..........................................................................................36

*Michigan v. U.S. Army Corps of Eng'rs*,
758 F.3d 892 (7th Cir. 2014) ..........................................................................................33

*United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*,
144 F.4th 976 (7th Cir. 2025) ...................................................................................17, 22

*US Ecology, Inc. v. State*,
129 Cal. App. 4th 887 (2005) ........................................................................................35

*Vanegas v. Signet Builders, Inc.*,
113 F.4th 718 (7th Cir. 2024) ........................................................................................36

*Walden v. Fiore*,
571 U.S. 277 (2014)..........................................................................................................37

*Warciak v. Subway Rests., Inc.*,
949 F.3d 354 (7th Cir. 2020) ..........................................................................................10

*White v. DaimlerChrysler Corp.*,
    368 Ill. App. 3d 278 (App. Ct. 2006).................................................................29

*Will v. Comprehensive Acct. Corp.*,
    776 F.2d 665 (7th Cir. 1985) ...........................................................................14

*Young v. Bryco Arms*,
    213 Ill. 2d 433 (2004) ......................................................................................33

**Statutes, Rules & Regulations**

10 U.S.C. § 1073a................................................................................................6, 21

10 U.S.C. § 1074g.................................................................6, 7, 8, 21, 26, 27

41 U.S.C. § 3301 ...............................................................................................6, 21

Cal. Bus. & Prof. Code § 17200 ............................................................................27

Cal. Code Civ. Proc. § 337(a) ................................................................................41

Cal. Code Civ. Proc. § 338(b)................................................................................40

10 Del. C. § 8106 ...................................................................................................41

D.C. Code § 12-301(a)(3) ......................................................................................40

215 Ill. Comp. Stat. Ann. 5/513b1 .........................................................................30

735 Ill. Comp. Stat. Ann. 5/13-205....................................................................40, 41

735 Ill. Comp. Stat. Ann. 5/13-206........................................................................41

Ky. Rev. Stat. Ann. § 413.140(1)(a) ......................................................................40

Fed. R. Civ. P. 12.............................................................................................10, 37

Fed. R. Civ. P. 23.............................................................................................38, 41

32 C.F.R. § 199.21 .................................................................................................21

80 Fed. Reg. 46,796 (Aug. 6, 2015).........................................................................8

**Other Authorities**

The Cigna Group, Annual Report (Form 10-K) at 35 & Ex. 21 (Feb. 27, 2025),
    https://investors.thecignagroup.com/financials/sec-filings/sec-filings-
    details/default.aspx?FilingId=18230536................................................................37

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 564a (Supp. 2025)............................18

Restatement (Second) of Contracts § 18 (1981) ............................................................................34

Restatement (Second) of Torts § 821B (1979) ..............................................................................33

**INTRODUCTION**

Plaintiffs' scattershot Complaint fails to state any claim. Plaintiffs have health insurance with prescription drug benefits provided by their employers or through the federal government's TRICARE program. According to their Complaint, Plaintiffs' health insurance plans cover the cost of specialty medications when filled by Defendant Accredo Health Group, Inc. ("Accredo"), but not when filled by other pharmacies. Plaintiffs are unhappy with Accredo's service and frustrated that the sponsors of their insurance plans—their employers or the federal government—did not offer different prescription drug benefits. But even accepting Plaintiffs' allegations as true, those allegations have nothing to do with the federal antitrust laws, which prohibit only *anticompetitive* conduct and not competitive conduct that Plaintiffs dislike. Nor can Plaintiffs use the antitrust laws to attack federal statutes or federal contracts relating to the TRICARE program. Rather than stating a claim, the TRICARE allegations show that Plaintiffs' theory of the case is completely wrong: The conduct that Plaintiffs attack as anticompetitive as to TRICARE is directly mandated by Congress or by the TRICARE contract. The federal government, not any Defendant in this case, decides which drugs covered by the TRICARE program are designated as specialty drugs and which pharmacies TRICARE members can use for covered services. And Plaintiffs' efforts to shoehorn their customer service complaints into various state-law causes of action also fail, including because the claims of nonresidents are not properly before this Court and because Plaintiffs fail to plausibly allege the elements of the claims they assert. Each of Plaintiffs' claims should be dismissed with prejudice.

*First*, none of Plaintiffs' five Sherman Act claims come close to clearing the threshold of plausibility. "The antitrust laws are designed to protect competition." *Brillhart v. Mutual Medical Ins., Inc.*, 768 F.2d 196, 200 (7th Cir. 1985). For that reason, to state a claim under Section 1 or Section 2 of the Sherman Act, a plaintiff must allege *competitive* harm in a relevant

market. Here, instead of alleging harm to competition, Plaintiffs repeatedly admit that plan sponsors have a choice about which pharmacy benefit manager ("PBM") to use and which pharmacy networks to offer. That Plaintiffs disagree with the choices their plan sponsors made in a competitive market does not render those choices anticompetitive.

*Second*, Plaintiffs' Section 1 claim fundamentally misunderstands the law on tying. A tying claim requires two distinct products, one of which customers are forced to buy as a condition of getting the other. Plaintiffs appear to allege a tie between the PBM services offered by Defendant Express Scripts, Inc. ("ESI") and a pharmacy network where Accredo is the exclusive in-network specialty pharmacy. But Plaintiffs affirmatively allege that pharmacy networks are an integral part of the PBM services offered by ESI. Pharmacy networks are not some *other* service foisted on plan sponsors and insurers as a condition of using ESI's PBM services. Indeed, as the federal government's competitive bidding process and ultimate selection of ESI as the PBM for TRICARE show, PBMs like ESI compete to offer attractive pharmacy networks (including specialty and mail-order pharmacies) that meet a given client's needs. Because Plaintiffs have not alleged that PBM services and specialty pharmacy networks are different products with distinct demand, any tying claim fails. And leaving aside the failure to plead a tie at all, Plaintiffs cannot state a Section 1 claim because the Complaint fails to define any relevant antitrust market in which competition is unreasonably restrained.

*Third*, similar defects doom Plaintiffs' monopolization and attempted monopolization claims under Section 2 of the Sherman Act. Plaintiffs allege that ESI's contracts with its PBM clients create aftermarkets for specialty pharmacy services, but those allegations fail many times over. Contracts do not define markets, and allegations that a defendant monopolizes its own products do not state a claim.

2

*Fourth*, Plaintiffs' monopolization and attempted monopolization claims relating to TRICARE are barred by federal instrumentality immunity. The TRICARE program is designed and administered by the federal government, and Defendants' alleged conduct reflects the implementation of that program in accordance with federal law, government contracts, and government-approved policies. When a private party provides services under a federal contract, at the federal government's direction, that conduct cannot be second-guessed or unwound under the federal antitrust laws.

*Fifth*, Plaintiffs' state-law claims fail because Plaintiffs have not plausibly alleged the elements of each claim. There can be no violation of Illinois or California consumer protection laws without an unfair practice and economic loss; no negligence without breach of a duty; no public nuisance without interference with a public right; no breach of contract without an enforceable contract; and no promissory estoppel without a definite promise. And leaving aside the myriad pleading failures, the claims of nonresident Plaintiffs' claims should be dismissed because this Court lacks personal jurisdiction over Defendants as to claims arising in other states.

*Finally*, to the extent the Court does not dismiss such claims as implausibly pled or for lack of personal jurisdiction, the Court should strike Plaintiffs' common-law class allegations because material variations in state law foreclose the ability to proceed with any nationwide common-law class. At a minimum, the Court should dismiss Defendants The Cigna Group ("Cigna") and Evernorth Health, Inc. ("Evernorth") because Plaintiffs have not plausibly alleged responsibility by either parent company for any claim in the Complaint.

## BACKGROUND

### A.      Pharmacy Benefit Managers and Pharmacy Networks

Central to this case is the relationship between patients, plan sponsors, insurers, PBMs, and "specialty pharmac[ies]." Compl. ¶¶ 1, 172. Each Plaintiff has a health insurance plan—a

"bundle of covered healthcare services and pharmacy benefits resulting from [a] contact between the sponsor, insurer, and (if applicable) any third-party PBM to which that person is entitled to access as a beneficiary." *Id.* According to Plaintiffs, PBMs contract with commercial plan sponsors (such as employers), insurers, and other third-party payors (such as the federal government). *Id.* ¶¶ 18–19. Plaintiffs receive their prescription drug benefits in one of two ways: either through their employers or through TRICARE, the "government healthcare program for current and retired members of the United States Armed Forces and their families." *Id.* ¶ 19.

PBMs provide their clients with many services designed to lower the costs of providing prescription drug benefits to members. These include claims administration, negotiating pricing with manufacturers for formulary inclusion, creating and managing formularies offered to plan sponsors, orchestrating the flow of funds through the supply chain, and creating and maintaining pharmacy networks offered to plan sponsors. Compl. ¶¶ 145–146, 160, 179. "A pharmacy network is a list of pharmacies approved by a patient's insurance at which the patient can use their pharmacy benefits to purchase prescription medication." *Id.* ¶ 152. "A patient who purchases a medication from an 'in-network' pharmacy can use their insurance benefits to assist with the purchase, while insurance covers significantly less of the costs or pays nothing at all if the patient tries to use an 'out-of-network' pharmacy." *Id.* Included within pharmacy networks are specialty pharmacies "where insurance benefits can be used to obtain specialty medications." *Id.* ¶ 153. PBMs, according to the Complaint, "define both whether a drug is specialty and whether a pharmacy is an in-network specialty pharmacy." *Id.* ¶ 154; *see id.* ¶ 173.

Among the services that PBMs provide clients is the development of drug formularies, or "lists of covered drugs" typically "organized into pricing tiers determined by PBM-led negotiations on behalf of insurers with drug manufacturers." Compl. ¶ 147. Formularies are customizable, and plan sponsors decide which formularies to use. Formularies typically include

specialty drugs, which are "generally high-cost medicines used to treat chronic or severe conditions (such as rheumatoid arthritis, multiple sclerosis, or cancer)." *Id.* ¶ 150. Specialty drugs may need special storage and handling or require clinical expertise to administer. *Id.* ¶¶ 52, 96. According to Plaintiffs, "[m]ost pharmacies have the technical expertise and capacity to distribute most specialty drugs." *Id.* ¶ 155.

Plaintiffs receive prescription drug benefits from health plans that use ESI for PBM services. Compl. ¶¶ 16–17, 19. According to Plaintiffs, ESI "categorizes medications as specialty drugs and creates and maintains networks of pharmacies at which patients may use their pharmacy benefits." *Id.* ¶ 20. Plaintiffs allege they are only able "to access their pharmacy benefits when they fill prescriptions from in-network pharmacies, as defined by the PBM used by their insurance plan." *Id.* ¶ 377. And they allege that their health plans cover specialty medications only when filled at Accredo because it is the one in-network specialty pharmacy offered by the plans. *Id.* ¶ 181. Plaintiffs acknowledge, however, that they can switch health plans, including during open enrollment and when changing employment. *Id.* ¶ 191.

**B.      Defendants**

Plaintiffs name Cigna, Evernorth, ESI, and Accredo as Defendants in this case. Compl. ¶¶ 36–38. Cigna, which is incorporated in Delaware and headquartered in Bloomfield, Connecticut, is a global health company broken into two segments: Evernorth and Cigna Healthcare. *Id.* ¶¶ 36–37. Evernorth, in turn, is the parent company of ESI and Accredo. *Id.* ¶ 38.

ESI is a PBM. Compl. ¶ 40. ESI's competitors include CVS Caremark, Optum Rx, and other smaller PBMs. *Id.* ¶ 144. Plan sponsors can and do switch between ESI and its PBM competitors. *See, e.g.*, *id.* ¶ 245. In addition to providing services to commercial clients, ESI also provides PBM services for TRICARE. *Id.* ¶ 19. TRICARE's enabling statute requires that the Department of Defense ("DoD") "establish an effective, efficient, [and] integrated pharmacy

5

benefits program." 10 U.S.C. § 1074g. By statute, the pharmacy benefits program must satisfy a host of requirements, including making prescription drugs available to TRICARE beneficiaries through DoD-operated pharmacies, a retail pharmacy network, and a national mail-order pharmacy program. *Id.* § 1074g(a)(2)(E).

TRICARE service contracts must undergo "full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a). As relevant here, DoD sought competitive bidding for PBM services through a Request for Proposal ("RFP") in July 2020. *See* TPharm5 RFP, Ex. B. DoD selected ESI as TRICARE's PBM after considering many statutorily mandated factors and ultimately determining that ESI would "provide the best value to the United States to the maximum extent consistent with furnishing high-quality health care in a manner that protects the fiscal and other interests of the United States." 10 U.S.C. § 1073a(a). The current contract between DoD and ESI is known as TPharm5 (i.e., the fifth generation of TRICARE Pharmacy Services) and requires ESI to provide nationwide mail-order pharmacy services to TRICARE beneficiaries. TPharm5 §§ C.6.1–C.6.1.1, Ex. C; *see also* Compl. ¶¶ 176–177.[1]

Together, TPharm5 and the TRICARE statute impose numerous requirements on ESI's administration of the TRICARE pharmacy benefit. For example, TPharm5 specifies that the federal government will provide "an initial list of pharmaceutical agents" to be considered as specialty drugs to ESI, which is then required to propose "updates to the list … for Government approval." TPharm5 § C.4.1. Ultimately, DoD maintains control over TRICARE's formulary and determines specialty drug coverage. *See* 10 U.S.C. § 1074g(a). The TRICARE statute also

---

[1] Plaintiffs' allegations span multiple TRICARE contract periods. The fourth-generation contract ("TPharm4") governed the TRICARE Pharmacy Benefits Program from May 1, 2014, through December 31, 2022. *See* TPharm4, Ex. D. TPharm5 replaced TPharm4 as of January 1, 2023. As explained in the concurrently filed Request for Judicial Notice, the Court may take judicial notice of these contracts, both of which are matters of public record and central to Plaintiffs' TRICARE-related claims.

imposes different cost-sharing requirements on members depending on the pharmacy they use and the refill amount. In particular, Congress set copayment amounts on a 30-day basis for prescriptions filled at retail pharmacies and on a 90-day basis for prescriptions filled through the national mail-order pharmacy program. *Id.* § 1074g(a)(6)(A).

Accredo is a specialty pharmacy that dispenses "specialty drugs" and "operates via home delivery and has no brick-and-mortar locations." Compl. ¶¶ 9, 52–54. According to Plaintiffs, "the vast majority of Express Scripts['] and Evernorth's contracts with their commercial clients require those clients to use Accredo as their designated and exclusive in-network specialty pharmacy." *Id.* ¶ 181. Plaintiffs also allege that Accredo captures "approximately 70% or more" of specialty drug dispensing revenue under ESI-administered commercial plans, confirming that many plan members fill prescriptions for specialty medications at pharmacies other than Accredo. *Id.* ¶ 184.

Like ESI, Accredo also provides services to TRICARE. During the competitive bidding process for TPharm5, DoD's RFP expressly required prospective PBM contractors to explain how they would deliver specialty pharmacy services as part of their proposals. *See* TPharm5 RFP §§ C.4, L.5.7.1. TPharm5, in turn, sets out a process for implementing specialty pharmacy services as part of the TRICARE Pharmacy Benefits Program. In accordance with that process, ESI "designated," and the government "approved," a mail-order pharmacy to "dispense specialty [drugs]" to TRICARE beneficiaries. TPharm5 § C.6.1. As the Complaint recognizes, Accredo has been approved by the government as the exclusive mail-order specialty pharmacy for TRICARE beneficiaries. Compl. ¶¶ 185–186.

The government's designation of Accredo as TRICARE's exclusive mail-order specialty pharmacy makes it the sole conduit through which beneficiaries can obtain long-term specialty medications by mail. For example, under the TRICARE statute, beneficiaries are required "to

7

refill non-generic prescription maintenance medications through military treatment facility pharmacies or the national mail-order pharmacy program." 10 U.S.C. § 1074g(a)(9)(A). In other words, Congress has expressly prohibited TRICARE beneficiaries from refilling prescriptions for long-term specialty medications at any pharmacy other than a military treatment facility *or* through Accredo. This requirement is not arbitrary: As DoD has explained, it results in "significant savings to the government by shifting a portion of TRICARE prescription refills to the mail order program or military treatment facility pharmacies," and "significant savings to TRICARE beneficiaries" in their potential copayments. 80 Fed. Reg. 46,796, 46,797 (Aug. 6, 2015). Even so, the statute permits TRICARE beneficiaries to refill *non-maintenance* specialty medications at any retail pharmacy that stocks them. *See id.*

### C.     The Complaint

Seven Plaintiffs—Kimberly Wolf, Valerie Dellorto, Melissa Arredondo, Robin Betz, Nathan Clymer (also representing his minor child P.C.), Shay Jarm, and Heather Lisser—allege that they have employer-sponsored health insurance plans where ESI is the PBM and Accredo is the "exclusive in-network specialty pharmacy." Compl. ¶¶ 27–35, 181, 208–314. Two other Plaintiffs—Jennifer Bellucci (also representing her minor children A.J.B., A.E.B., and A.O.B.) and Amy King—allege that they have pharmacy benefits through TRICARE, which Plaintiffs allege makes "Accredo … the only option reasonably available to patients who do not live on or in the immediate vicinity of a military base." *Id.* ¶¶ 30, 34, 186, 315–334.

Plaintiffs reside in California, Illinois, Pennsylvania, Texas, Virginia, and Wisconsin. Compl. ¶¶ 27–35. The Complaint does not allege that any nonresident Plaintiffs received services in Illinois or that the customer service issues they allege are connected in any way with conduct occurring in Illinois.

8

Plaintiffs assert claims on behalf of the following putative classes and subclasses: a nationwide Private Insurance Statutory Claims Class, California and Illinois Private Insurance Subclasses, a nationwide TRICARE class, and a nationwide Accredo Common Law Claims Class. Compl. ¶¶ 336–343. Plaintiffs assert their statutory claims against all Defendants and their common-law claims only against Accredo.

Plaintiffs allege that Accredo has provided deficient specialty pharmacy services, including by delaying the delivery of Plaintiffs' medications, failing to promptly resolve billing and authorization issues, and providing ineffective customer service. Compl. ¶¶ 12–14, 67–135, 136–143. Plaintiffs allege that many of the delays they complain about arose from coverage and prior-authorization requirements imposed by third-party payors, including instances where prescriptions could not be dispensed until required approvals were obtained. *Id.* ¶¶ 213, 217, 237, 252, 270, 278, 286, 292, 294, 310.

Against this backdrop, Plaintiffs bring federal antitrust claims under Sections 1 and 2 of the Sherman Act against all Defendants on behalf of the various putative classes. At the center of each claim is Plaintiffs' frustration that "[p]atients have no input into whether their insurer or plan sponsor contracts with Express Scripts or Accredo, and they have no power to require additional in-network specialty pharmacy options or that a prescribed medication not be designated as a specialty drug." Compl. ¶ 189. Across all claims, Plaintiffs' allegations focus almost completely on ESI and Accredo. The Complaint's few allegations about Evernorth and Cigna largely concern their alleged "oversight" role. Compl. ¶ 360. For example, Plaintiffs allege that "Defendants share senior leadership who collaborate at multiple levels of Cigna's corporate structure," and that this leadership is purportedly "responsible for integrating the activities of Accredo, Express Scripts, and Evernorth into a coherent business strategy directed from the highest levels of Cigna's executive leadership for the benefit of Cigna and its shareholders." *Id.*

¶ 44; *see also id.* ¶¶ 167–168. Plaintiffs do not allege that Evernorth or Cigna provide PBM services or specialty pharmacy services.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the Complaint "must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020). Meanwhile, under Rule 12(b)(2), although the Complaint need not "include facts alleging personal jurisdiction," once it has been contested, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003). A motion to strike class allegations should be granted when it is "apparent from the complaint that the class allegations are 'facially and inherently deficient' and therefore class certification is inappropriate." *Huddleston v. Am. Airlines, Inc.*, 2018 WL 4742097, at *2 (N.D. Ill. Oct. 2, 2018).

## ARGUMENT

### I. PLAINTIFFS' CLAIM UNDER SECTION 1 OF THE SHERMAN ACT (COUNT I) FAILS

Plaintiffs allege that Evernorth, ESI, and Accredo have entered contracts with plan sponsors and insurers that violate Section 1 of the Sherman Act. *See, e.g.*, Compl. ¶¶ 189, 194, 368. To state a Section 1 claim, a plaintiff must allege "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012). Although "every contract is a restraint of trade" in some sense, the Sherman Act only bars agreements that *unreasonably* restrain trade. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984); *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021). To make that determination, courts primarily rely on two frameworks—the *per se* rule and the rule

10

of reason. *Agnew*, 683 F.3d at 335. Plaintiffs' Complaint fails to state a claim under either framework.

### A.      Plaintiffs' *Per Se* Tying Claim Fails

Plaintiffs' allegations fail to state any *per se* claim. The *per se* rule applies only to a small subset of restraints considered "so plainly anticompetitive" that they "qualify as illegal *per se*" and can be "conclusively presumed illegal" without showing evidence of anticompetitive effects in a relevant market. *Fourqurean v. NCAA*, 143 F.4th 859, 867 (7th Cir. 2025). Plaintiffs refer to "*per se* illegal tying" in their Complaint. Compl. ¶ 369. To plead a *per se* tying claim, "a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006).

Here, Plaintiffs do not—and cannot—sufficiently plead any of these elements.

### 1.      Plaintiffs do not plausibly allege a tying arrangement

Despite repeatedly using the term, *see* Compl. ¶¶ 1, 365, 369, Plaintiffs do not allege any conduct actually constituting a "tie." Under the antitrust laws, a "tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–462 (1992). The "essential" feature is "the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (emphasis added). Thus, to state a tying claim, a plaintiff must plausibly allege that (1) there are two distinct products—a "tying" product and a "tied" product—and (2) customers were forced to purchase the tied product as a condition of

11

obtaining the tying product. *See, e.g.*, *Robinson v. HP, Inc.*, 2025 WL 2802077, at *5 (N.D. Ill. Sept. 30, 2025); *Lazarou v. Am. Bd. of Psychiatry & Neurology*, 2023 WL 6461255, at *8 (N.D. Ill. Oct. 4, 2023). Plaintiffs' tying claim fails on both grounds.

*First*, the alleged "tie" does not involve two separate products but instead challenges features of a single integrated product. To the extent it can be discerned from the Complaint, the alleged "tying" product is "PBM services." Compl. ¶ 1. According to Plaintiffs, Defendants refuse to provide "PBM services" unless the plan sponsor agrees to use a specialty pharmacy network where Accredo is the only covered pharmacy. *Id*. But Plaintiffs defeat their own claim by repeatedly alleging that "PBM services" include providing clients with pharmacy networks that PBMs "create and maintain," including "specialty pharmacy networks." *Id.* ¶ 179 ("As part of the PBM services Express Scripts and Evernorth provide their clients they create and maintain pharmacy networks, including specialty pharmacy networks that define the pharmacies at which patients may use their insurance benefits to obtain specialty drugs."); *see also id.* ¶ 146 ("PBMs provide services including … pharmacy networks"); *id.* ¶ 160 (defining PBM services to "include creating and managing formularies, specialty drug lists, and pharmacy networks"); *id.* ¶ 173 ("PBM services [include] negotiating rebates, managing formularies, and/or maintaining pharmacy networks"). In other words, Plaintiffs admit that plans sponsors are not *forced* to use a pharmacy network as a condition of buying *other* "PBM services"; rather, pharmacy networks are an *integral feature* of the PBM services that plan sponsors obtain from PBMs.

Nor do Plaintiffs allege distinct demand for specialty pharmacy networks separate and apart from demand for "PBM services." An unlawful tie can occur "only where there is a sufficient demand for the purchase of the tied product separate from the tying product." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022) (brackets and quotation marks omitted). According to the allegations in the Complaint, plan sponsors select PBMs and specialty

pharmacy networks together. Compl. ¶ 364; *see also* TPharm5 RFP § M.4.6.1 (scoring PBM bidders on the specialty pharmacy network that the PBM proposes to include in its TRICARE bid). Plaintiffs repeatedly admit that ESI competes with other large and small PBMs to provide "PBM services" to plan sponsors, and that an important component of those "PBM services" is "creat[ing] and maintain[ing]" pharmacy networks that meet clients' needs. Compl. ¶¶ 146, 160, 173, 178, 179. And Plaintiffs allege no facts that would reasonably support disaggregating demand for "PBM services" from demand for the "pharmacy network services" offered by a PBM. Even if PBM services could be disaggregated, Plaintiffs allege no facts suggesting that demand is driven by some particular PBM services and not others. Plan sponsors may choose ESI as their PBM *because* ESI offers an Accredo-only specialty pharmacy network that suits their needs, and the Complaint does not allege otherwise.

Courts have repeatedly rejected efforts to split an integrated health insurance offering into separate products. In *Prime Aid Pharmacy Corp. v. Humana Inc.*, for example, the court expressly rejected the separate markets proposed here because "specialty pharmacy services are not [a distinct] aftermarket to the market for health insurance plans. Rather, the two are contracted for together when a patient [or plan sponsor] chooses a particular plan." 2017 WL 3420933, at *2 (D.N.J. Aug. 9, 2017). Similarly, in *Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau*, the Ninth Circuit rejected the notion that "the pharmacy benefit and the restrictions on the sources from which drugs can be purchased" are separate products, explaining that "purchase of drugs in the required manner was the consummation of the pharmacy benefit, not an unwanted and unnecessary product tied to the desired product." 701 F.2d 1276, 1289–1290 (9th Cir. 1983). The same reasoning applies here, where Plaintiffs admit that specialty pharmacy services are contracted for together with other PBM services. Compl. ¶ 364.

13

*Second*, even if Plaintiffs had plausibly alleged two distinct products, the Complaint would still fail to allege an unlawful tie because, as Plaintiffs admit, ESI's clients are not forced to use Accredo-only networks to obtain other ESI services. Plaintiffs' theory is that the *only* specialty pharmacy network offered by ESI is an exclusive Accredo network. Yet, according to the Complaint, Accredo has only a 70% share of the specialty pharmacy market for *plans administered by ESI. Compare* Compl. ¶ 181, *with id.* ¶ 184. It cannot be true that ESI *forces* plan sponsors to use Accredo as their exclusive specialty pharmacy as a condition of providing other unspecified PBM services and yet many members of the plans administered by ESI use their insurance to fill prescriptions at other specialty pharmacies.

### 2. Plaintiffs have not alleged market power in any tying market

Plaintiffs tying claim separately fails because they do not plausibly allege Defendants have "market power in the tying product." *Ill. Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 46 (2006). "The purpose of the rule against certain tying arrangements is to stop the extension of market power from one product to another," which is "impossible unless the seller has substantial market power." *Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 671 (7th Cir. 1985). The tying product—here, presumably "PBM services," Compl. ¶ 1—must exclude the tied product: specialty pharmacy networks. *See Siva*, 38 F.4th at 575. But Plaintiffs have not alleged that any PBM sells PBM services *without* pharmacy networks and have not alleged that Defendants have substantial market power in any such market for "PBM services other than creating and maintaining pharmacy networks." For that reason alone, the tying claim fails.

### 3. Plaintiffs fail to allege a substantial effect on interstate commerce

To state a *per se* claim, Plaintiffs must also show that "a not insubstantial amount of interstate commerce is affected" by the alleged tie. *Reifert*, 450 F.3d at 316. Here, Plaintiffs have not even clearly alleged what the tied product is, much less identified who the competitors in that

14

market are, or what portion of commerce in that market is impacted by the alleged tie. To the extent that the tied market is specialty pharmacy networks, Plaintiffs fail to allege anything at all about the specialty pharmacy networks offered by ESI's competitors. They have thus necessarily failed to plausibly allege that the tie precludes "a substantial volume of commerce" in any market. *Id.* at 317.

### 4. Plaintiffs lack antitrust standing to assert their tying claim

Plaintiffs' tying claim fails for the independent reason that they lack antitrust standing to bring that claim. "[O]nly those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995). For tying claims, courts have recognized that only "victims who purchase both the tied and tying product" fit this bill "because only those victims experience the 'lack of choice' that tying arrangements induce." *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 162 F.4th 1268, 1277 (10th Cir. 2025); *see also, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 802 (N.D. Ill. 2019).

As Plaintiffs repeatedly acknowledge, they have no role in choosing a PBM or choosing a covered specialty pharmacy network. *See, e.g.*, Compl. ¶¶ 172, 181, 189, 196, 210, 244, 262, 304, 316, 361. At most, they are passive beneficiaries of arrangements negotiated by plan sponsors and insurers. That disconnect is reflected throughout the Complaint, which repeatedly alleges the supposed terms and mechanics of the alleged tie "on information and belief"—a telltale sign that Plaintiffs lack firsthand knowledge of any purported tie and are the wrong parties to bring this suit. *Id.* ¶¶ 175, 180, 183, 187, 206, 388, 443. Plaintiffs' lack of antitrust standing separately requires dismissal of any tying claim.

15

**B.      Plaintiffs Have Not Plausibly Alleged a Claim Under the Rule of Reason**

Plaintiffs' Section 1 claim fares no better under the rule of reason. First, to the extent Plaintiffs allege a rule-of-reason tie, that claim fails for the same reasons as their *per se* tying claim. *Supra* Section I.A; *see Siva v. Am. Bd. of Radiology*, 512 F. Supp. 3d 864, 868 (N.D. Ill. 2021), ("[U]nder either the *per se* rule or the rule of reason, the plaintiff must establish that a tie exists between two separate products."), *aff'd*, 38 F.4th 569 (7th Cir. 2022); *Car Carriers, Inc. v. Ford Motor Co.*, 561 F. Supp. 885, 887 (N.D. Ill. 1983) ("[Antitrust] standing is a threshold requirement that must be met, regardless of whether the substantive antitrust claim is grounded on a *per se* or rule of reason theory."), *aff'd*, 745 F.2d 1101 (7th Cir. 1984). Second, to the extent Plaintiffs allege a rule-of-reason claim beyond tying—and it is unclear they do—any such claim would necessarily fail because they have not identified a cognizable antitrust market. A plaintiff's "threshold burden under the Rule of Reason analysis involves the showing of a precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects." *Agnew*, 683 F.3d at 337. "Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (brackets omitted). "A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020).

Plaintiffs make no attempt to identify the impacted market in Count I.[2] They object that the prescription drug benefit offered by their employers restricts coverage for out-of-network

---

[2] To the extent Plaintiffs argue that Count I incorporates the markets alleged in Counts II, III, VI, or VII, despite failing to identify those markets in Count I, those markets fail for the reasons explained below in Section II.A.

16

providers. *See* Compl. ¶¶ 152, 179, 361. And they make the conclusory allegation that "Express Scripts and Evernorth have market power over Plaintiffs." Compl. ¶ 363. But they identify no product that either company even *sells* to Plaintiffs, and no mechanism through which market power could be asserted over Plaintiffs. The Complaint says nothing at all about the scope of the "market" in which Defendants purportedly have "power over Plaintiffs," *id.*, the participants in that market, or the lack of reasonably interchangeable alternatives for the products over which ESI and Evernorth supposedly have market power. *Cf. Sharif*, 950 F.3d at 916–918.

In short, Count I of the Complaint fails to identify any relevant market, and without a market definition, any rule-of-reason claim must fail. *See Am. Express*, 585 U.S. at 543.

## II.   PLAINTIFFS' SECTION 2 CLAIMS (COUNTS II, III, VI, AND VII) FAIL

Plaintiffs also cannot state a claim under Section 2 of the Sherman Act.[3] To state a monopolization claim under Section 2, a plaintiff must plausibly allege two elements: "(1) 'the possession of monopoly power in the relevant market' and (2) 'the willful acquisition or maintenance of that power' through exclusionary conduct." *United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025). To state an attempted monopolization claim under Section 2, a plaintiff must plausibly allege three elements: "(1) specific intent to monopolize, (2) exclusionary conduct directed to accomplishing this purpose, and (3) a dangerous probability of achieving monopoly power." *Id*. Plaintiffs fail to state a claim for monopolization or attempted monopolization.

---

[3] Plaintiffs do not assert a Section 2 claim based on alleged tying, but any such claim would fail for the reasons already explained. *Supra* Section I.A; *see Robinson*, 2025 WL 2802077, at *8 (dismissing Section 2 claim because "plaintiffs have not plausibly alleged a tying arrangement").

A. **Plaintiffs Fail to Plausibly Allege a Relevant Product Market**

"A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif*, 950 F.3d at 916. The purpose of market definition is to identify "the area of effective competition." *Fourqurean*, 143 F.4th at 869; *see also Am. Express*, 585 U.S. at 543.

Plaintiffs' Section 2 claims are based on two purported "aftermarkets": (1) "the Express Scripts specialty pharmacy commercial aftermarket" and (2) "the Express Scripts specialty pharmacy TRICARE aftermarket." Compl. ¶¶ 383, 434. An aftermarket is a product market in which "demand depends entirely or substantially on the demand for some other product" in a foremarket. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 564a (Supp. 2025). Here, Plaintiffs allege that the prior choice by plan sponsors, insurers, or the federal government in a foremarket—that is, the decision regarding which PBM to use and which specialty pharmacies to include in-network—results in an ESI-only aftermarket for specialty pharmacy services.

Plaintiffs' alleged aftermarkets fail. As the Seventh Circuit has held, a firm cannot have "monopoly power in its own product, absent proof that the product itself has no economic substitutes." *Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997). "When a complaint limits the relevant market to a 'single brand, franchise, institution, or comparable entity that competes with potential substitutes,'" courts in this district "dismiss the complaint unless [it] contains sufficient factual allegations that make it plausible there is no substitute." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *4 (N.D. Ill. Aug. 29, 2013). Here, Plaintiffs allege nothing "unique and non-interchangeable" about the specialty pharmacy services they receive from Accredo. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 439 (3d Cir. 1997). They allege the opposite—that "most" pharmacies can dispense the same drugs and that other specialty pharmacies compete with Accredo. Compl. ¶ 155. Plaintiffs also admit

18

that ESI competes with other PBMs to provide "PBM services" to plan sponsors and insurers, *id.* ¶ 144, so any aftermarket limited to ESI's specialty pharmacy network is improperly defined.

Courts routinely reject similar attempts to gerrymander single-brand product markets. *See, e.g.*, *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 936 (7th Cir. 2025) (explaining that "[c]onsumer preference for a particular brand is not sufficient to plausibly allege a single-brand market absent significant differences in product design or quality" when rejecting Plaintiffs' narrow market); *Brandywine Hosp., LLC, v. CVS Health Corp.*, 2026 WL 607526, at *13 (E.D. Pa. Mar. 3, 2026) (rejecting market limited to certain "services for CVS pharmacies"). This Court should reject Plaintiffs' attempt to contrive an ESI-specific aftermarket here.

Plaintiffs' proposed aftermarkets fail for the additional reason that Plaintiffs have not plausibly alleged that specialty pharmacy services are *aftermarkets* to any market for PBM services. Plaintiffs admit that a core feature of PBM services is the creation and maintenance of pharmacy networks and that when a plan sponsor selects a PBM, it selects the specialty pharmacy network at the same time. *See* Compl. ¶¶ 146, 152, 172, 178–181, 364. According to Plaintiffs, Defendants' contracts with plan sponsors, insurers, and the federal government, which purportedly require the use of Accredo, define an aftermarket for specialty pharmacy services because they limit how Plaintiffs can use their prescription drug benefits. *See, e.g.*, *id.* ¶¶ 376, 382–383, 434. Black-letter antitrust law, however, forbids this approach to defining markets—for good reason.

"A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." *Queen City Pizza*, 124 F.3d at 438. Any other rule would convert every "exclusive dealing arrangement, output or requirement

19

contract, or … tying agreement" into a relevant market. *Id.* at 438; *see also McLaughlin Equip. Co. v. Servaas*, 2004 WL 1629603, at *19–20 (S.D. Ind. Feb. 18, 2004) (rejecting notion that a "contractual restraint can by itself define a relevant product market"). As the Seventh Circuit has explained, the ramifications of such an approach would be sweeping:

> [E]xclusive restaurants could no longer require customers to purchase their wines only at the establishment, because the restaurant would be "monopolizing" the sale of wine within its interior. Movie theaters, which traditionally (and notoriously) earn a substantial portion of their revenue from the sales of candies, popcorn, and soda, would be required by the antitrust laws to allow patrons to bring their own food.

*Elliott*, 126 F.3d at 1005.

Unsurprisingly, courts regularly dismiss antitrust complaints alleging that contracts define downstream markets. For example, a stadium's "policy" that prohibits outside food does not create a relevant market for food concessions at the stadium, *see Elliott*, 126 F.3d at 1003–1004; a franchise contract that gives the power to the franchisor to select ingredients the franchisee can use does not create a relevant market centered on ingredients for those franchisees, *Queen City Pizza*, 124 F.3d at 438–439; and a university's requirement that incoming students purchase housing from the university does not create a relevant market for housing for that university's students, *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000). The Court should do the same here.

Finally, Plaintiffs fail to allege that plan sponsors were unaware of the specialty pharmacy networks allegedly included in their PBM contracts and cannot rely on *Kodak* to support their aftermarkets. In *Kodak*, the Supreme Court held that plaintiffs could proceed on an antitrust claim based on a single-brand aftermarket for Kodak-specific service and parts. 504 U.S. at 481. Critical to that holding, however, was the Court's recognition that customers were subject to *unanticipated* and unavoidable lock-in: They had made substantial investments in

20

Kodak equipment *without prior notice* of Kodak's restrictive aftermarket policies and, once those policies were imposed, faced prohibitive switching costs that prevented them from turning to alternatives. *Id.* at 473. Under *Kodak*, to plead a single-brand aftermarket, a plaintiff must allege that the *purchaser* of the product in the foremarket was unable to access information regarding restrictions or limitations in the aftermarket and faced significant switching costs to competitors' products in the foremarket after the initial purchase. *Harley-Davidson*, 151 F.4th at 926. Here, both of Plaintiffs' alleged aftermarkets flunk this requirement.

As to the commercial aftermarket, the Complaint expressly acknowledges that their employers or plan sponsors decide which PBM to use and which pharmacies to include in-network. *E.g.*, Compl. ¶¶ 21, 189, 360–361, 364. As to the TRICARE aftermarket, the federal government selects a PBM through a competitive bidding process, *see* 41 U.S.C. § 3301(a), and after assessing which providers would "provide the best value to the United States to the maximum extent consistent with furnishing high-quality health care in a manner that protects the fiscal and other interests of the United States," 10 U.S.C. § 1073a(a). *See generally* 10 U.S.C. § 1074g; 32 C.F.R. § 199.21. The Complaint nowhere alleges that plan sponsors, including the federal government, were unaware of which pharmacy networks were included in the PBM services they chose to obtain from ESI. To the contrary, the Complaint *expressly* alleges that an Accredo-only specialty pharmacy network is specified in the contracts the plan sponsors sign with ESI. Compl. ¶ 181; *see Harley-Davidson*, 151 F.4th at 936 (rejecting aftermarket where information regarding aftermarket restrictions were "available to [the purchaser] at the time [of] purchase").

Because Plaintiffs do not define a relevant market, they have not plausibly alleged monopolization or attempted monopolization, and Plaintiffs' Section 2 claims must be dismissed.

21

### B. Plaintiffs Have Not Alleged Exclusionary Conduct

Plaintiffs do not allege any actionable exclusionary conduct, a requirement that is "common to monopolization and attempted monopolization claims." *United Wis.*, 144 F.4th at 980. "Exclusionary conduct is behavior with anticompetitive effect, meaning it reduces competition and thereby harms consumers." *Id*. To adequately allege such conduct, plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive *process*, i.e., to competition itself." *Chicago Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019) (emphasis added).

To start, Plaintiffs fail to allege harm to the competitive process. Plaintiffs complain that as a result of "a web of contracts," "patients with commercial health plans are only able to access their pharmacy benefits when they fill prescriptions from in-network pharmacies, as defined by the PBM used by their insurance plan." Compl. ¶ 376–377. Plaintiffs go on to assert that as health plan members, they have no say in which pharmacy networks their insurance covers or which drugs must be dispensed by specialty pharmacies to be covered by their plan and object that they "cannot easily switch insurance plans." *Id.* ¶ 21, 379. Plaintiffs claim that consequently "all pharmacies capable of dispensing a medication" "do not and cannot compete" for every insured patient's business and that a PBM's inclusion of a single in-network specialty pharmacy is therefore exclusionary. *Id.* ¶¶ 376, 380. But as the court explained in *Prime Aid* when rejecting nearly identical allegations, "[r]estriction[s] to approved providers is inherent to any healthcare plan." 2017 WL 2889677, at *4. And as the Seventh Circuit has long recognized, health plans do not violate the antitrust laws merely by adopting networks of preferred providers. *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1330 (7th Cir. 1986) (describing PPOs and how copayments are "meant to induce patients to stick with the preferred providers," enabling negotiated discounts).

22

In any event, Plaintiffs have also admitted that PBMs like ESI can compete to win plan-sponsor business by offering plan sponsors lower net drug costs and better network terms. *See* Compl. ¶ 163. And to the extent plan sponsors are unhappy with their PBM services, they can and do switch PBMs. *See, e.g.*, *id.* ¶ 245. One of the dimensions on which PBMs compete is by offering attractive pharmacy networks, including mail-order and specialty options. *See id.* ¶¶ 152–153; TPharm5 RFP §§ C.4, L.5.7.1, M.4.6.1. For example, during the competitive bidding process for TPharm5, DoD's RFP expressly required the prospective PBM contractor to include in its response its proposal for specialty pharmacy services. *See* TPharm5 RFP §§ C.4, L.5.7.1. As a result of that process, DoD selected ESI as its PBM along with Accredo as the mail-order specialty pharmacy provider. *See* Compl. ¶¶ 177, 432; *see also* TPharm5 § C.6.1.

As the Seventh Circuit has explained, "competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 411 (7th Cir. 2017); *see also Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*, 41 F.4th 787, 792 (7th Cir. 2022). Plaintiffs may disagree with their plan sponsors' or the government's choices, but that is not sufficient to meet their burden to plausibly allege that Defendants' conduct is the type of "predatory or unjustifiable" conduct prohibited by the federal antitrust laws rather than a form of competition on the merits. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011).

In short, Plaintiffs' allegation that they must use ESI and Accredo to access benefits does not describe exclusionary conduct at all; it describes the services their plan sponsors purchased and the benefit their employer or the federal government decided to offer. If Plaintiffs' theory were accepted, much of the current health insurance market would violate Section 2 of the Sherman Act.

### C.  Plaintiffs Have Not Adequately Pled an Intent to Monopolize

As to the attempted monopolization claims (Counts III and VII), the Complaint does not adequately plead that Defendants possessed the specific intent to monopolize either of the purported aftermarkets. To plead an attempted monopolization claim, it is not enough to allege defendants acted with the intent to "defeat and drive out competitors." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986); *see also Om v. Weathers*, 1992 WL 151553, at *5 (N.D. Ill. June 23, 1992) (allegation that defendants excluded plaintiff from competing in a market was insufficient to establish "an intent to monopolize"). Instead, a plaintiff must plead that the defendants engaged in conduct that was "essentially predatory in nature" with "no legitimate business justification." *Great Escape*, 791 F.2d at 541. Here, however, the Complaint nowhere alleges that Defendants engage in any predatory conduct (i.e., conduct with no legitimate business justification), in either the commercial or TRICARE specialty pharmacy aftermarkets. To the contrary, Plaintiffs themselves acknowledge that the vertically integrated PBM model is designed to generate efficiencies and cost savings through economies of scale, coordination, and utilization controls—concessions that are fundamentally inconsistent with any claim that Defendants' conduct is predatory or lacks a legitimate business justification. Compl. ¶¶ 145–146, 159–165. Thus, Plaintiffs' attempted monopolization must be dismissed.

### III.  PLAINTIFFS' TRICARE CLAIMS (COUNTS VI AND VII) ARE INDEPENDENTLY BARRED BY FEDERAL INSTRUMENTALITY IMMUNITY

The TRICARE-related claims brought by Plaintiffs King and Bellucci (on behalf of her children) are additionally barred by federal instrumentality immunity. As many courts have recognized, a defendant cannot be held liable for antitrust violations "where the complained of acts were specifically directed by the federal government." *Name.Space, Inc. v. Network Sols.,*

24

*Inc.*, 202 F.3d 573, 583 (2d Cir. 2000); *see also Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385, 424 (E.D. Pa. 2008), *aff'd*, 600 F.3d 286 (3d Cir. 2010).

The *Name.Space* and *Byers* decision are instructive. In *Name.Space*, the federal government contracted with a private company, NSI, to run a critical piece of the internet's "domain name system," or "DNS," i.e., the master list that determines which website endings such as ".com" or ".org" are universally recognized. 202 F.3d at 577. After NSI refused to register the plaintiff's proposed endings, the plaintiff sued, alleging that NSI's refusal violated antitrust law. *Id.* at 578–579. The Second Circuit held that NSI was entitled to federal instrumentality immunity because "the conduct being challenged … was compelled by the explicit terms of NSI's agreement with a government agency and by the government's policies regarding the proper administration of the DNS." *Id.* at 582. Similarly, in *Byers*, the district court applied federal instrumentality immunity to dismiss antitrust claims against private companies based on an agreement with the IRS "to restrict the availability of free electronic tax preparation and filing services under the Free File Program." 564 F. Supp. 2d at 426.

The same holds true here. Plaintiffs allege that ESI is "the PBM used by TRICARE," and Accredo is the "sole designated in-network specialty pharmacy" of the TRICARE program. Compl. ¶¶ 19, 455; *see also id.* ¶¶ 176–177, 432. The regulations make clear that Plaintiffs can, in fact, fill covered non-maintenance specialty medications at retail pharmacies and are limited to military treatment facilities and Accredo only for covered specialty *maintenance* medications. *Supra* pp. 7–8. But in any event, the federal government and TPharm5 require TRICARE

25

recipients exclusively to use a specialty mail-order pharmacy. ESI has "designated," and the government has "approved," Accredo to serve in that capacity. TPharm5 § C.6.1.[4]

Similarly, Plaintiffs allege patients are limited to obtaining a 30-day supply of medication if they choose to use an independent pharmacy but are promised a 90-day supply through Accredo. Compl. ¶ 188. They also allege that patients are generally required to pay a higher out-of-pocket cost to obtain the same drug from a pharmacy other than Accredo. *Id.* But these features—the availability of 30-day supplies at retail pharmacies versus 90-day supplies through mail order, and the corresponding differences in beneficiary cost-sharing—are mandated by federal law. 10 U.S.C. § 1074g(a)(6)(A).

Likewise, Plaintiffs allege that ESI "maintains an extensive list of maintenance drugs used to treat chronic conditions, and insureds are required to fill specialty drugs on the list either through home delivery via Accredo or at a military pharmacy." Compl. ¶¶ 186, 438. Yet again, however, Plaintiffs overlook the role of the federal government. Far from a list "maintain[ed]" by ESI and foisted upon its clients, the TRICARE formulary, including the designation of some drugs as specialty drugs, is determined by the federal government. *See* 10 U.S.C. § 1074g(a)(2)(A) ("The pharmacy benefits program shall include a uniform formulary of pharmaceutical agents, which shall assure the availability of pharmaceutical agents in the complete range of therapeutic classes."); TPharm5 § C.4.1 (the federal government will provide "an initial list of pharmaceutical agents" to be considered as specialty drugs to ESI, which is then required to propose "updates to the list … for Government approval"); *see also* TPharm4 § C.8.1.1. And it is the federal government, not Defendants, that has decided that covered

---

[4] Although phrased differently, the prior contract TPharm4 reflected the same basic structure under which DoD approved Accredo as TRICARE's mail-order specialty pharmacy. *See* TPharm4 § C.7.9.2 ("DoD designates specialty mail order pharmacies in which the Contractor has ownership or a financial interest as extensions of the TMOP pharmacy.").

maintenance specialty drugs must be filled either through a military pharmacy or Accredo's mail-order service. 10 U.S.C. § 1074g(a)(9)(A). Accordingly, the benefit design Plaintiffs challenge reflects statutory requirements governing the TRICARE pharmacy program and compliance with a government contract, not discretionary conduct by Defendants. Counts VI and VII must be dismissed.

## IV.    PLAINTIFFS' STATE-LAW CLAIMS FAIL

Plaintiffs assert six state-law theories of liability arising from their dissatisfaction with the service they received from Accredo: alleged violations of the California Unfair Competition Law and the Illinois Consumer Fraud and Deceptive Business Practices Act, negligence, public nuisance, breach of contract, and promissory estoppel. None of the state-law claims have merit, and the claims should all be dismissed. In addition, nonresident Plaintiffs cannot establish personal jurisdiction over Defendants for claims arising outside of Illinois, providing another reason to dismiss their state-law claims.

### A.    Plaintiffs Fail to State a California Unfair Competition Law Claim (Count IV)

Plaintiffs Arredondo and Betz—the two residents of California—fail to state a claim under California's Unfair Competition Law ("UCL"). The UCL prohibits only "unlawful, unfair or fraudulent business act[s] or practice[s]. Cal. Bus. & Prof. Code § 17200; *see also Freeman v. Time, Inc.*, 68 F.3d 285, 288–289 (9th Cir. 1995). The California Plaintiffs' failure to sufficiently plead any of the three UCL prongs dooms their claims.

Plaintiffs' two UCL theories are that (1) Accredo's "promotional materials" falsely advertised "high quality care" that Accredo allegedly did not provide, Compl. ¶ 411, and (2) ESI's alleged restrictions requiring use of Accredo's specialty pharmacy services harmed competition, *id.* ¶ 412. The first theory fails at the outset because the only promotional material

27

that Plaintiffs mention is Accredo's "Patient Bill of Rights." *Id.* ¶ 411. "California courts have held that when the 'unfair competition' underlying a plaintiff's UCL claim consists of a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance." *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1013 (N.D. Cal. 2013). As Plaintiffs acknowledge, however, the Patient Bill of Rights is not an advertisement for services, but rather part of Accredo's Patient Handbook, addressed to "Accredo patient[s]." Compl. ¶ 497. Plaintiffs never allege the Handbook induced them to use Accredo—to the contrary, they allege they had no choice in the matter. *See id.* ¶¶ 21, 248, 262. Nor do Plaintiffs allege they ever read the Handbook or took any action based on it. Without an allegation of reliance, they cannot state a claim for "unfair" or "unlawful" conduct based on the Handbook. *See iPhone Application Litig.*, 6 F. Supp. 3d at 1015–1022.

Plaintiffs' second theory fails for the same reasons as the antitrust claims. When it comes to alleged anticompetitive conduct under the UCL, "unfair" means "conduct that threatens an incipient violation of an antitrust law, … because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns*, *Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186–187 (1999). Such a claim must therefore hew closely to "cognizable antitrust evils." *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668 (2005). A UCL plaintiff who cannot state an antitrust claim must identify an "'unusual' aspect of the alleged conduct that would make that conduct something that violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves." *Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, 2017 WL 679496, at *6 (N.D. Cal. Feb. 21, 2017). Here, Plaintiffs have not plausibly alleged a violation of the antitrust laws—or of their "policy and spirit" and so cannot proceed under the "unfair prong." *Id.*; *see supra* Parts I–III. And the absence of "a predicate antitrust violation" likewise defeats

28

any UCL claim under the "unlawful" prong, which rises or falls with Plaintiffs' antitrust claims. *Sabol v. PayPal Holdings, Inc.*, 2024 WL 3924686, at *4 (N.D. Cal. Aug. 23, 2024); *see also Cal. Crane Sch., Inc. v. Google LLC*, 722 F. Supp. 3d 1026, 1041 (N.D. Cal. 2024); *Loakes v. Wells Fargo Bank, N.A.*, 2016 WL 6666813, at *7 (C.D. Cal. June 27, 2016).

In any event, Plaintiffs lack statutory standing to assert UCL claims because they do not plausibly allege any economic injury. To have standing to sue under the UCL, Plaintiffs must "(1) establish a loss or deprivation of money or property sufficient to qualify as an injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Lagrisola v. N. Am. Fin. Corp.*, 314 Cal. Rptr. 3d 941, 947 (Ct. App. 2023). But the only allegation that approaches an economic injury is Plaintiff Betz's allegation that a $1,331.58 charge was placed on her Accredo account, which turned out to stem from a "billing issue" that could have been resolved by transmitting certain paperwork to Ms. Betz's copay support program. Compl. ¶¶ 265–268. The remainder of Plaintiffs' alleged harms are either unsubstantiated or plainly not cognizable under the UCL. *See* Compl. ¶ 415.

### B. Plaintiffs Fail to State an Illinois Consumer Fraud Claim (Count V)

Plaintiffs Wolf and Dellorto—the two residents of Illinois—assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). To prevail on their ICFA claims, they must plead, among other elements, (1) a deceptive act or unfair practice by defendant and (2) that the plaintiff sustained actual damages. *White v. DaimlerChrysler Corp.*, 368 Ill. App. 3d 278, 283 (App. Ct. 2006). Plaintiffs have not plausibly alleged either element.

*First*, Plaintiffs cannot satisfy the "deceptive act or unfair practice" element of ICFA. Plaintiffs allege a violation of the ICFA solely under the unfair practice prong. To determine whether conduct is unfair, courts look to "(1) whether the practice offends public policy;

29

(2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–418 (Ill. 2002). The only "public policy" allegation in the Complaint is that Plaintiffs were violating the Illinois's 2025 Prescription Drug Affordability Act. *See* Compl. ¶ 421. That statute prohibits PBMs like ESI from reimbursing unaffiliated pharmacies less than affiliated pharmacies for providing the same drug or service. *See* 215 Ill. Comp. Stat. Ann. 5/513b1(f-10). But Plaintiffs identify no violation. And, regardless, the Prescription Drug Affordability Act is limited to "contracts entered into, renewed, or amended on or after January 1, 2026." *Id.* 5/513b1(j). The Complaint thus does not plead that any Defendant violated either that statute or any other "public policy."

Nor have Plaintiffs plausibly alleged any "immoral, unethical, oppressive, or unscrupulous" conduct. The only allegations regarding such conduct are the alleged misrepresentations in the Patient Handbook and alleged anticompetitive conduct requiring Plaintiffs to use Accredo. But both sets of allegations fail for the reasons just discussed with respect to the California Plaintiffs' UCL claims: Plaintiffs do not allege that anything in the Patient Handbook induced them to use Accredo; they allege the opposite—that their health insurance plans imposed that requirement. *See* Compl. ¶¶ 21, 209, 244; *supra* p. 8. And because Plaintiffs have not pled a viable antitrust claim, they cannot plausibly allege anticompetitive conduct as the basis for any unfairness under ICFA. *Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 846–849 (N.D. Ill. 2024). In the absence of either (1) a public policy violation or (2) immoral, unethical, oppressive, or unscrupulous conduct, the Court need not consider whether Plaintiffs' allegations rise to the level of substantial injury. *See Mirabile v. Bank of Am., Nat'l Ass'n*, 2024 WL 1250265, at *9 (N.D. Ill. Mar. 22, 2024).

30

*Second*, Plaintiffs do not allege any economic loss. ICFA "provides remedies for purely economic injuries," *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 402 (App. Ct. 2009), so a plaintiff must "plead that the deceptive or unfair act caused her to suffer … pecuniary loss," *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019), meaning damages that are "calculable and 'measured by the plaintiffs['] loss,'" *Morris*, 392 Ill. App. 3d at 402. Here, Plaintiffs assert "lost money and property" in an entirely conclusory fashion, claiming that they incurred "increased out-of-pocket payments, premium contributions, and the loss of the economic value of specialty drugs and pharmacy benefits for which they paid but did not timely receive." Compl. ¶ 425. But they have alleged no facts to support a specific pecuniary loss—they do not, for example, explain how any specific transaction, premium payment, or out-of-pocket charge was higher than it otherwise would have been. Plaintiffs thus fail to plausibly plead their ICFA claims. *See Benson*, 944 F.3d at 648 (dismissing ICFA claims for failing to explain how their pled damages "corresponds to their alleged harm.").

### C. Plaintiffs Fail to State a Negligence Claim (Count VIII)

In addition to their statutory claims, Plaintiffs allege a litany of common-law claims against Accredo arising under the law of "the states where [they] reside and received services." Compl. ¶ 343. But Plaintiffs fail to adequately plead the required elements of these claims in any of their respective jurisdictions.

In each of their states—California, Illinois, Texas, Pennsylvania, Virginia, and Wisconsin—Plaintiffs must plead that Accredo breached a duty of care owed to them. *See Iseberg v. Gross*, 227 Ill. 2d 78, 86–87 (2007); *Chaconas v. JP Morgan Chase Bank*, 713 F. Supp. 2d 1180, 1186 (S.D. Cal. 2010); *Reason v. Kathryn's Korner Thrift Shop*, 169 A.3d 96, 101 (Pa. Super. 2017); *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794–795 (Tex. 2006) (per curiam); *Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 624 S.E.2d 55, 62 (Va. 2006);

31

*Hamus v. Bank of N.Y. Mellon*, 2011 WL 13266806, at *12 (W.D. Wis. May 13, 2011). Because pharmacies are a highly regulated industry, *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 942 (7th Cir. 2001), courts narrowly construe the duties owed by pharmacies, *see Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 989 (N.D. Cal. 2016); *McKee v. Am. Home Prods., Corp.*, 113 Wash. 2d 701, 720 (1989).

Plaintiffs' negligence claims rest on the assertion that Accredo breached a duty of care by lacking adequate customer service systems and failing to timely deliver medications. Compl. ¶¶ 469–470. As pled, however, the Complaint itself attributes many alleged delays to coverage and authorization requirements imposed by third-party payors—most notably, the need for prior authorization before a prescription may be dispensed. *See, e.g.*, *id.* ¶¶ 213, 217, 237, 252, 270, 278, 286, 292, 294, 310. Courts have recognized that a pharmacy may properly decline to fill a prescription when it knows that a third-party payor will not reimburse the claim, which is typically the case when required authorization is missing. *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 564 (W.D. Pa. 2015). And once a pharmacy advises that it lacks the information necessary to dispense a medication, "the burden shifts to the patient and physician to obtain the missing information and provide it to the pharmacy." *Scholl v. Walgreens Specialty Pharmacy*, LLC, 2025 WL 950866, at *9 (N.D. Okla. Mar. 28, 2025). Because Plaintiffs' own allegations make it equally (if not more) plausible that the third-party payor or doctor, not Accredo, breached any duty owed to the patient by failing to authorize their prescriptions, this claim should be dismissed. *See Barker v. Miller*, 2022 WL 1843211, at *2 (C.D. Cal. Feb. 24, 2022) ("[I]t is simply implausible that this quickly rectified two-day delay was intentional retaliation given the far more obvious alternative explanation that it was simply an accidental oversight."); *see also Hughes v. Nw. Univ.*, 63 F.4th 615, 629 (7th Cir. 2023) ("[S]omething 'more' … is necessary to survive dismissal when there is an obvious alternative explanation that suggests [a

defendant's] conduct falls within the range of reasonable judgments [she] may make based on her experience and expertise.").

### D. Plaintiffs Fail to State a Public Nuisance Claim (Count IX)

Under the laws of Plaintiffs' states, the public nuisance claim fails because Plaintiffs do not plausibly allege that Defendants have engaged in "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B (1979); *see also People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1104 (1997); *Young v. Bryco Arms*, 213 Ill. 2d 433, 441 (2004); *Ricchiuti v. Home Depot, Inc.*, 412 F. Supp. 2d 456, 458–459 (E.D. Pa. 2005); *Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641, 673 (E.D. Wis. 2021), *aff'd sub nom. Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023). Plaintiffs do not allege that Defendants' PBM or specialty pharmacy services constitute a public nuisance. Rather, Plaintiffs "allege that the *manner* in which defendants are operating … creates a public nuisance." *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 904 (7th Cir. 2014). Specifically, Plaintiffs' theory is that Defendants' alleged delays and service failures interfere with the public's collective interest in access to healthcare by burdening shared medical resources, and that this "substantial use of medical resources … makes it more difficult and costly for others to receive care." Compl. ¶ 482. But Plaintiffs offer no allegations that the manner in which Defendants are operating has led to this widespread disruption. Instead, they allege only a handful of incidents stemming from unfortunate lapses in the delivery of medicine. Such individualized service failures, even if assumed to be true, do not plausibly constitute an unreasonable interference with a right common to the general public and therefore cannot support a public nuisance claim.[5]

---

[5] The Texas Plaintiffs' public nuisance claims additionally fail under Texas law because Texas recognizes nuisance as a type of injury rather than a separate cause of action. *See Bolton v. Fisher*, 528 S.W.3d 770 (Tex. App. 2017).

### E. Plaintiffs Fail to State a Breach of Contract Claim (Count X)

Plaintiffs fail to state a claim for breach of contract against Accredo. To make a prima facie case for breach of contract, Plaintiffs must allege, at a minimum, the existence of a valid contract that they can enforce. *See Aisenman v. City & County of San Francisco*, 2005 WL 43497, at *4 (N.D. Cal. Jan. 6, 2005); *Reynolds v. Bank of Am., N.A.*, 2013 WL 1904090, at *3 (N.D. Tex. May 8, 2013); *Jones v. Bank of Am., N.A.*, 2012 WL 405053, at *5 (E.D. Va. Feb. 7, 2012); *Don-Rick, Inc. v. QBE Ams.*, 995 F. Supp. 2d 863, 871 (W.D. Wis. 2014). Here, the "contract" allegedly breached is Accredo's Patient Handbook, which includes a "Patient Bill of Rights." Compl. ¶¶ 491, 494. But that is plainly not a contract between Accredo and Plaintiffs. It is black-letter law that a contract requires the "[m]anifestation of mutual assent to an exchange," which "requires that each party either make a promise or begin or render a performance." Restatement (Second) of Contracts § 18 (1981). As noted, the Handbook is addressed to "Accredo patient[s]," *id.* ¶ 497, and Plaintiffs do not allege that the Handbook was a promise rendered in advance of their becoming Accredo patients, *see id.* ¶¶ 21, 248, 262. Indeed, Plaintiffs do not even allege that they ever received a copy of the Patient Handbook.

Moreover, courts across jurisdictions have repeatedly declined to recognize documents like the Patient Handbook as enforceable contracts. *See, e.g.*, *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813 (N.D. Cal. 2023). A general policy document like the Handbook, which is "distributed by one party to the other, is not negotiated, does not identify itself as a contract, and is not signed," does not create an enforceable contract. *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 395 (D.D.C. 2020); *see also Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517 (7th Cir. 2022); *Babbitt Muns., Inc. v. Health Care Serv. Corp.*, 64 N.E.3d 1178 (Ill. App. Ct. 2016). Because Plaintiffs fail to allege the existence of an

34

enforceable contract—much less any breach of a binding contractual obligation—their breach-of-contract claim must be dismissed.

## F. Plaintiffs Fail to State a Promissory Estoppel Claim (Count XI)

Although promissory estoppel claims may vary in certain ways across states, in each of their home states, Plaintiffs must plead at least (1) that Accredo made them a promise and (2) that they reasonably and substantially relied on that promise. *See, e.g.*, *Nowaczyk v. Joliet Cath. Acad.*, 2014 WL 3642197, at *3 (N.D. Ill. July 23, 2014); *Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 292 (Tex. App. 2021); *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 901 (2005). As with their contract claim, Plaintiffs point to Accredo's Patient Handbook, which includes the "Patient Bill of Rights." But the language on which Plaintiffs rely is far too indefinite to infer any unambiguous duty. Plaintiffs point to language stating that, among other things, patients "have the right to … [e]xpect timely delivery of service" and "to … [e]xpect [Accredo] to coordinate care with [their] prescriber[s] and other providers." Compl. ¶ 497. While Defendants certainly endeavor to meet these expectations, courts have uniformly recognized that such open-ended language does not provide the kind of definite promise necessary for a promissory estoppel claim. *See, e.g.*, *Doe v. Princeton Univ.*, 790 F. App'x 379, 386 (3d Cir. 2019) (holding that a university's "aspirational" statements regarding "general expectations a student has when attending a university" do not "constitute an enforceable promise that can support a promissory estoppel claim"); *Norris Sales Co. v. Target Div. of Diamant Boart, Inc.*, 2002 WL 31771169, at *5 (E.D. Pa. Dec. 11, 2002) ("At most, these comments are aspirational in nature and do not constitute promises upon which a reasonable person could rely.").

More importantly, Plaintiffs cannot plausibly allege that they relied on the Patient Handbook, much less that any reliance was reasonable or substantial—all of which must be pled to bring a promissory estoppel claim under their states' common law. *See, e.g., Baylor*, 633

35

S.W.3d at 292 (explaining that Plaintiffs must show that they "reasonably and substantially relied on the promise to [their] detriment"). While Plaintiffs allege that they "did and do rely on Accredo's repeated promises in its Patient Handbook," Compl. ¶ 507, "a formulaic recitation of the elements" of promissory estoppel is insufficient to clear their pleading threshold, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And it is contradicted by Plaintiffs' own repeated allegations that they had no choice in selecting Accredo. *See, e.g.*, Compl. ¶¶ 181, 189, 196, 210, 244, 262, 304, 316, 361. Because Plaintiffs cannot plead reasonable and substantial reliance, their promissory estoppel claim fails.

### G. This Court Lacks Personal Jurisdiction over Defendants as to the Non-Illinois State-Law Claims

Deprived of any pendent personal jurisdiction by association with the dismissed federal antitrust claims, the Court must look to "Illinois's long-arm statute to determine whether … Defendants are subject to personal jurisdiction in Illinois." *Batton v. Nat'l Ass'n of Realtors*, 2024 WL 689989, at *11 (N.D. Ill. Feb. 20, 2024); *see also Vanegas v. Signet Builders, Inc.*, 113 F.4th 718, 727 (7th Cir. 2024) (rejecting an argument for pendent personal jurisdiction in the absence of federal claims providing for extraterritorial service). "[T]he Illinois long-arm statute permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause," which authorizes both general and specific personal jurisdiction depending on "[t]he nature of the defendant's contacts with the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 700–701 (7th Cir. 2010). "[F]or personal jurisdiction, … each claim must stand alone," meaning that personal jurisdiction must be established as to each claim asserted by each plaintiff. *Vanegas*, 113 F.4th at 723.

Plaintiffs bear the burden of establishing personal jurisdiction in one of two ways: "general jurisdiction" where a defendant is so "at home" in the forum that a court may adjudicate

36

claims against it even if those claims are unrelated to the forum; and "specific jurisdiction," which permits a court to adjudicate claims against an out-of-state defendant only if "the defendant's suit-related conduct … create[s] a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 283–284 & n.6 (2014); *see also Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("[O]nce the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.").

The Court may exercise general personal jurisdiction over corporations like Defendants only where they are incorporated or have their principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 127, 137 (2014). Plaintiffs themselves admit that Defendants are Delaware corporations with principal places of business outside Illinois. *See* Compl. ¶¶ 36–41.[6]

That leaves specific jurisdiction, which "requires that the suit 'arise out of' or 'be related to' [a defendant's] minimum contacts with the forum state." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997). All Plaintiffs except Ms. Dellorto and Ms. Wolf reside outside Illinois, and their common-law claims in Counts VIII through XI concern services provided by Accredo to Plaintiffs in their home states. Compl. ¶¶ 27–35, 67–135. The Complaint does not plead any facts that would connect the non-Illinois Plaintiffs' common-law claims to any conduct in Illinois. Plaintiffs' UCL claim likewise is limited to Plaintiffs Arredondo and Betz, who reside in California, and the Complaint pleads no facts connecting those Plaintiffs to Illinois. "Because specific personal jurisdiction is based on claims arising out of a defendant's conduct within the forum state, this Court has no jurisdiction over claims based on out-of-state

---

[6] Although Plaintiffs fail to allege these facts with respect to Defendant Evernorth, like ESI, Evernorth is incorporated in Delaware and headquartered in St. Louis, Missouri. The Cigna Group, Annual Report (Form 10-K) at 35 & Ex. 21 (Feb. 27, 2025), https://investors.thecignagroup.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=18230536.

37

consumer fraud laws." *Demedicis v. CVS Health Corp.*, 2017 WL 569157, at *4 (N.D. Ill. Feb. 13, 2017).

Nonresident Plaintiffs' state-law claims should therefore be dismissed for lack of personal jurisdiction.

## V. AT A MINIMUM, THE COURT SHOULD STRIKE PLAINTIFFS' COMMON-LAW CLASS ALLEGATIONS

As this Court has recognized, a motion to strike class allegations should be granted when it is "apparent from the complaint that the class allegations are facially and inherently deficient and therefore class certification is inappropriate." *Huddleston v. Am. Airlines, Inc.*, 2018 WL 4742097, at *2 (N.D. Ill. Oct. 2, 2018) (Wood, J.) (internal quotations omitted). A motion to strike class allegations is evaluated under Federal Rule of Civil Procedure 23, which directs a court to determine "[a]t an early practicable time after a person sues … whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Thus, Plaintiffs' class allegations should be struck if, on their face, they plainly cannot meet Rule 23's requirements.

"Most often, motions to strike are granted when the defendant shows that the underlying class claims either require individualized inquiries, there are substantive variations in the governing law, or both." *Harris v. Rust-Oleum Corp.*, 2022 WL 952743, at *3 (N.D. Ill. Mar. 30, 2022) (Wood, J.); *see also Jones v. BRG Sports, Inc.*, 2019 WL 3554374, at *4 (N.D. Ill. Aug. 1, 2019). Both are true here. Plaintiffs propose a nationwide class that would implicate the common law of all fifty states with respect to Counts VIII–XI. Compl. ¶ 343; *cf. Harris*, 2022 WL 952743, at *4. The Complaint expressly contemplates that each common-law claim would be governed by the law of the state where the plaintiff resides. Compl. ¶ 343. As the Seventh Circuit has emphasized, when "claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012,

1018 (7th Cir. 2002). Although there are some common elements with respect to these claims—and indeed Plaintiffs' own claims fail to plead many of those elements, *supra* Sections IV.A–IV.F—there are material differences among the 50 states that preclude class treatment of any of the putatively "nationwide" common-law claims.

Start with Plaintiffs' negligence claim. "The substance, procedural requirements, and remedies of state tort law—especially with regard to causes of action for negligence and medical malpractice—vary widely from state to state." *Pollard v. GEO Grp., Inc.*, 607 F.3d 583, 597 (9th Cir. 2010), *rev'd on other grounds sub nom. Minneci v. Pollard*, 565 U.S. 118 (2012). In recognition of these state-by-state differences, the Seventh Circuit has admonished that negligence claims are ill-suited for adjudication on a multi-state class basis. *Bridgestone*, 288 F.3d at 1016. This is particularly true here given the complicated state-specific regulatory overlay governing pharmacies.

Plaintiffs' negligence claim is premised on a breach of a duty of reasonable care owed by pharmacies to patients. *See* Compl. ¶¶ 469–471. While Plaintiffs do not identify the duty of care, the court will need to look to state statutes and regulations, including from state boards of pharmacy, for guidance regarding that the standard of care for pharmacists. *See Gabriel*, 124 F. Supp. 3d at 564; *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 435 (Tenn. 1994); *Scholl v. Walgreens Specialty Pharmacy, LLC*, 2025 WL 950866, at *4–5 (N.D. Okla. Mar. 28, 2025). Washington, for example, exempts pharmacies from a duty to deliver when "the prescription cannot be filled due to lack of payment; because the prescription may be fraudulent, erroneous, or incomplete; because of declared emergencies; because the pharmacy lacks specialized equipment or expertise; or when a drug or device is unavailable despite good faith compliance with the Stocking Rule." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1080 (9th Cir. 2015). Adjudication of the negligence claims for this putative nationwide class would require the Court to examine

39

each state's regulatory scheme to assess whether and how the duty of care differs across jurisdictions, thereby making classwide adjudication unruly and impracticable.

In addition, states vary in their statutes of limitations for such tort claims. *Compare, e.g.*, Ky. Rev. Stat. Ann. § 413.140(1)(a) (1 year), *with* D.C. Code § 12-301(a)(3) (3 years). Because negligence claims vary so significantly across state lines, courts in this district have repeatedly held that negligence claims cannot proceed on a nationwide basis. *See, e.g.*, *In re NCAA Student-Athlete Concussion Inj. Litig.*, 314 F.R.D. 580, 595 (N.D. Ill. 2016) ("Because the student-athletes allegedly were injured at their schools (or at another NCAA school if they were at an 'away' game or meet), the Court would have to consider the law of virtually every state and territory in order to evaluate Plaintiffs' claims in these actions.").

The same is true of Plaintiffs' other common-law claims. The elements of public nuisance, for example, vary greatly between states. Some states require that the conduct in question affect "a considerable number of persons," *Dudley v. API Indus., Inc.*, 2025 WL 3769876, at *5 (N.Y. App. Div. Dec. 31, 2025), while others emphasize that "[a] public nuisance may be proved by a few witnesses," *State v. Quality Egg Farm, Inc.*, 104 Wis. 2d 506, 520, 311 N.W.2d 650, 657 (1981). Texas, moreover, does not even recognize nuisance as a distinct cause of action, instead considering it a special type of legal injury applicable in private nuisance claims. *Bolton v. Fisher*, 528 S.W.3d 770, 778 (Tex. Ct. App. 2017). And as with Plaintiffs' negligence claims, the statutes of limitations change across state lines. In Illinois, a plaintiff has five years from an alleged injury to file suit, 735 Ill. Comp. Stat. Ann. 5/13-205, while, in California, nuisance claims are generally subject to a three-year limitations period. Cal. Code Civ. Proc. § 338(b).

Contract law, too, varies by state. As a substantive matter, states differ greatly in the use of extrinsic evidence. "For instance, the Ninth Circuit has noted that '[i]n contrast to many other

40

states, California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous.' Other states, such as Arkansas, allow extrinsic evidence only where there is contractual ambiguity." *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529 (C.D. Cal. 2013) (citations omitted). And, as with negligence and public nuisance, "[t]he statute[s] of limitations for breach of contract are not uniform throughout the United States, and the applicable law of each state defines the applicable period of limitations." *Art Akiane LLC. v. Art & SoulWorks LLC*, 2020 WL 6733681, at *1 n.2 (N.D. Ill. Nov. 5, 2020). *Compare, e.g.*, 735 Ill. Comp. Stat. Ann. 5/13-206 (10 years), *with* Cal. Code Civ. Proc. § 337(a) (4 years).

Finally, the states take different approaches to remedies in promissory estoppel cases. Some states strictly limit recovery to reliance damages, *AgReliant Genetics, LLC v. Gary Hamstra Farms, Inc.*, 213 N.E.3d 1087, 1098 (Ind. Ct. App. 2023), while others also allow courts to award expectation damages or even restitution. *Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constructors, Inc.*, 255 P.3d 286, 289–290 (Nev. 2011). And, like the other common-law claims, promissory estoppel also presents differing statutes of limitations. *Compare, e.g.*, 735 Ill. Comp. Stat. Ann. 5/13-205 (5 years), *with* 10 Del. C. § 8106(a) (3 years).

In the face of this choice-of-law morass, Plaintiffs nonetheless insist that "[a]ny differences among state laws can be addressed through subclasses or jury instructions at class certification or trial." Compl. ¶ 343. That contention fails. At this juncture, Plaintiffs must plead class allegations that, on their face, indicate that class treatment is feasible. "No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3)." *Bridgestone*, 288 F.3d at 1015. When, as here, the Complaint itself acknowledges that multiple bodies of state law apply, and it is apparent those laws differ in material ways, Rule 23's predominance and

41

superiority requirements cannot be satisfied on the face of the pleadings. *Harris*, 2022 WL 952743, at *4–5. Accordingly, Plaintiffs' common law class allegations are facially deficient and should be struck at this early stage.

## VI.     CIGNA AND EVERNORTH SHOULD BE DISMISSED AS DEFENDANTS

Plaintiffs make no allegations of unlawful conduct by Cigna or Evernorth, which should accordingly be dismissed from this action. As detailed above, Plaintiffs' allegations focus almost entirely on the acts of ESI in its capacity as a PBM and Accredo in its provision of mail-order specialty pharmacy services. *See supra* pp. 8–10. By contrast, Plaintiffs' allegations relating to Cigna and Evernorth focus solely on their role as parent companies—Cigna as the parent of Evernorth, which is the parent, in turn, of Accredo and ESI. Compl. ¶¶ 36–37. Plaintiffs repeatedly refer to Evernorth as a party to ESI's contracts, but they plead no facts relating to Evernorth's obligations under those alleged contracts. *See, e.g.*, *id.* ¶¶ 171, 173–174, 176, 178, 209.

To establish the liability of Cigna or Evernorth, Plaintiffs must allege that the "parent compan[ies] mandated an overall business and budgetary strategy and carried that strategy out by [their] own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary." *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, 2012 WL 1886440, at *10 (N.D. Ill. May 22, 2012). Plaintiffs' allegations come nowhere close to meeting this standard. Plaintiffs' claims rest on basic statements describing vertical relationship between Cigna, Evernorth, ESI, and Accredo. *See* Compl. ¶¶ 38, 42–43. From there Plaintiffs conclude that "Defendants share senior leadership who collaborate at multiple levels of Cigna's corporate structure and, as officers of Cigna, are responsible for integrating the activities of Accredo, Express Scripts, and Evernorth into a coherent business strategy directed from the highest levels of Cigna's executive leadership for

42

the benefit of Cigna and its shareholders." *Id.* ¶ 44. But these cursory allegations are insufficient to "point to direct participation" by Cigna or Evernorth in any of the alleged misconduct and do not differentiate either parent company's role from the "normal incident[s] of ownership" and, thus, are insufficient to hold Cigna or Evernorth liable for the alleged conduct of their subsidiaries. *Nathan*, 2012 WL 1886440 at *10.

## VII.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS WITH PREJUDICE

Plaintiffs' claims should be dismissed with prejudice. Although Plaintiffs are generally "give[n] … a chance to amend their complaint," courts in this district have recognized that dismissal with prejudice is warranted when "amendment would be futile." *Irvin v. Exeter Fin. LLC*, 2024 WL 3398348, at *2 (N.D. Ill. July 11, 2024). Plaintiffs' antitrust claims are premised on affirmative choices made by plan sponsors to offer one type of prescription drug benefit rather than another. Additional factual allegations cannot salvage those claims. Plaintiffs' TRICARE-related claims are barred as a matter of law by federal instrumentality immunity. And without their antitrust claims, Plaintiffs have no viable basis for this Court to exercise personal jurisdiction over Defendants as to nonresident Plaintiffs' claims arising under other states' laws. Even as to the Illinois plaintiffs, additional allegations will not render the claims viable. Defendants therefore respectfully ask the Court to dismiss the Complaint with prejudice.

## CONCLUSION

Defendants' Motion to Dismiss and to Strike Class Allegations should be granted.

Dated: March 23, 2026

Respectfully submitted,

*/s/ Jennifer Milici*
Jennifer Milici (D.C. Bar No. 987096)
Kevin Lamb (D.C. Bar No. 1030783)
Susan A. Musser (D.C. Bar No. 1531486)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000 (p)
(202) 663-6363 (f)
Jennifer.Milici@wilmerhale.com
Kevin.Lamb@wilmerhale.com
Susan.Musser@wilmerhale.com

*Counsel for Defendants*

44